**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Jason Hill, | |
| Plaintiff, | |
| v. | Case No: 1:22-cv-06990 |
| DePaul University, | Judge John F. Kness |
| Defendant. | Jury Trial Demanded |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION AND MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY**
**JUDGMENT (DKTS. 78, 79, 80)**

Plaintiff, Dr. Jason Hill ("Dr. Hill" or "Plaintiff"), responds and objects to DePaul's Motion

and Memorandum in Support of its Motion for Summary Judgment, Dkts. 78 – 80 as follows:

## I.      FACTUAL BACKGROUND

### A.  Dr. Hill's Background and Career at DePaul University

Dr. Jason Hill, a tenured professor in the College of Liberal Arts and Sciences, has worked

at DePaul University for 27 years (DSOF ¶5, PSOF ¶1). At all relevant times, Dr. Salma Ghanem,

DePaul's Provost, had overarching authority over various colleges within DePaul, including the

College of Philosophy. (DSOF ¶6, PSOF ¶2). Dr. Salma Ghanem, DePaul's Provost, had authority

over various colleges, including the College of Philosophy, and communicated university policies

to the faculty (*Id.*). Dr. Paeth was a professor of Religious Studies and served as the President of

the Faculty Council in 2019 (DSOF ¶¶7-8, PSOF ¶13).

### B.  The Aftermath of Dr. Hill's Article

On April 16, 2019, Dr. Hill published a pro-Israel Op-Ed in *The Federalist*. (DSOF ¶ 14).

Dr. Hill faced immediate backlash from DePaul's faculty and students for his pro-Israel stance in

the article. (PSOF ¶9).  Dr. Hill testified that after his article was published he faced harassment

and a hostile work environment due to his support for Jewish people, whom he identifies as a race.

(PSOF ¶ 9) He further testified that the provost's actions suggested a Black man should not advocate for the Jewish race and religion. (*Id.*)

On April 23, 2019, email communications between Scott Paeth, Valerie Johnson, and Salma Ghanem discussed how to handle Dr. Hill's Op-Ed, with Ghanem indicating an orchestrated effort to respond. (PSOF ¶10). President Esteban later promoted the civil exchange of ideas, which was contradicted by subsequent actions taken against Dr. Hill. (*Id.*) On April 25, 2019, Scott Paeth published a blog post condemning Dr. Hill's article, further fueling the controversy and setting the stage for the Faculty Council's involvement. (*Id.*)

On April 24, 2019, Resnicoff, a DePaul College of Law Professor, emailed President Esteban to thank him for his statement on academic freedom and to express interest, on behalf of the Center for Jewish Law & Judaic Studies (JLJS), in participating in the upcoming fora. (PSOF ¶¶ 3, 11). Resnicoff felt JLJS's involvement was crucial due to concerns about anti-Israel and anti-Semitic bias on campus and the need for a fair discussion about Professor Hill. (*Id.*) He received no response from President Esteban or anyone else and did not request to be a presenter, only to help ensure a fair process. (*Id.*)

On April 26, 2019, Dr. Hill email Dr. Ghanem for help. He detailed the student protests, safety threats, and a hostile work environment. (PSOF ¶ 12) As the only Black faculty member in an all-white department, he sought administrative help to address these issues. (*Id.*) Dr. Hill testified that he and the office administrator alerted campus security about being stalked and harassed by Islamic individuals in his department, but no protective measures were taken by the university. (*Id.* at ¶¶40, 26)

On May 1, 2019, the Faculty Council voted 21-10 to censure Dr. Hill for his pro-Israel stance, with the resolution led by faculty members including Scott Paeth (PSOF ¶14). Paeth

claimed the resolution aimed to defend Dr. Hill's academic freedom while disagreeing with his article, but there was widespread misunderstanding that the resolution was a formal censure (PSOF ¶¶14). Paeth leaked the proposed resolution to *The DePaulia* before the Faculty Council meeting and later acknowledged the responsibility to clearly distinguish between the council's decisions and his personal views, noting that the faculty handbook had no provision for formal censure (*Id.* at ¶14).

Some professors attempted to speak on behalf of Dr. Hill at the Faculty Council meeting, but Scott Paeth refused to call on them. (*Id.* at ¶15). Professor Michael Miller opposed the censure against Dr. Hill and expressed concerns about the Faculty Council's role in policing faculty speech and op-eds, fearing it would chill free speech and harm the university's reputation (*Id.* at ¶¶15-17). Resnicoff wrote an op-ed piece describing the proposed resolution as containing "ugly, explosive charges" that seemed defamatory to Dr. Hill, especially those accusing the promotion of racism and advocacy for war crimes and ethnic cleansing. (*Id.* at ¶37). He also indicated that accusing a tenured member of an American university of abusing academic freedom is a very strong negative accusation, though he could not determine if it constituted defamation. (*Id.*) Additionally, Gil Gott's email critiqued DePaul's inconsistent application of free speech and academic freedom. (*Id.* at ¶16).

On May 15, 2019, Dr. Ghanem sent a campus-wide email with the subject line: "A message from the Acting Provost on free speech and Vincentian values."[1] (PSOF ¶19). The email, bearing the DePaul University logo and sent from Ghanem's DePaul-issued email account, was distributed to the entire student body and staff. (*Id.*) Dr. Hill testified that this email included a condemnation

---

[1] The court may take judicial notice of public articles. *Travelers Insurance v. Precision Cabinets, Inc.*, 2012 IL App (2d) 110258WC, ¶ 36. https://suburbanchicagoland.com/2019/05/16/depaul-professor-condemned-for-racist-criticism-of-activists/

of him, inciting harm by fostering a hostile atmosphere. The email from the provost expressed being "extremely impressed by the way members of the DePaul community made their voices heard," which Dr. Hill interpreted as support for the violent student demonstrations against him. (*Id.*)[2]

Dr. Hill argued that the university's failure to maintain neutrality, as directed by President Esteban, significantly worsened his situation. Dr. Hill contended that the provost's campus-wide email blast after his censure fanned the flames by exacerbating race-based and anti-Semitic sentiments, encouraging faculty and students to engage in violence, slander, and defamation, which damaged his credibility and contributed to a hostile work environment. Dr. Ghanem's email drafts, which included commentary on her proposed campus-wide email blast, reveal a concerning bias against Dr. Hill. (Pl. Ex. 26). This admission raises serious questions about the impartiality of her actions and suggests that personal bias may have influenced the administration's response to Dr. Hill's protected activities. This evidence strongly supports Dr. Hill's claim that the university's actions were not neutral, but rather motivated by personal and discriminatory factors. Dr. Hill felt demeaned by demands to attend racial sensitivity workshops and receive instruction on the Palestinian-Israeli conflict, despite his expertise. (*Id.* at ¶ 28) He emphasized that this hostile environment impacted his ability to perform his job and harmed his well-being. (*Id.* at ¶ 8)

---

[2] **The Provost & Depaul are Indistiguishable**. Plaintiff Hill has averred that he suffered material adverse employment actions. One of which was by DePaul University (emp. on University). It was in the form of a letter/email sent to every student and member of the faculty, from DePaul University, see (Pl. Ex. 5). We know it came from the University as opposed to a lone wolf, since the email was on DePaul letterhead and signed by the Provost. The appropriate silogy is that the provost is the university and the university is the provost. Plaintiff cites to deposition testimony of the former president of the DePaul Faculty Council (Df. Ex. I – Paeth Dep.). His explanation is as follows: Q. Okay. What is a — What is a provost at a university? A. BY DR PAETH: A provost is the chief academic officer of the university. Q. Okay. And in line from the president of the university, the provost's like third down or somewhere in that area? Q. Okay. But you're aware that Dr. Ghanem sent out an E-mail to all faculty and all students as to Dr. Hill, correct? A. I'm aware that she sent an E-mail. Q. Okay. And you know that E-mail came from the office of the provost, correct? A. Yes. (Df. Ex. I,16:4-10)

4

Later that day, after the provost's email blast, student protests escalated dramatically. Students chanted, "Professor Hill, you can't hide, we know you want genocide, ho, ho, racist prophet's got to go," distributed leaflets, and blocked him from teaching. (*Id.* at ¶¶ 7, 26, 28) Dr. Hill also witnessed members of Students for Justice in Palestine (SJP) acting aggressively toward Jewish students, further intensifying the hostility. (*Id.* at ¶ 7) The situation reached a critical point when students, led by SJP members, took over one of DePaul's campus buildings, continuing their chants and distributing thousands of leaflets portraying Dr. Hill as a racist, Islamophobic, transphobic war criminal, and an advocate of ethnic cleansing and genocide. (*Id.* at ¶¶ 7, 26, 28) Some leaflets ominously stated "Dump Hill," which some interpreted as a threat to "dump his body." (*Id.* at ¶28) As a result, Dr. Hill received death threats and required a campus escort for three weeks. (*Id.*)

Further worsening Hill's situation, flyers and at least one Facebook post invited DePaul's student body and faculty to "celebrate the censure of Dr. Hill" on May 28, 2019. (*Id.* at ¶20) This "censorship dinner" was allegedly sponsored by multiple DePaul colleges, including the philosophy department. (*Id.*) Dr. Hill testified that these departments actively encouraged students to boycott his classes. (*Id.* at ¶30) Dr. Hill criticized the DePaul community for celebrating his censure, arguing that the provost's support of the protests made it impossible for him to effectively perform his job. (PSOF ¶¶ 7, 26)

Despite the clear escalation of hostility and the involvement of SJP members in these actions, DePaul University failed to hold SJP accountable. (*Id.* at ¶39) This lack of accountability not only emboldened SJP but also perpetuated an environment of intimidation and fear. (*Id.* at ¶29) Dr. Hill reported being stalked and harassed within his department, necessitating campus police intervention. (*Id.* at ¶¶26, 40) Although he has not interacted with SJP members since 2019, their

continued presence on campus, coupled with the university's failure to address their actions, leaves Dr. Hill feeling perpetually intimidated and threatened. (*Id.* at ¶¶26, 29) The administration's inaction has effectively allowed SJP to operate without consequence, further exacerbating the hostile environment against Dr. Hill. (*Id.* at ¶¶26-29, 36)

The email exchange involving McNeill, the philosophy department chair in 2019, reveals a targeted effort by DePaul administrators to closely monitor and manage Dr. Hill's classes in response to concerns about student reactions to his op-ed. While the emails may appear neutral, they reflect a significant and deliberate scrutiny focused specifically on Dr. Hill. His decision to move his class to a more secure location was a direct response to the hostility he faced, yet the administration's primary concern was logistical, rather than addressing the underlying issue—the backlash against Dr. Hill's protected speech (Id. at ¶22). The discussion about potentially removing Dr. Hill from his teaching responsibilities, under the pretext of student concerns, indicates a preemptive strategy that ignored his rights as a tenured professor. This behavior suggests that the university prioritized appeasing dissenting students over safeguarding Dr. Hill's academic freedom and safety. The request for confirmation that Dr. Hill's class was "uneventful" further underscores the administration's focus on managing fallout rather than addressing the real issues, bolstering Dr. Hill's claim that he was being set up as a scapegoat (*Id.*). Shortly thereafter, on June 12, 2019, McNeill escalated the situation by emailing a link to Dr. Hill's controversial article to several faculty members, including Acting Provost Ghanem (*Id.* at ¶23). Although McNeill claimed this was to ensure everyone was informed and to express concern for Hill's safety, his actions instead further inflamed tensions, contributing to the ongoing campaign against Dr. Hill (*Id.*).

Matthew Girson, a DePaul University administrator, either created or encouraged the creation of a database documenting allegations against Dr. Hill, claiming he harmed Arab students.

(*Id.* at ¶24) Dr. Hill argued that this database was intended to inform future students, fostering an environment that promoted boycotts of his classes. (*Id.*) Although the database was taken down after the lawsuit was filed, Dr. Hill insists it existed and influenced student behavior. (*Id.*)Dr. Hill further testified that several students informed him their professors advised against taking his classes due to the censure and the database. (*Id.*)

Dr. Matthew Girson circulated an email to attendees of the "DePaul Listens" event, attaching a Joint Statement titled "DePaul University Faculty, Students, and Staff," which condemned Dr. Hill's Op-Ed as offensive, unsubstantiated, uninformed, racist, and violent (Id. at ¶21). The statement supported students who opposed Hill's views and expressed concerns about the impact his words had on those he supervised (*Id.* at ¶¶21-22). Girson encouraged recipients to disseminate the statement to department chairs, program leaders, and student organization advisors to gather a broad list of signatories before graduation, showcasing the organized and unified opposition against Hill's views and further reinforcing the hostile environment he faced (*Id.*).

DePaul University has a policy prohibiting racial discrimination (DSOF ¶4, PSOF ¶5). Isabel Diaz, Director of Employee Relations and Equal Employment Opportunity, oversees complaints of discrimination and harassment and confirmed that DePaul is committed to being anti-discrimination and anti-harassment regarding protected classes. (PSOF ¶ 4). Managers are required to report any discrimination or harassment, and employees can file complaints through her office or a misconduct hotline. (*Id.* at ¶5) However, during the protests against Dr. Hill, Diaz's office did not investigate the reasons behind the protests, nor did they receive any complaints from Dr. Hill about racial discrimination or harassment. (*Id.* at ¶6) Provost Ghanem never contacted Diaz about Hill's safety concerns during this period. (*Id.*) Diaz testified that her office only

investigates if a formal complaint is filed, even if they are aware of racial discrimination on campus. (*Id.*)

DePaul University's encouragement of student protests, systematic shunning by colleagues, and the threat of future discipline have severely chilled Dr. Hill's activities both as a teaching faculty member at DePaul and as a public intellectual. (*Id.* at ¶¶7-8, 18-19, 30, 35-36) Dr. Hill maintains that he has an extensive lecturing record. Dr. Hill stated that his opportunities for earning income outside of DePaul University, through speaking and writing engagements as a public author and commentator, have been diminished due to the controversy surrounding his censure. (*Id.* at ¶31) Specifically, Dr. Hill only received one speaking engagement directly attributed to the controversy, where he was asked to speak about his experiences and anti-Semitism generally. (*Id.*)

Dr. Hill testified that the sharp decline in his class enrollment was directly caused by DePaul University's conduct, including his censure, the provost's rebuke, and a celebratory dinner held by faculty members. (*Id.* at ¶30) He argued that these actions significantly contributed to the drop in student attendance, as his classes previously had higher enrollment. (*Id.*) Hill considers the censure, the provost's letter, and the celebratory dinner as harassment that fueled the hostile work environment at DePaul. (*Id.*) He asserts that the censure, co-sponsored by the Philosophy Department, led to the cancellation of his upper-level classes due to low enrollment, unlike similar classes taught by colleagues. (*Id.*) Hill believes this was a direct result of student boycotts. (*Id.*) In the fall of 2019, he taught only two classes: one, which typically had thirty students, had just eight, and an "Honors" course, usually with twenty students, had only twelve. (*Id.*) Dr. Hill no longer teaches post-graduate students at DePaul despite his requests to do so. (*Id.*)

Before 2019, Dr. Hill felt confident and safe on campus, often holding late office hours to accommodate students. However, after the hostile environment emerged, he was consumed by fear, unable to perform optimally, and suffered a significant blow to his dignity. (PSOF ¶29). He stated, "I'm consumed by a lot of fear, that I'm not exactly in my right mindset to most effectively conduct myself as a professor." (*Id.*) This affected his ability to communicate effectively with students and maintain his high standards. (*Id.*) Now, he teaches online from over 2,000 miles away, feeling safer than on campus. (*Id.*) He no longer feels comfortable at DePaul due to what he perceives as an anti-Semitic environment, which he attributes to the presence of SJP and believes has become part of DePaul's identity. (*Id.*)

Dr. Hill, the only Black faculty member in his department and a pro-Israel advocate, reported being stalked and harassed by Islamic individuals to both Provost Ghanem and Dr. McNeill. (*Id.* at ¶¶12, 26) Despite the severity of these reports, Dr. Hill is unaware of any students facing discipline for boycotting and protesting against him, taking over a building, organizing a censorship dinner, or distributing leaflets calling him a racist. (*Id.* at ¶39) He also knows of no investigation or disciplinary action against faculty involved in the censure resolution or the database targeting him. (*Id.* at ¶40)

Dr. Hill testified that he perceived racial animus in statements and actions directed at him at DePaul University, particularly citing Professor Hofman's remark referring to Jamaica as a "shit hole country." (*Id.* at ¶34) He believed this statement was a racist expression, using Donald Trump as a pretext to reveal her own racial animus against him. (*Id.*) Additionally, Dr. Hill recounted an incident in which a DePaul University employee used the slur "nigger faggot" against him in his online class. (*Id.* at ¶35) He reported the incident to the Dean of Students, who confirmed the employee was removed from the class but did not disclose the employee's role or any

repercussions. (*Id.*) Dr. Hill filed a formal complaint with the provost, but no one from DePaul has followed up on the status of this complaint. (*Id.*)

Dr. Hill testified that no other DePaul faculty members who published controversial work—none of whom were Black or pro-Israel—faced similar repercussions. (*Id.* at ¶¶31-33, 37). Other faculty members faced contentious resolutions, but none were related to Dr. Hill or for being pro-Israel, and all were defeated. (*Id.* at ¶37) These include two light-skinned faculty members, neither of whom took a pro-Israel position. (*Id.*)

## II.    LEGAL STANDARD

Summary judgment is a drastic remedy proper only when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). At summary judgment, courts cannot make credibility determinations or weigh the evidence; these are tasks for a fact finder. See *Joll v. Valparaiso Community Schools*, 2020 WL 1316688, at 4 (7th Cir. 2020). Summary judgment may be inappropriate even when parties agree on basic facts but disagree on the inferences to be drawn from these facts. See *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).

The Seventh Circuit applies heightened scrutiny to summary judgment motions in employment discrimination cases due to the involvement of intent and credibility issues. See *Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000); *EEOC v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 739 (N.D. Ill. 2012). Plaintiff's oral testimony alone can suffice

to establish a genuine issue of material fact. *Randolph v. Indiana Regional Council of Carpenters*, 453 F.3d 413 (7th Cir. 2006); *Brooks v. Edmonds*, 2023 WL 1811237, at 6 (N.D.Ala., 2023). The plaintiff need not prove his case at summary judgment but must present some facts that could entitle him to judgment. *Belour v. Adapt of Ill., Inc.*, 460 F.Supp.2d 867, 873 (N.D. Ill. 2006).

## III.    ARGUMENT

The pending claims in Dr. Hill's complaint fall under 42 U.S.C. §1981 (Counts II and III) and 42 U.S.C. § 2000e-3(a) (Count IV) [Doc. 1, ¶¶ 5, 44–62; 71–74]. Section 1981 prohibits racial discrimination in the making, performance, and termination of contracts, including employment contracts. This statute covers race-based employment discrimination. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987). Title VII similarly prohibits intentional discrimination in employment based on race and extends to all aspects of employment, not just tangible terms and conditions. See *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Genuine issues of material fact exist regarding DePaul's failure to protect Dr. Hill from a racially hostile environment and the subsequent retaliation he faced. Dr. Hill's Title VII and §1981 claims can be analyzed together, as courts apply the same standard for discrimination and retaliation under both statutes. See *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).

In employment discrimination and retaliation cases, the Seventh Circuit has eliminated the distinction between "direct" and "indirect" evidence. Courts are now instructed to consider all the evidence in the record to determine whether a causal link exists between the protected activity and the adverse action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765. The key question under either method is whether a reasonable trier of fact could infer retaliation. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564. Under the *Ortiz* framework, the court must evaluate all evidence holistically to determine if a reasonable jury could conclude that Dr. Hill suffered an adverse employment action

due to a prohibited factor, ensuring the entire context is considered rather than relying solely on the traditional burden-shifting method.

## A. §1981 RACIAL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT FOR BEING BLACK AND TAKING A PRO-ISRAEL STANCE (COUNT II)

To prove discrimination under §1981 (Count II), Dr. Hill must demonstrate that he belongs to a protected class, met DePaul's legitimate expectations, suffered an adverse employment action, and that a similarly situated employee outside the protected class received better treatment. He can also claim retaliation for advocating for others in a protected class. The evidence must show that racial discrimination was the but-for cause of the adverse action. See *Comcast Corp. v. Nat'l Ass'n of African Am. Owned Media*, 140 S. Ct. 1009, 1019 (2020).

### 1. Dr. Hill engaged in protected activity.

As an African American whose grandmother was Jewish, Dr. Hill faced racial harassment and retaliation due to his support of the Jewish race and his identity as a Black man. (PSOF ¶40). He engaged in protected activity by publishing an op-ed in support of Israel, which is protected under 42 U.S.C. §2000e–3. See *Humphries*, 474 F. 3d at 403; *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (protected activity includes complaining about harassment).

### 2. A Material Question of Fact Exists Whether Dr. Hill Suffered an Adverse Employment Action

The parties dispute whether Dr. Hill's claims constitute adverse actions. Defendant's narrow interpretation ignores the broader legal standards. An adverse action includes any employer conduct that might deter a reasonable person from opposing unlawful employment practices under Title VII or § 1981, even if the actions are not drastic. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–69 (2006). Significant changes in job responsibilities, such as diminished duties or failure to investigate complaints, can also constitute adverse actions *Crady v. Liberty*

*Nat'l Bank & Trust Co.*, 993 F.2d 132, 136, 7th Cir.1993; *Lavalais v. Melrose Park*, 734 F.3d 629, 7th Cir. 2013.

Dr. Hill asserts several adverse actions, including: 1) harassment by DePaul faculty, such as the censure for publishing his article; 2) the philosophy department's meeting to censure him; 3) being censured by a resolution; 4) distribution of flyers promoting a celebratory dinner about the censure; 5) denial of due process during the censure process; 6) DePaul's failure to protect him from student harassment, including a 2019 protest; 7) death threats; 8) lack of investigation into these threats; 9) issues raised by his department chair about students being unable to reach him; and 10) Hoffman's "shit-hole country" email (DSOF ¶¶ 20-26). DePaul acknowledges multiple claims but addresses only three, effectively waiving its argument regarding the adverse actions it failed to analyze. *Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived . . . .").

### a) DePaul University's Failure to Address Racially Charged Threats

Failure to address racially charged threats can constitute an adverse action if the uncorrected action is significant enough. The Seventh Circuit has not specifically addressed whether failure to investigate qualifies as an adverse action, but other circuits provide guidance. For example, the Second and Tenth Circuits have held that failure to investigate a complaint does not constitute an adverse action unless it leads to demonstrable harm. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640–41 (10th Cir. 2012); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010). Notably, the Second Circuit left open the possibility that failure

to investigate could be considered an adverse action if it was in retaliation for a separate protected act. *Fincher*, 604 F.3d 712 at 721.

An employer's failure to address threats can reasonably dissuade an employee from making or supporting a charge of discrimination. The D.C. Circuit has found that failure to investigate a potential death threat following a discrimination complaint could be an adverse action. *Rochon v. Gonzales*, 438 F.3d 1211, 1219–20 (D.C. Cir. 2006). Similarly, the Sixth Circuit recognized that failure to investigate a complaint of a co-worker setting the plaintiff's car on fire could be an adverse action. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 349 (6th Cir. 2008).

Similar to the employers in Rochon and Hawkins, DePaul failed to conduct even a cursory investigation into Dr. Hill's concerns for his public safety (PSOF ¶¶ 7, 11). Dr. Hill notified Dr. Ghanem of his fears, prompting campus security to extend his escorts. The lack of investigation into the death threats should not be minimized simply because Dr. Hill cannot prove that a DePaul faculty member or student sent the messages. DePaul's president, provost, and security were notified about the social media threats Dr. Hill was receiving, as well as through his complaints to Drs. Ghanem and McNeill (PSOF ¶¶25-26). This clearly indicates that DePaul was closely tracking online activity, including potential threats, yet failed to take adequate action to address the hostile environment Dr. Hill faced. Dr. Hill's complaints were not mere "ordinary workplace tribulations" *Baird v. Gotbaum*, 888 F. Supp. 2d 77. DePaul's response, or lack thereof, parallels *Rochon*, where the employer's failure to investigate was a materially adverse action and should compel the same result.

**b) DePaul's Faculty Council Resolution was an Adverse Employment Action**

DePaul's Resolution constitutes an adverse employment action for several reasons. First, it was an official act endorsed by the university's Faculty Council, making it an extension of

DePaul's institutional power. DePaul's position that the Faculty Council is not synonymous with DePaul is meritless. Faculty Council members use depaul.edu email addresses, and their handbook prominently features the DePaul logo, underscoring their official capacity within the university. Additionally, the Provost attends Faculty Council meetings, further linking the Council's actions to DePaul's administration. This official condemnation signaled to the university community that Dr. Hill's views and safety were not protected, thereby exacerbating his vulnerability. Third, the Resolution appeared to intentionally encourage extremists, galvanizing anti-Semitic and pro-Hamas sentiments among students and faculty. Dr. Hill argues that DePaul's intent through the censure and resolution was to galvanize anti-Semites and Hamas supporters, creating a retaliatory work environment where he feared for his physical safety. Notably, other resolutions proposed by the Faculty Council that did not target Jewish individuals failed, indicating a pattern of discriminatory intent. (*Id.* at ¶37).

c) **Dr. Ghanem's Campus-wide Email Blast was an Adverse Employment Action**

Dr. Ghanem, emailed every student and faculty member, which Dr. Hill asserts endorsed the retaliatory message and further contributed to the hostile work environment. Dr. Paeth's testimony supports Dr. Hill's claims about the role of the provost and the university's administrative structure, indicating that the actions taken by the provost's office were significant in the university's response to Dr. Hill's situation. A factfinder who credits Dr. Hill's account could reasonably conclude that Ghanem's email was motivated by pressure from pro-Palestine faculty and students. This factual dispute is a matter for a jury to decide. *Calvente v. Ghanem*, No. 20-CV-03366, 32, N.D. Ill. Sep. 15, 2022).

d) **A Reasonable Fact-Finder Can Conclude that Hill's Workplace Was a Hostile Work Environment**

For a hostile work environment claim under §1981, Dr. Hill must show that he perceived the environment as hostile or abusive and that a reasonable person would find the harassment severe or pervasive enough to alter employment conditions. A successful claim requires proving unwelcome harassment based on race that was severe or pervasive enough to create a hostile work environment and that the employer is liable. *Meritor Sav. Bank, FSB v. Vinso*n, 477 U.S. 57, 66–72 (1986). As established by the Seventh Circuit, Dr. Hill can defeat summary judgment by showing that the employer had constructive notice of the harassment, which was sufficiently obvious. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 n. 8 (7th Cir.2000); *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1018 (7th Cir.1996).

Harassment must be severe or pervasive enough to create an abusive work environment, considering factors like frequency, severity, and impact on work performance. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *Johnson v. Advocate Health & Hosps. Corp.,* 892 F.3d 887, 900–01 (7th Cir. 2018). Determining whether harassment creates a hostile environment is generally a factual question for the jury. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016). The employer may also be found negligent in discovering or remedying the harassment. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (overruled on other grounds by *Ortiz v. Werner Enterp., Inc.*, 834 F.3d 760 (7th Cir. 2016); Cf. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002).

Employer liability for harassment depends on whether the harassment was by supervisors or coworkers. An employer is liable for coworker harassment if it was negligent in failing to take reasonable steps to discover and remedy it. DePaul failed to take adequate action and exercised unreasonable care to prevent and correct the harassment, contributing to the hostile environment. *Nischan v. Stratosphere Quality*, LLC, 865 F.3d 922, 930, 7th Cir. 2017; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278, 11th Cir. 2002. An employer can also be held liable if it fails to take prompt and effective remedial action when it knew or should have known of the conduct. The employer's response must be reasonably calculated to end the harassment and prevent future incidents. Failure to provide a remedy, or providing an ineffective remedy, results in liability. *Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756, 9th Cir. 1997; *Freitag v. Ayers*, 468 F.3d 528, 539–40, 9th Cir. 2006; *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1528–29, 9th Cir. 1995.

Defendants can be held liable for harassment "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Further, "[T]he employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, inter alia, the employer's ability to stop the harassment and the promptness of the response." *Freitag v. Ayers*, 468 F.3d 528, 539–40 (9th Cir. 2006), as amended (Nov. 3, 2006) (internal citations omitted). Effectiveness is measured not only by ending the current harassment but also by "deterring future harassment—by the same offender or others. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1528– 29 (9th Cir. 1995) (internal citation omitted).

Dr. Hill's circumstances involve significant challenges that a reasonable jury could find constitute a hostile work environment. DePaul was aware of Dr. Hill's discrimination claims but took no action to investigate his concerns. A discriminatorily abusive work environment can detract from job performance and discourage employees from advancing in their careers. *Harris*, 510 U.S. at 22. DePaul's actions, including the failure to investigate and address Dr. Hill's complaints, create a triable issue for a jury on whether the harassment was severe or pervasive enough to constitute a hostile work environment. Dr. Hill has identified conflicts on material issues that must be weighed by a jury. These actions are precisely the types of adverse actions that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

An employer can be held liable for a hostile work environment if it is negligent in preventing or correcting offensive behavior. As established in *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013), an employer must show it took reasonable care to prevent and correct any harassing behavior. Additionally, the employee must have unreasonably failed to take advantage of preventive or corrective opportunities. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

In Dr. Hill's case, the employer's negligence is evident in its failure to take prompt and appropriate corrective action that would reasonably prevent the harassment from recurring. In Dr. Hill's situation, harassment by a supervisor triggers strict liability on the part of the employer. However, liability may also extend to a hostile work environment created by a non-supervisory employee if Dr. Hill can demonstrate the employer's negligence in addressing the harassment, as described in *Rhodes*. 359 F.3d at 506. Dr. Hill made multiple concerted efforts to inform the employer about the ongoing harassment, akin to the plaintiff in *Silk v. City of Chicago*, 194 F.3d

788, 807 (7th Cir.1999), who repeatedly complained about the harassment. Despite the employee's efforts, the employer failed to take effective action. *Id.*

Dr. Hill endured pervasive harassment, including formal censure, derogatory flyers, student-led protests, and death threats, which created a toxic atmosphere that no reasonable person could tolerate. The record shows that these protests, death threats, and faculty attacks significantly impacted Dr. Hill's well-being. Students took over a building, distributed thousands of leaflets accusing Dr. Hill of genocide, and harassed him, with DePaul playing a significant role in encouraging or at least acquiescing this behavior. (PSOF ¶¶38-39).

Dr. Hill notified his department chair, Dr. McNeill, and Provost Ghanem about his safety concerns (PSOF ¶¶12, 26). Instead of addressing these concerns, Dr. McNeill escalated the situation by circulating links to Dr. Hill's article critical of SJP among faculty members, further inflaming tensions. (PSOF ¶¶27-28) Provost Ghanem then deepened the hostility by sending a campus-wide email that praised the DePaul community for their vocal opposition, effectively endorsing the backlash against Dr. Hill. This emboldened SJP, student boycotts, and faculty to rally against his pro-Israel position, worsening the hostile environment. (*Id.* at ¶20).

Despite the drastic actions taken by faculty and students against Dr. Hill, no one was disciplined. (PSOF ¶¶38-39). This includes the failure to investigate the death threats against him, which significantly contributed to a hostile work environment. *Frazier v. Delco Electronics Corp.*, 263 F.3d 663, 668 (7th Cir. 2001).

The evidence strongly supports the conclusion that Dr. Hill's workplace was a hostile environment. He endured severe and pervasive harassment that DePaul University failed to address adequately. The cumulative effect of these actions—including censure, derogatory flyers, DePaul's failure to protect him from student harassment, and death threats—would deter any

reasonable faculty member from making or supporting a discrimination complaint. This claim is reinforced by federal cases where less severe harassment was found sufficient to establish a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

DePaul University has faced multiple lawsuits alleging racial discrimination in the last decade. Dr. Hill is the only Black professor in the Philosophy department, indicating a broader pattern of exclusion. Evidence of discrimination against others can support claims of a hostile environment. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Considering the cumulative evidence, a jury could find a pervasive environment that made it difficult for Dr. Hill to do his job. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).

## B. GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING DR. HILL'S CLAIM OF RETALIATION UNDER §1981 (COUNT III) & TITLE VII (COUNT IV)

Dr. Hill opposes the Defendant's Motion for Summary Judgment on his retaliation claims under 42 U.S.C. § 1981. Retaliation is a distinct violation under Title VII, and an employee does not need to prove the underlying discrimination claim for the retaliation claim to succeed. *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999). Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee "because she has opposed any practice made an unlawful employment practice" by the statute or "because she has made a charge, testified, assisted, or participated in [a relevant] investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a).

To prove retaliation under § 1981, Dr. Hill must demonstrate that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by the employer; and (3) there was a causal connection between the two. *Calvente v. Ghanem*, No. 20-CV-03366, 24-25, N.D. Ill. Sep. 15, 2022. The standard for an adverse action in retaliation claims is lower than in discrimination claims; it must be significant enough to dissuade a reasonable worker from making

or supporting a discrimination charge. *Chaib v. Indiana*, 744 F.3d 974, 986-87, 7th Cir. 2014. Whether an action is materially adverse is fact-dependent and context matters. *Burlington N.*, 548 U.S. at 68-69.

Dr. Hill adopts his argument from Section A, affirming his status as a member of a protected class and demonstrating that he faced multiple adverse employment actions. He now turns to the causation prong, which applies to all three counts in his case. Dr. Hill argues that the temporal proximity between his protected activities—such as publishing his op-ed and raising complaints about discrimination—and the subsequent adverse actions strongly supports an inference of causation. The sequence of retaliatory actions, including the Faculty Council's Resolution, the Provost's campus-wide email, and the lack of protection from escalating threats, illustrates a clear causal link between his protected activities and the hostile environment he endured. This pattern of behavior by DePaul not only satisfies the causation requirement for each count but also underscores the retaliatory and discriminatory motives behind the university's actions against him.

A few points bear re-emphasis in support of Dr. Hill's claims. Dr. Hill's retaliation claims are powerfully supported by a series of specific retaliatory actions taken by DePaul following his protected activities. After publishing his op-ed in support of Israel, the Faculty Council held a formal meeting to publicly censure him, severely damaging his professional reputation and clearly deterring further engagement in protected activities.

Dr. Hill faced severe professional repercussions after engaging in protected activities. He was denied the opportunity to teach upper-level courses, and several classes were canceled due to low enrollment. His speaking engagements dwindled, and he became socially ostracized among his peers, eroding his professional standing and career progression. The distribution of derogatory

flyers and emails by colleagues and students further isolated Dr. Hill, creating a hostile environment that severely undermined his professional position.

DePaul's failure to investigate Dr. Hill's harassment and discrimination complaints further underscores this retaliatory motive, signaling to Dr. Hill and others that such complaints would not be taken seriously. The most alarming act of retaliation came in the form of death threats that Dr. Hill received after his op-ed and discrimination complaints. DePaul's failure to protect him from these threats or take them seriously not only highlights the university's retaliatory motive but also contributed to a hostile work environment that severely impaired Dr. Hill's ability to perform his duties. These actions collectively demonstrate a calculated effort to retaliate against Dr. Hill, with devastating effects on his career and reputation. This inaction implicitly discouraged him from pursuing his rights under anti-discrimination laws.

## C. MATERIAL ISSUE EXISTS AS TO WHETHER DR. HILL'S PROTECTED ACTIVITIES WERE THE "BUT FOR" CAUSE OF DISCRIMINATION AND RETALIATION

A material question of fact exists as to whether Dr. Hill can demonstrate that his protected activities were the decisive factor—the "but for" cause—of the discrimination and retaliation he experienced. A reasonable jury could conclude that Dr. Hill was being set up as a scapegoat. The decision to issue a Faculty Council Resolution, send out a campus-wide email critical of Dr. Hill, and the failure to discipline any faculty or students who were actively boycotting or bullying him— all within days of his op-ed—suggests a concerted effort to build a case against him rather than a neutral attempt to uncover the truth. See *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020). Considering this circumstantial evidence, summary judgment is inappropriate because genuine issues of material fact exist regarding the Defendants' true motives, including their decision to send out the campus-wide emails and permit blatant anti-Semitism.

**D. The Timing Between Dr. Hill's Protected Activities and Defendant's Adverse Actions is Suspicious Under Title VII Retaliation & §1981**

Dr. Hill's case demonstrates a compelling connection between his protected activities and the discriminatory and retaliatory actions taken against him, supported by the close temporal proximity and the nature of the adverse actions. After publishing his op-ed and raising discrimination complaints, Dr. Hill experienced several adverse actions, including being denied opportunities to teach upper-level courses, a sharp decline in class enrollments, and a significant reduction in speaking engagements. He also became socially ostracized by his peers, further damaging his professional standing.

This compressed timeline strongly suggests a causal link between Dr. Hill's protected activities and the adverse actions, aligning with cases where courts have found such timing to be highly suspicious, particularly when there were no prior performance issues. While the Seventh Circuit acknowledges that suspicious timing alone may not be sufficient to overcome summary judgment, it remains a critical factor in the overall analysis.

The nature and severity of the discriminatory and retaliatory actions further strengthen Dr. Hill's claims under both Title VII and § 1981. The ongoing pattern of adverse actions—including public censure, the failure to investigate his complaints, and the distribution of derogatory materials—demonstrates clear retaliation and discrimination. Moreover, the fact that employees who did not engage in similar protected activities were treated systematically better reinforces Dr. Hill's case.

In conclusion, Dr. Hill has provided substantial evidence of suspicious timing and a consistent pattern of discriminatory and retaliatory actions that support an inference of causation under both Title VII and § 1981. This evidence, viewed as a whole, precludes summary judgment and warrants a trial to resolve these factual disputes. The pattern of behavior by DePaul would

dissuade any reasonable person from engaging in similar protected activities, meeting the causation requirement for retaliation claims.

## E. THE COURT SHOULD NOT PERMIT DR. GHANEM AND DR. MCNEILL TO CHANGE THEIR SWORN TESTIMONY.

The primary purpose of summary judgment is to prevent unnecessary trials by filtering out claims that lack factual support. *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Rule 56(c)(4) aids this process by allowing a party to use an affidavit or declaration to support or oppose a motion for summary judgment only if the affidavit: (1) attests to facts within the affiant's personal knowledge; (2) sets out facts that would be admissible in evidence; and (3) shows that the affiant is competent to testify on the matters stated. Rule 56(h) further empowers a judge to sanction a party that presents an affidavit in bad faith or solely for delay.

Federal courts, including the Seventh Circuit, have long recognized that a judge must scrutinize the substance of an affidavit offered in response to a summary judgment motion to determine whether a reasonable jury could rely on the factual statements it contains. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007). Courts may disregard "sham" affidavits— those that contradict prior deposition testimony or other sworn statements—to prevent the creation of a false issue of material fact. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985); *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018). This principle ensures that a genuine issue of material fact cannot be conjured out of thin air, serving the core purpose of summary judgment by "weeding out unfounded claims, specious denials, and sham defenses." *Id.*

In support of its motion for summary judgment, DePaul attempts to retract deposition testimony by submitting a declaration from both Dr. Ghanem and Dr. McNeill. Both declarations directly contradicts each of their prior sworn testimony. DePaul's attempt to misuse the summary judgment procedure by presenting a sham affidavit should not be allowed. As the Seventh Circuit

has consistently held, such tactics are an abuse of the process and should be disregarded. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Therefore, the Court should disregard the Affidavits of both Dr. Ghanem (D's Ex. C) and Dr. McNeill (D's Ex. K) as an attempt to manufacture evidence by contradicting a prior sworn statement. Should the Court require further clarification or discussion on this issue, Plaintiff is prepared to address the matter of the sham affidavit in a subsequent brief.

## IV.     CONCLUSION

DePaul seeks to avoid accountability for its anti-Semitic and discriminatory behavior. The university has failed to meet the standards for summary judgment, prioritizing self-preservation over its Vincentian principles and Dr. Hill's civil rights. Given the seriousness of these violations, Dr. Hill urges the Court to deny DePaul's motion for summary judgment and proceed to trial without delay.

Respectfully submitted,

Dr. Jason Hill

s/ Gianna Scatchell Basile

s/ Christopher C. Cooper

Christopher Cooper, Esq.
Law Offices of Christopher Cooper, Inc.
105 West Madison Street, Ste 1350
Chicago, Illinois 60602
P: (312) 473-2968
E: cooperlaw3234@gmail.com

GB Law
Gianna Scatchell Basile
1821 W Hubbard Street, #209
Chicago, Illinois 60622
(312) 248-3303
gb@lawfirm.gs

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that he served the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum of Law in Support of its Motion for Summary Judgment on all counsel of record via this Court's CM/ECF filing system on August 9, 2024, and that all such counsels are registered e-filers.

s/ Gianna Scatchell Basile

s/ Christopher C. Cooper
