# EXHIBIT 1

PL EX 1

# IN THE MATTER OF:

## HILL
### -v-
## DePAUL

BOB WACHOWSKI

2:23 CV 06990

February 23, 2024

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992
cagoodreporter@pavesich.com



**Page 1**

IN THE UNITED STATES DISTRICT
COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON HILL,           )
                      )
        Plaintiff,    )
                      )
    vs.               ) No. 2:23-cv-06990
                      )
DEPAUL UNIVERSITY,    )
                      )
        Defendant.    )

    The videoconference deposition of
ROBERT WACHOWSKI, taken in the above-entitled
cause, remotely before Christine Golden,
Certified Shorthand Reporter in the State of
Illinois, on the 23rd day of February, 2024,
at the hour of 10:15 a.m., pursuant to notice.

Reported for
Cynthia A. Pavesich & Associates by
Christine Golden, CSR

**Page 2**

1
   APPEARANCES:
2
   LAW OFFICE OF CHRISTOPHER COOPER
3  BY:  MR. CHRISTOPHER COOPER
   Via videoconference
4  426 North Broad Street
   Griffith, Indiana 46319
5  312-473-2968
   cooperlaw3234@gmail.com
6      Representing the Plaintiff;
7  ARNETT LAW GROUP, LLC
   BY:  MS. GIANNA SCATCHELL BASILE
8  Via videoconference
   233 West Jackson Boulevard, Suite 750
9  Chicago, Illinois  60606
   312-702-1901
10 gbasile@arnettlawgroup.com
       Representing the Plaintiff;
11
   BURKE, WARREN, MACKAY & SERRITELLA, PC
12 BY:  MS. RACHEL BOSSARD
   Via videoconference
13 330 North Wabash Avenue
   Chicago, Illinois  60611
14 312-840-7029
   rbossard@burkelaw.com
15     Representing the Defendant.
16
17
18
19
20
21
22
23
24

**Page 3**

1          I N D E X
2
3  WITNESS                    EXAMINATION
4  ROBERT WACHOWSKI
     By Mr. Cooper         4
5
6
7
8
9
           (NO EXHIBITS WERE MARKED.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1      THE COURT REPORTER:  Could I ask counsel to
2  identify themselves and stipulate to the remote
3  swearing in of the witness, please?
4      MR. COOPER:  Christopher Cooper on behalf of
5  Plaintiff Hill.  No objection to remote.  Gia?  I know
6  she's probably signing in.  I can speak for her.
7      MS. BOSSARD:  Rachel Bossard on behalf of
8  DePaul University, and we stipulate to being remote.
9          (The witness was sworn.)
10         ROBERT WACHOWSKI,
11 called as a witness herein, having been first duly
12 sworn, was examined and testified as follows:
13         DIRECT EXAMINATION
14 BY MR. COOPER:
15     Q.  Okay.  Sir, can you please state your name for
16 the record but spell your last name?
17     A.  Robert Wachowski, W-A-C-H-O-W-S-K-I.
18     Q.  Sir, do you have a middle name?
19     A.  Francis.
20     Q.  Okay.  Have you been deposed before?
21     A.  Yes, sir.
22     Q.  Okay.  Are you under the influence of anything
23 that would cause you not to testify truthfully?
24     A.  No.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5

1    Q.  My name is Christopher Cooper.  I represent
2  Dr. Jason Hill.  Am I breaking up?
3    A.  Yes.
4    Q.  I'm sorry.  Do you know Dr. Hill?
5    A.  Yes.
6    Q.  Okay.  How do you know Dr. Hill?
7    A.  He's a faculty member at DePaul who I've dealt
8  with in the past.
9    Q.  When did you deal with him in the past?
10    A.  We've dealt with him actually a couple times.
11  Probably about the first time was approximately 10 years
12  ago, and then we dealt with him specifically again in
13  2019.
14    Q.  Let me just go off on some tangential issues,
15  and we'll come back to that.  You're employed by
16  DePaul University?
17    A.  Yes.
18    Q.  What is your job title at DePaul University?
19    A.  I'm the Director of Public Safety.
20    Q.  How long have you been in that position?
21    A.  I've been in that position for 27 years.
22    Q.  What are your duties, generally?
23    A.  My general duties, I oversee campus safety for
24  both the Loop and Lincoln Park campus, and I'm

1  responsible for the overall safety of both staff and
2  students on both campuses.
3    Q.  Are you a sworn police officer or licensed
4  investigator?
5    A.  I am not.
6    Q.  Does DePaul University have a police
7  department?
8    A.  No.
9    Q.  So it has a public safety office?
10    A.  Yes.
11    Q.  You are the equivalent of a police chief?
12    A.  Yes.
13    Q.  You said you dealt with Dr. Hill many years
14  ago, is that correct?
15    A.  Correct.
16    Q.  Approximately when was that?
17    A.  I want to say probably around 2012, 2014.
18    Q.  Why did you interact with him in 2012 or 2014?
19    A.  He had requested our assistance on a matter
20  where he felt that he was being harassed by an
21  individual.
22    Q.  Can you tell me more, please?
23    A.  He specifically called our office and felt
24  that an individual had been -- that he had a prior

1  conversation with and met on a couple occasions was
2  stalking him on campus.
3    Q.  All right.  Did he say why he thought the
4  person was stalking him?
5    A.  To the best of my recollection, he had received
6  a phone call where the individual knew that he was in
7  his office at the time.
8    Q.  All right.  So how did your office respond or
9  did it respond?
10    A.  We worked with him to identify the individual
11  that he was having issues with and, you know, we also
12  recommended that he make a Chicago Police report at the
13  time, since they're the local authority, and once we
14  identified the individual we just checked him out as
15  much as we could.
16    Q.  Okay.
17    A.  And then we proceeded to tell him, you know,
18  if he has any future issues with the individual that he
19  should contact both us and the Chicago Police
20  Department.
21    Q.  Sure.  Then there's another occasion when you
22  interacted with Dr. Hill?
23    A.  Yes.  That would move forward to the 2019.
24    Q.  Okay.

1    A.  That's where we were informed first and
2  foremost by our vice president of communications that
3  there could be an issue because Dr. Hill had published
4  something and there was some traction on social media,
5  you know, involving Dr. Hill with some of it being
6  negative.  That was our first interaction where we got
7  that notification.  Then after that specifically -- That
8  occurred on April 18th.  Then specifically on April 19th
9  we received an email from the dean and the president's
10  office was carboned on it, and basically what it was is
11  it was in response to the article that Dr. Hill had
12  written, and Dr. Hill was concerned with possibly
13  student protests and demonstrations for the next week
14  that could occur on campus.  He was concerned with some
15  of the social media posts that were out there.  He felt
16  that one, you know, was a death threat to him.  And
17  then he requested, you know, what could the university
18  do for him, you know, to ensure that we can keep him to
19  the best that we could safe while he's on campus.  Also
20  on April 19th we received an email that copied my
21  associate director Mike Dohm, and what we decided is we
22  asked in response to this from Dr. Hill that he provide
23  us with any information that he might have about any
24  planned protests.  We also asked that he make us aware

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5



Page 9

1  of his teaching schedule so that we could provide extra
2  security during those times, you know, in the hallways,
3  outside the classroom.
4      Q.  Can I interrupt you for one second?  So you're
5  reading from a police report?
6      A.  No, I'm not.
7      Q.  What are you reading from?
8      A.  My notes.
9      Q.  Okay.  I'd like you to give those notes to
10  your attorney at some point.  I would like to see those.
11  How many pieces of paper do you have?
12      A.  Just one.
13      Q.  Can you hold it up so I can see it?  Can you
14  bring it a little bit closer to the camera, the paper?
15  That has a caption on it?  All right.
16      A.  That's just my notes that I printed.
17      Q.  Okay.
18      MS. BOSSARD:  Bob, do you need your notes in order
19  to testify?  If you don't ask that you take the notes
20  away.
21      THE WITNESS:  Sure.
22      MS. BOSSARD:  Testify to your memory and your
23  recollection.
24      THE WITNESS:  Sure.  I just had the notes for the

Page 10

1  specific dates.
2      MR. COOPER:  Rachel, all due respect, but Plaintiff
3  hereby requests a copy of those notes, please.
4      MS. BOSSARD:  I heard your request.
5      MR. COOPER:  Okay.
6  BY MR. COOPER:
7      Q.  What year -- You referred to April 18th, 19th.
8  What year are we talking about?
9      A.  2019.
10      Q.  Okay.  Then you mentioned your associate or
11  your assistant.  Can you please spell his last name?
12      A.  Sure.  D-O-H-M.
13      Q.  What is his first name?
14      A.  I'm sorry, you broke up.
15      Q.  What is his first name?
16      A.  ████████
17      Q.  ████████ or Marco?
18      A.  ████████
19      Q.  Okay.  So you were notified by who?  I don't
20  recall.  Hill, or you were notified by someone else
21  that there were issues?
22      A.  Both by Hill sent us something and also the
23  dean, and how it initially started when I referred to
24  in the first question our vice president for

Page 11

1  communications had emailed us that there's something
2  brewing on social media.
3      Q.  And do you still have that email?
4      A.  Yes.
5      Q.  Do you still have that email?
6      A.  Yes.
7      Q.  Is that an email you can give to your attorney?
8      A.  Yes.
9      MS. BOSSARD:  That was produced in this litigation.
10      MR. COOPER:  All right.
11  BY MR. COOPER:
12      Q.  The email was addressed to you?
13      A.  I'm sorry, you broke up.
14      Q.  The email was addressed to you?
15      A.  There was a couple emails that were addressed
16  to me and there was an email that was addressed to
17  Mike Dohm.
18      Q.  So there were two emails?
19      A.  I believe so, yes.
20      Q.  From the vice president for -- I'm sorry?
21      A.  Vice president for communications was the first
22  email.  That's how we were alerted to this situation.
23  The second email that we received was from the dean's
24  office.

Page 12

1      Q.  And you have both of those as you sit here
2  today?
3      A.  Yes.
4      Q.  Okay.  Had you received an email from
5  Provost Ghanem?  G-H-A-N-E-M, for the court reporter.
6      MS. BOSSARD:  I just want to insert an objection
7  because I'm unclear here as to whether you're asking
8  Mr. Wachowski about his personal information or his
9  office and the university's information related to this.
10  He's here to speak on behalf of the university.  So
11  whether or not he personally received an email or his
12  office has a knowledge of an email, those are two
13  different things.
14  BY MR. COOPER:
15      Q.  All of my questions, sir, are as to your role
16  as a representative of DePaul University.
17      A.  Okay.
18      Q.  I believe my last question was did you receive
19  an email from Provost Ghanem?
20      A.  I do not recall receiving an email specifically
21  from her.  She may have been copied on one of the emails.
22      Q.  You don't recall a campus-wide email from her
23  office as to Dr. Hill's publication?
24      A.  At this time I do not recall that.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                                   a448d363-6973-48d0-a1c3-016b23bdefe5

## Page 13

1    Q.  What is your email address or email address you
2  had at the time?
3    A.  I'm sorry, you broke up.
4  . Q.  What is the email address you had at the time?
5    A.  It's my --
6    Q.  What is your email address you had in 2019?
7    A.  Bwachows@depaul.edu.
8    Q.  And that's B, as in bravo?
9    A.  Yes.
10    Q.  And if Professor Ghanem -- Correction.  If
11  Provost Ghanem sent an email campus-wide you would have
12  received it, correct?
13    A.  Correct.
14    MS. BOSSARD:  I'm going to object to outside the
15  scope of the notice.
16  BY MR. COOPER:
17    Q.  You understand that the provost is a person
18  of -- I'm trying to think of how to word this.  What's
19  your understanding of the role of a provost at DePaul?
20    A.  I'm not sure how you want me to define the
21  role.
22    MS. BOSSARD:  Objection to the scope.  Outside the
23  scope of the notice.
24

## Page 14

1  BY MR. COOPER:
2    Q.  Would you consider her to be one of the
3  leaders of the university, correct?
4    A.  Correct.
5    Q.  Okay.  So if she took an action and that
6  indicated to your office that you would have to take an
7  action, you would take that action, correct?  When I
8  say you, I'm talking about your office, correct?
9    MS. BOSSARD:  Objection, calls for speculation.
10    THE WITNESS:  Correct.
11  BY MR. COOPER:
12    Q.  Okay.  So with regard to Dr. Hill, were you
13  aware that he had taken a position in defense of Jewish
14  people?
15    A.  Yes.
16    Q.  One moment, please.  So the situation that he
17  found himself in, did your office consider that to be
18  serious?
19    A.  Your last sentence broke up, the last two
20  words.
21    Q.  Sure.  The situation that Dr. Hill found
22  himself in, did you consider -- did your office
23  consider that to be a serious situation?
24    A.  Yes.

## Page 15

1    Q.  And why did your office consider it to be a
2  serious situation?
3    A.  Because it was brought to our attention that
4  this possibly has -- Dr. Hill had stated in previous
5  emails that he felt threatened.  He was concerned for
6  his safety.  So it's under me to take that under
7  advisement and take all that seriously and look at what
8  we can do to make him feel safe on campus and protect
9  him while he's on campus.
10    Q.  And you take -- (technical interruption) --
11  seriously?
12    A.  I'm sorry, you broke up again.
13    Q.  Does your office take antisemitism seriously?
14    A.  We take anything seriously.
15    Q.  Do you understand what antisemitism is?
16    A.  Yes.
17    Q.  What is it?
18    MS. BOSSARD:  Objection.  This is outside the scope
19  of the notice.  You can answer.
20    THE WITNESS:  Basically it's when you take a stance
21  against it could be perceived as somebody who lives in
22  Palestine.
23  BY MR. COOPER:
24    Q.  If you take a stance against Jewish people.

## Page 16

1    MS. BOSSARD:  Is that a question, Chris?
2  BY MR. COOPER:
3    Q.  Yes.
4    A.  Did you say do I take a stance?  I'm sorry, I'm
5  having a hard --
6    Q.  I'm sorry.  I'm trying to understand your
7  response.  So if people take a position against Jewish
8  people, a race-based decision, that is antisemitism,
9  correct?
10    A.  It can be, yes.
11    Q.  And you're aware that Dr. Hill is a supporter
12  of Israel, correct?
13    A.  Correct.
14    Q.  And he's a supporter of Jewish people, correct?
15    A.  Correct.
16    Q.  What actions did DePaul University take to
17  protect Dr. Hill from people who have a hate for Jewish
18  people?
19    A.  Basically what we did is we take everything
20  seriously like this, so we took a look at the situation,
21  we monitored the situation, we made some
22  recommendations, such as we recommended that Dr. Hill
23  move his office, because he had an office that had a
24  window facing the street.  We also requested Dr. Hill's

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5

1 class schedule so that we can make patrols of the area
2 and put some officers outside the classroom area. We
3 offered an escort service to Dr. Hill after his class,
4 either back to his office or back to his car. We also
5 informed him that if he received any information of any
6 more threats or any more protests that were going to
7 occur on campus that he keeps our office apprised of
8 it. We also recommend, which we do in every case, is
9 that he makes a Chicago Police report, because they are
10 the local authority.
11     Q. But you're aware that the people threatening
12 him were behaving as would a racist group of people,
13 correct?
14     MS. BOSSARD: Object to the form of the question.
15     THE WITNESS: I cannot answer that because I do not
16 know. We don't know exactly who was threatening him, so
17 I do not know if they were a group of racist people.
18 BY MR. COOPER:
19     Q. Okay. But if people are making statements
20 derogatory towards Jewish people, that's a race
21 situation, isn't it?
22     MS. BOSSARD: Objection, calls for speculation.
23     THE WITNESS: It could be considered a hate
24 incident, but without investigations we cannot -- I

1 cannot classify that.
2 BY MR. COOPER:
3     Q. So as to Dr. Hill, what steps did the
4 university take to protect Jewish people?
5     MS. BOSSARD: Object to the form of the question.
6 That's outside the scope of this notice. This notice
7 doesn't talk about protection of Jewish people.
8     THE WITNESS: We would protect anybody on campus
9 no matter what their nationality or what their religious
10 beliefs are the same.
11 BY MR. COOPER:
12     Q. But you didn't protect Dr. Hill, did you?
13     MS. BOSSARD: Object to form of the question.
14 Argumentative. This witness has testified to actions
15 taken to protect Dr. Hill.
16     THE WITNESS: I would refer back to my previous
17 answers of what measures we took in place to protect
18 Dr. Hill.
19 BY MR. COOPER:
20     Q. Are you familiar with The Association on
21 Discrimination?
22     MS. BOSSARD: Objection.
23     MR. COOPER: I'm sorry?
24     MS. BOSSARD: I'm going to object. That's outside

1 the scope of this notice.
2 BY MR. COOPER:
3     Q. Sir, do you have an answer?
4     A. I am not.
5     Q. Do you agree that Dr. Hill can take up for
6 Jewish people?
7     MS. BOSSARD: Object to the form of the question.
8     THE WITNESS: You broke up again.
9 BY MR. COOPER:
10     Q. Do you believe that Dr. Hill is allowed to
11 advocate on behalf of Jewish people?
12     A. Anybody, you know, on their own free will can
13 advocate for anybody who they choose.
14     Q. Okay. One moment.
15         What steps are you taking right now to make
16 sure that Dr. Hill and Jewish people are safe from
17 harassment?
18     A. I think I have answered that in the previous
19 questions.
20     Q. When I say you, I'm referring to the
21 university.
22     A. Yes.
23     Q. I'm sorry, when I say you it's a reference to
24 the university.

1     A. Sure. Correct. It would be my answer to the
2 previous questions. We take all allegations seriously.
3 They're vetted and we take the necessary steps that we
4 see fit based on the information we are provided.
5     Q. Have you taken any steps recently to protect
6 Dr. Hill?
7     A. I'm sorry, but you're breaking up again. Can
8 you repeat?
9     Q. Have you taken any steps recently to protect
10 Dr. Hill?
11     A. My office has not had any contact with
12 Dr. Hill.
13     Q. When was the last time the university took
14 steps to protect Dr. Hill?
15     A. It would be back in 2019.
16     Q. Approximate month and year?
17     A. I'm sorry, you broke up.
18     Q. You said it would be back in 2019, correct?
19     A. Correct. When all this was going on. We
20 have not had anything else reported to our office.
21     Q. Okay. Do you report to Dr. Ghanem?
22     A. I do not.
23     Q. She's not in your chain of command?
24     A. I'm sorry?

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5

## Page 21

1   Q.  She is not in your chain of command?
2   A.  I mean, ultimately I report to a vice
3   president of facility operations.  As Dr. Ghanem is a
4   senior officer of the university she's obviously over
5   everything, but we do not report up directly.
6   Q.  But you would agree that Dr. Ghanem is one of
7   your supervisors, correct?
8   MS. BOSSARD:  Objection.
9   THE WITNESS:  I would consider any officer of the
10  university not a direct supervisor but yes, an overall
11  supervisor.
12  BY MR. COOPER:
13  Q.  Was Dr. Hill's office changed?
14  A.  To my knowledge, we did not receive
15  confirmation that it was changed, but that was our
16  recommendation.
17  Q.  How did you discover who the people were that
18  were people harassing Dr. Hill, what actions would the
19  university have taken?
20  A.  I'm sorry, you're breaking up toward the end.
21  Q.  If the university had discovered the identity
22  of the people harassing Dr. Hill, what actions would the
23  University have taken?
24  MS. BOSSARD:  I missed a few words in that

## Page 22

1   question.  I don't know if anyone else did.
2   THE WITNESS:  Towards the end.
3   BY MR. COOPER:
4   Q.  If the university learned the identity of the
5   people harassing Dr. Hill, what would be the
6   university's next steps?
7   A.  There would be two directions.  We would
8   either -- and this would be entirely up to Dr. Hill how
9   he wanted to proceed -- we would recommend he involve
10  the Chicago Police and go through that avenue, because
11  that is the local law enforcement authority.  Secondly,
12  we would involve the dean of students' office if their
13  identities were revealed and they were students at the
14  university or staff at the university.  So they either
15  go through the student judicial process or through
16  Human Resources, and that's only if they were
17  identified as being a community member of DePaul.
18  Q.  Did your office ever identify -- I should say,
19  did the university ever identify people harassing
20  Dr. Hill?
21  A.  No.
22  Q.  In this most recent situation in 2019?
23  A.  No.  Not to my knowledge.
24  Q.  Were you aware of a large protest in the lobby

## Page 23

1   of the Arts Building?
2   A.  Yes.
3   Q.  And your office has no idea who was there
4   protesting?
5   A.  We don't know individually because at the
6   protest there were no direct threats from anybody in
7   the crowd that I'm aware of to Dr. Hill.
8   Q.  What about the Jewish students on DePaul
9   campus?  Aren't they entitled to safety?
10  MS. BOSSARD:  Object to the form of the question.
11  THE WITNESS:  Everybody on our campus is entitled
12  to safety.
13  BY MR. COOPER:
14  Q.  It just doesn't sound like that.  It sounds
15  like Jewish people are being treated differently.  Am
16  I wrong?
17  MS. BOSSARD:  Argumentative, Chris.
18  THE WITNESS:  They are not being treated
19  differently.
20  (Technical interruption.)
21  THE WITNESS:  I can't hear any of that.  It's all
22  garbled, sir.
23  BY MR. COOPER:
24  Q.  In the same way you protect Jewish people and

## Page 24

1   faculty?
2   A.  Can you repeat that one more time, because you
3   broke up in the beginning.
4   Q.  Your testimony is that DePaul University
5   protects Jewish faculty and students in the same way
6   that it protects Palestinian students and faculty,
7   correct?
8   A.  Correct.
9   Q.  So it's your testimony that your office was not
10  discriminatory towards Jewish faculty and students?
11  MS. BOSSARD:  Object to the form of the question.
12  THE WITNESS:  I would refer back to my previous
13  answer.
14  BY MR. COOPER:
15  Q.  What is that?
16  A.  Sorry?
17  Q.  What is your previous answer?
18  A.  Can you repeat the question again?  You're
19  breaking up and pausing.
20  MR. COOPER:  I said I'm almost done.  The court
21  reporter can read back the question.
22  (The record was read as requested.)
23  THE WITNESS:  Yes.
24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                a448d363-6973-48d0-a1c3-016b23bdefe5

Page 25

1    BY MR. COOPER:
2        Q.  And you understand that that question is as
3    to Dr. Hill and as to the matters in 2019?
4        MS. BOSSARD:  Object to the form of the question.
5        THE WITNESS:  I'm not understanding the question.
6    BY MR. COOPER:
7        Q.  Okay.  I want to make sure the record reflects
8    the right time frame.  You understood the question
9    asked, that the court reporter read back to you,
10   references Dr. Hill in 2019, correct?
11       A.  Your last couple words broke up.  I got
12   references something.
13       Q.  My question is is it your understanding that
14   your answer to the question that the court reporter read
15   back relates to Dr. Hill in 2019?
16       A.  Yes.
17       Q.  I'm almost done.  Please tell me the steps of
18   the investigation.  Please tell me the steps that you
19   took pursuant to your investigation as to --
20       A.  I'm sorry but you broke up.
21       Q.  -- Dr. Hill and others?  It's your testimony
22   that either Dr. Hill or someone else complained to your
23   office, correct?
24       A.  Correct.

Page 26

1        Q.  In 2019, correct?
2        A.  Correct.
3        Q.  Okay.  Your office did an investigation,
4    correct?
5        A.  From what we could investigate, correct.
6        Q.  Tell me what steps the university took, that
7    is, what steps did your office take in the furtherance
8    of an investigation?
9        A.  What was the last word?
10       Q.  What steps did your office take in the
11   furtherance of an investigation?
12       A.  What we could do in this situation given the
13   limited information we had is we checked, you know, to
14   see if any emails or any texts were tied back to anybody
15   and we couldn't prove anything, so what we had to rely
16   upon, because we don't have access to social media and
17   that, that would have to go through the police
18   department.  So we would cooperate with the Chicago
19   Police Department, and we were never contacted further
20   in the investigation by them.
21       Q.  Did you as in the university contact the
22   Chicago Police Department?
23       A.  We did not contact them.
24       Q.  How did your office find out about the protest

Page 27

1    in the Arts Building?
2        A.  I would say about five minutes after it
3    started.
4        Q.  And then you rushed over there?
5        A.  Correct.
6        Q.  Do you wear a uniform?
7        A.  No.
8        Q.  Who else went there with you from your office?
9        A.  I don't remember the individuals specifically
10   but a representative from the Dean of Students' office.
11       Q.  What did you do when you arrived?
12       A.  We monitored what was going on.
13       Q.  What was going on?
14       A.  There were just students up on the upper floors
15   of the things, they dropped either a banner or flag, I
16   don't recall which one it was.  They also were dropping
17   flyers off of that onto the ground floor, on the first
18   floor.  Everything was peaceful from our observations.
19   There were no confrontations at the event, and the event
20   was over quickly.
21       Q.  What did the flyers say?
22       A.  I don't recall specifically but it was
23   something about a possibly sanction for Dr. Hill.  I
24   can't remember the detail of it.

Page 28

1        Q.  You don't remember any hate speech?
2        A.  I do not.
3        Q.  You have an understanding of hate speech,
4    correct?
5        A.  Somewhat, yes.
6        Q.  Racially inflammatory speech?
7        A.  If directed, yes.
8            (Technical interruption.)
9        THE WITNESS:  You are totally breaking up.
10       MS. BOSSARD:  We didn't hear that.
11       THE WITNESS:  I didn't hear anything.
12   BY MR. COOPER:
13       Q.  I said one moment.  I said one moment.  I'm
14   going to talk with my co-counsel.  I'm going to mute
15   myself.
16       A.  I didn't hear a lot of that.
17       MS. BOSSARD:  I think he's taking a quick break.
18       MR. COOPER:  I'm taking a break to talk to my
19   co-counsel.  Can we come back in about 5 minutes,
20   please?
21       MS. BOSSARD:  Sure.
22       MS. BASILE:  Actually, can we have till 11:00
23   o'clock?
24       MS. BOSSARD:  Sure.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5

Page 29

1          (A short break was taken.)
2    BY MR. COOPER:
3       Q.  We're going to do a screen share of a document.
4    Gia, are you there?  We're going to do a screen share,
5    if you can put that document up.
6       MS. SCATCHELL BASILE:  This is Bates-stamped
7    DePaul_084584.txp.
8       MR. COOPER:  Right now there's nothing there.
9       MS. SCATCHELL BASILE:  There's not?  Does anybody
10   else see anything?
11      THE WITNESS:  I have something on my screen.
12      MS. BOSSARD:  Yeah, I see it.
13      MR. COOPER:  I see that you started screen sharing.
14   I don't see it.  Now I see it.  Okay.  Can you make it a
15   little bit larger?
16      MS. SCATCHELL BASILE:  Let me see.
17   BY MR. COOPER:
18      Q.  Sir, are you able to read it?
19      A.  It's a little difficult but yes, I can read it.
20      MS. SCATCHELL BASILE:  I can just send it.  Is this
21   better?
22      MR. COOPER:  Yes.
23      MS. SCATCHELL BASILE:  Better?
24      THE WITNESS:  Yes.

Page 30

1       MR. COOPER:  Right there, it's centered.
2    BY MR. COOPER:
3       Q.  If you can read the email and then when you're
4    ready and need Attorney Basile to scroll down let us
5    know, and I'm going to ask you a few questions.
6          Let me know when you're ready.
7       A.  Can you scroll up a little bit, please?
8       MS. SCATCHELL BASILE:  Yeah.
9    BY MR. COOPER:
10      Q.  You mean down, right?
11      A.  Down.  I'm sorry.  Okay, I'm done.
12      Q.  So when you received this email how did you
13   respond?
14      MS. BOSSARD:  Object to form of the question, and
15   also object that this is outside the scope of the
16   notice.
17      THE WITNESS:  I do not recall receiving this.
18   BY MR. COOPER:
19      Q.  Do you know who the author is?
20      A.  I do not.
21      Q.  And you will admit that your name is in this
22   email, correct?
23      A.  Can you scroll down?
24      Q.  Yes.  Gia, can you scroll down to where his

Page 31

1    name is?  It's right below the email response telling
2    people to --
3       MS. SCATCHELL BASILE:  I highlighted it.
4    BY MR. COOPER:
5       Q.  That is your name, correct?
6       A.  That is my name.
7       Q.  One second.  I have a question for you.  I need
8    to look at a document to ask you the question.  Who is
9    Vasquez de Velasco Guillermo?  For the court reporter
10   it's Vasquez, V-A-S-Q-U-E-Z, de, d-e-, Velasco,
11   Guillermo, G-U-I-L-L-E-R-M-O.  Who is that, sir?
12      A.  I believe at that time he would have been the
13   dean of Professor Hill's college.
14      Q.  Who is Linda Blakely?
15      A.  Linda Blakely would have been our vice
16   president for communications.
17      Q.  Who is Antoinette Wilson?
18      A.  She would have been a member of the
19   president's office.
20      Q.  In what role?
21      A.  I'm not sure of her specific title, but she
22   was like an executive administrative person.
23      Q.  A couple more.  Steven -- I'm sorry --
24   Stephanie Smith, who is she?

Page 32

1       A.  She would have been our vice president of
2    Human Resources.
3       Q.  And either Bob Janus or Janus Bob?
4       A.  Bob Janus would have been my boss,
5    vice president for facility operations.
6       Q.  You would report to him as well, correct?
7       A.  At that time.
8       Q.  So after the -- Gia, we can take this down
9    unless -- Let me see.  Gia, did you send me a message?
10      MS. SCATCHELL BASILE:  I did.
11   BY MR. COOPER:
12      Q.  Who is Gabriel Nesteban?  Who was he in 2019?
13      A.  A President of DePaul University.
14      Q.  So after the protest or -- Let me back up a
15   little bit.
16          You went to the protest with another person
17   from your office, correct?
18      A.  Somebody else from my office, and there was
19   also a representative from the Dean of Students' office,
20   but I just don't remember which one.
21      Q.  Did you write a report?
22      A.  I did not personally write a report, no.
23      Q.  Okay.  And after you left the protest that was
24   the last of your dealing with situations as to Dr. Hill

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    a448d363-6973-48d0-a1c3-016b23bdefe5

## Page 33

1  in 2019?
2      A.  Correct.  That was brought to our attention.
3      MR. COOPER:  Nothing further.
4      THE WITNESS:  No.
5      MR. COOPER:  I'm sorry, no what?
6      THE WITNESS:  No.
7      MR. COOPER:  I said nothing further.
8      THE WITNESS:  No, nothing further.
9      MR. COOPER:  What is the no in response to?
10     MS. BOSSARD:  He didn't understand that you
11  weren't asking a question.  You have no more questions
12  for him?
13     MR. COOPER:  I wasn't asking a question.  I was
14  saying I have nothing further.
15     MS. BOSSARD:  We have no questions for the witness,
16  and we'll reserve signature.
17     MR. COOPER:  Thank you for coming, sir.  Rachel,
18  I'd like to see those notes.  Possibly if you can scan
19  those and send them to us I would appreciate it.
20         AND FURTHER DEPONENT SAITH NAUGHT
21
22
23
24

## Page 34

1         IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF ILLINOIS
               EASTERN DIVISION
3   JASON HILL,          )
4       Plaintiff,       )
                         )
5       vs.              )  No. 2:23-cv-06990
                         )
6   DEPAUL UNIVERSITY,   )
                         )
7       Defendant.       )
8
9         This is to certify that I have read the
10  transcript of my deposition taken in the above-entitled
    cause by Christine Golden, Certified Shorthand Reporter,
11  on the 23rd day of February, 2024, and that the
12  foregoing transcript accurately states the questions
13  asked and the answers given by me as they now appear.
14
15
16
17      _____
             ROBERT WACHOWSKI
18
19  SUBSCRIBED AND SWORN TO
20  before me this_____, day
    of_____2024.
21
22      _____
             Notary Public
23
24

## Page 35

1         CERTIFIED SHORTHAND REPORTER
               REPORTER CERTIFICATE
2
3         I, CHRISTINE GOLDEN, an Officer of the Court,
4   do hereby certify that heretofore, to-wit, on the 23rd
5   day of February, 2024, remotely appeared before me
6   ROBERT WACHOWSKI, in a cause now pending and
7   undetermined in the United States District Court for
8   the Northern District of Illinois, Eastern Division,
9   wherein Jason Hill is the Plaintiff, and DePaul
10  University is the Defendant.
11        I further certify that the said witness was
12  first duly sworn to testify the truth, the whole truth
13  and nothing but the truth in the cause aforesaid; that
14  the testimony then given by said witness was reported
15  stenographically by me in the presence remotely of the
16  said witness, and afterwards reduced to digital format
17  by Computer-Aided Transcription, and the foregoing is a
18  true and correct transcript of the testimony so given by
19  said witness as aforesaid.
20        I further certify that the signature to the
21  foregoing deposition was not waived by counsel for the
22  respective parties.
23        I further certify that the taking of this
24  deposition was pursuant to notice, and that there were

## Page 36

1   present remotely at the deposition the attorneys
2   hereinbefore mentioned.
3         I further certify that I am not counsel for nor
4   in any way related to the parties to this suit, nor am I
5   in any way interested in the outcome thereof.
6         IN TESTIMONY WHEREOF:  I have hereunto set my
7   verified digital signature this 2nd day of July, 2024.
8
9
10
11
12
13      _____
             Illinois Certified Shorthand Reporter
14
15
16
17
18
19
20
21
22
23
24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)          a448d363-6973-48d0-a1c3-016b23bdefe5

EXHIBIT 2

# IN THE MATTER OF:

## HILL
-v-
## DePAUL

ISABEL DIAZ

2:23 CV 06990

February 23, 2024

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992
cagoodreporter@pavesich.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON HILL,           )
                      )
        Plaintiff,    )
                      )
vs.                   )  No. 2:23-cv-06990
                      )
DePAUL UNIVERSITY,    )
                      )
        Defendant.    )

        The 30(b)(6)videoconference deposition
of ISABEL DIAZ, taken in the above-entitled cause,
remotely before Christine Golden, Certified   Shorthand
Reporter in the State of Illinois, on      the 23rd
day of February, 2024, at the hour of 9:30 a.m.,
pursuant to notice.

Reported for
Cynthia A. Pavesich & Associates by
Christine Golden, CSR

Page 2

1   APPEARANCES:
2       LAW OFFICE OF CHRISTOPHER COOPER
        BY: MR. CHRISTOPHER COOPER
3       Via videoconference
        426 North Broad Street
4       Griffith, Indiana  46319
        312-473-2968
5       cooperlaw3234@gmail.com
            Representing the Plaintiff;
6
        ARNETT LAW GROUP, LLC
7       BY: MS. GIANNA SCATCHELL BASILE
        Via videoconference
8       233 West Jackson Boulevard, Suite 750
        Chicago, Illinois  60606
9       312-702-1901
        gbasile@arnettlawgroup.com
10          Representing the Plaintiff;
11      BURKE, WARREN, MACKAY & SERRITELLA, PC
        BY: MS. RACHEL BOSSARD
12      Via videoconference
        330 North Wabash Avenue
13      Chicago, Illinois  60611
        312-840-7029
14      rbossard@burkelaw.com
            Representing the Defendant.
15
16
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2
3   WITNESS                  EXAMINATION
4   ISABEL DIAZ
        By Mr. Cooper            4
5
6
7
8
9
        (NO EXHIBITS WERE MARKED.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1       THE COURT REPORTER:  Could I ask counsel to
2   identify themselves and stipulate to the remote
3   swearing in of the witness, please?
4       MR. COOPER:  Christopher Cooper on behalf of
5   Plaintiff Hill.  No objection to remote.
6       MS. SCATCHELL BASILE:  Gianna Scatchell also on
7   behalf of Plaintiff Hill.  No objection.
8       MS. BOSSARD:  Rachel Bossard on behalf of
9   DePaul University.  No objection to the remote
10  proceeding.
11      (The witness was sworn.)
12          ISABEL DIAZ,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15          DIRECT EXAMINATION
16  BY MR. COOPER:
17      Q.  Good morning, Ms. Diaz.  My name is
18  Christopher Cooper and I represent Dr. Hill.  Do you
19  have a middle initial, by chance?
20      A  I do not.
21      Q.  Okay.  This is just to enable me to make sure
22  that you are who you say you are.  Do you live in
23  Cook County?
24      A.  I do.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                    186fc383-8708-4b76-98c0-66ba0f9512a6

Page 5

1    Q. Were you born in Cook County?
2    A. Yes, I was.
3    Q. Have you ever done a deposition before?
4    A. Yes, I have.
5    Q. Okay. So I'm going to ask you some questions.
6  Your attorney may ask you some questions, and I expect
7  to be done quickly.
8    A. Okay.
9    Q. Are you under the influence of anything that
10  would cause you not to testify truthfully?
11    A. No.
12    Q. Okay. I'm going to ask you questions that may
13  seem silly but they're not, because at some point a
14  judge may read this document. He doesn't know you and
15  I have to enable the court to know something about you.
16  So the first question is are you employed?
17    A. Yes.
18    Q. By whom are you employed?
19    A. DePaul University.
20    Q. What is your job title for DePaul University?
21    A. I am the Director of Employee Relations and
22  Equal Employment Opportunity.
23    Q. Okay. How long have you been in that position?
24    A. In my current title I have been for six years.

Page 6

1    Q. Prior to that you were also in the employ of
2  DePaul?
3    A. Yes.
4    Q. What was your job title?
5    A. Manager of Employee Relations and Engagement.
6    Q. Can you say that one more time, please?
7    A. Manager of Employee Relations and Engagement.
8    Q. Okay. I see your current job. What are your
9  job duties, generally?
10    A. I manage two individuals, one person who is an
11  investigator, another person who is an employee
12  relations specialist. We manage complaints of
13  discrimination and harassment on the basis of a
14  protected class. We manage employee relations issues
15  for staff employees. We manage medical accommodations,
16  policies for the Human Resources Department.
17    Q. Okay. Therefore I should assume that
18  DePaul University has a policy that prohibits racial
19  discrimination?
20    A. Correct.
21    Q. I don't need you to know the policy verbatim
22  but can you tell me generally what that policy
23  represents?
24    A. Yeah. The policy basically outlines that we

Page 7

1  are anti-discrimination, anti-harassment on the basis
2  of the protected classes. Do you want me to list those?
3    Q. No.
4    A. On the basis of protected classes. Individuals
5  can report complaints of what they allege have been an
6  issue of discrimination or harassment through our
7  office. We have a form that they can complete. Or they
8  can submit a complaint through the misconduct hotline
9  that the university has as well.
10    Q. Okay. What happens if an employee makes a
11  report to another managerial person at DePaul and to not
12  someone in your office?
13    A. We do have an expectation that a manager would
14  report to our office if someone has disclosed being
15  discriminated or harassed on the basis of a protected
16  class.
17    Q. Now, is it a violation of DePaul's policy if an
18  employee files a complaint as to his or her protected
19  class status but not to you?
20    A. No.
21            (Technical interruption.)
22  BY MR. COOPER:
23    Q. I'm back. I apologize. My last question was
24  if an employee files a complaint with a manager as to

Page 8

1  his or her protected class status, is that a violation
2  of DePaul policy?
3    A. It is not a violation of the policy.
4    Q. And you know why you're here today, correct?
5    A. Yes.
6    Q. And you know of or perhaps you actually know
7  Dr. Jason Hill?
8    A. I do not know him personally. I know of this
9  case.
10    Q. Okay. What do you know of this case?
11    A. I know that there was an issue in -- I don't
12  even know the year that it was because our office was
13  not involved and did not conduct an investigation --
14  but I know that there was protests and different things
15  going on on campus regarding this issue.
16    Q. Okay. How did you find out about protests and
17  other things happening as to Dr. Hill?
18    MS. BOSSARD: I'm going to object to the extent
19  that it calls for attorney-client privileged
20  information, but other than that, you can answer.
21    THE WITNESS: Yes. When I was called to be the
22  person who represents the university for this
23  deposition.
24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)          186fc383-8708-4b76-98c0-66ba0f9512a6

## Page 9

1  BY MR. COOPER:
2      Q.  Okay.  So at the time that there were protests,
3  your office or you were unaware of the protests?
4      A.  I believe that I recall about the protests, to
5  be honest with you.
6      Q.  Okay.  At the time of the protests did your
7  office investigate why there were protests?
8      A.  No.  Our office would not have gotten involved
9  in that type of situation.
10     Q.  Why is that?
11     A.  Because our office strictly manages complaints
12 of discrimination and harassment on the basis of a
13 protected class, so our office would not have been
14 involved in anything on the student side involving a
15 protest.
16     Q.  Okay.  So your knowledge of the protests, I'm
17 using protests plural, is that only students who were
18 involved?
19     MS. BOSSARD:  I'm going to object that this is
20 outside the scope of the notice, but she can answer.
21     THE WITNESS:  That's actually more of an assumption
22 on my end.  I'm not sure who was protesting.
23 BY MR. COOPER:
24     Q   And, to your knowledge, did the protests

## Page 10

1  represent racial discrimination?
2      A.  To my knowledge, no.
3      Q.  So I'm going to ask you the same question.  It
4  may seem like it's repetitive, but it's not.  To your
5  knowledge, did the protest represent racial
6  discrimination against people who were Jewish?
7      MS. BOSSARD:  Again, I'm just going to have an
8  ongoing objection to outside the scope of notice.
9      THE WITNESS:  I was not aware what the protest was
10 for.
11 BY MR. COOPER:
12     Q.  At some point in the past were you made aware
13 that Dr. Hill expressed that he was the victim of
14 racial discrimination?
15     A.  I was not made aware of that.
16     Q.  So you've never been made aware that he has
17 alleged that he was a victim of racial discrimination
18 in his defense of Jewish people?
19     A.  Our office never received a complaint, so I did
20 not have an awareness.
21     Q.  Okay.  Did you receive an email from Provost
22 Ghanem as to Dr. Hill at some point in time?
23     A.  I did not.
24     Q.  And you have a DePaul University email address?

## Page 11

1      A.  I do.
2      Q.  And you know who Professor Ghanem is or, I
3  should say, correction, Provost Ghanem?
4      A.  I do know who she is, yes.
5      Q.  So as we sit here today you're saying that you
6  were unaware of Dr. Hill complaining that he was being
7  treated differently because of his defense of Jewish
8  people?
9      A.  That is correct.
10     Q.  And I assume that you're also unaware that he
11 complained that he's being treated differently then and
12 now because he's black?
13     A.  Yeah, I have no knowledge of a complaint of
14 discrimination and harassment on his behalf, no.
15         (Technical interruption.)
16 BY MR. COOPER:
17     Q.  I asked you questions about harassment.  Are
18 you familiar with the terminology hostile work
19 environment?
20     A.  Yes.
21     Q.  Okay.  Did you receive a complaint from
22 Dr. Hill or from someone else that Dr. Hill was the
23 victim of a hostile work environment?
24     A.  I did not.

## Page 12

1      Q.  So it's fair to say that DePaul University
2  did not take any steps to stop or address a hostile
3  work environment as to Dr. Hill, correct?
4      A.  If he communicated that he had been a victim
5  of discrimination and harassment on the basis of a
6  protected class then yes, that would be fair to say.
7      Q.  But as you sit here today, you don't know of
8  any steps that were taken, correct?
9      A.  I don't know of any steps.
10     Q.  Is it possible that your office took steps and
11 you just don't know about it?
12     A.  No.  We did not receive a complaint.
13     Q.  Okay.  Now, wouldn't it be your responsibility
14 to listen to, say, rumblings?  You understand what I
15 mean by that?
16     A.  Yes.
17     Q.  Wouldn't it be your responsibility to listen
18 to rumblings or talk around campus that there's a
19 racial issue afoot?
20     A.  No.  Our office conducts the investigation
21 portion.  We have other departments in the university
22 who handle things like that.
23     Q.  Things like what?
24     A.  Like rumblings.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)                186fc383-8708-4b76-98c0-66ba0f9512a6

## Page 13

1  Q. Rumors?
2  A. Yes.
3  Q. Which office?
4  A. So anything that's related to, like, racial
5  things that we don't receive a complaint about, it
6  would be, like, the office of DEI, so our ID --
7  Institutional -- I'm sorry, I'm getting the name mixed
8  up, but our discrimination and harassment, IDEI office,
9  would get involved in things like that.
10 Q. So help me to understand. What's the
11 difference between your office and the DEI office?
12 A. They're more of an office that provides
13 support, training, promotes, you know,
14 non-discrimination, non-harassment on campus on
15 different topics.
16 Q. And that office also does investigations?
17 A. They do not.
18 Q. So if you work for DePaul and you believe
19 you're a victim of racial discrimination you go to
20 that office, the DEI office, or your office?
21 A. If you're formalizing a complaint you would
22 go to my office.
23 Q. And if there's a rumor or many rumors, you
24 know, on campus that there's a hot racial issue

## Page 14

1  happening, your office doesn't get involved?
2  A. It does not.
3  MR. COOPER: Court reporter, you got that answer,
4  right?
5  BY MR. COOPER:
6  Q. Do you have a responsibility, does your office
7  have a responsibility to respond -- Withdraw the
8  question.
9  MR. COOPER: I need a minute to talk to my --
10 (A discussion was had off the record.)
11 BY MR. COOPER:
12 Q. I have two questions for you, maybe more, but
13 right now it's two questions. Now that you've been
14 made aware that Dr. Hill has complained that because
15 of his defense of Jewish people he's being harassed,
16 are you going to open an investigation?
17 MS. BOSSARD: Object to the form of the question,
18 and mischaracterizes the evidence.
19 BY MR. COOPER:
20 Q. Ms. Diaz?
21 A. No.
22 Q. Okay.
23 A. You're getting cut off.
24 Q. Do you consider Jewish people as a whole to be

## Page 15

1  a race?
2  MS. BOSSARD: We didn't hear most of that question.
3  BY MR. COOPER:
4  Q. Do you consider Jewish people to be a race?
5  A. Yes.
6  Q. Okay. And do they deserve protection from your
7  office, if necessary?
8  A. Absolutely.
9  Q. And they would deserve as much protection as
10 would, say, an Arab person?
11 A. Yes. They would deserve our office to complete
12 an investigation if we received a complaint, yes.
13 Q. So your office is not pro-Israel or
14 anti-Israel, correct?
15 A. Correct.
16 Q. Now, does the DEI office communicate with you?
17 A. No.
18 Q. What does DEI stand for, just for the record?
19 A. I'm sorry, discrimination, equity and
20 inclusion.
21 Q. That's okay. Is it diversity, equity and
22 inclusion?
23 A. Yes.
24 Q. Do you know who the director of that office

## Page 16

1  is?
2  A. We have an interim right now, Jose Perales.
3  Q. Okay. But you don't talk with him about
4  business issues, you may talk with him, say, on a --
5  (technical interruption).
6  A. We don't have a standing meeting or anything
7  like that to discuss issues. Our efforts are different.
8  Q. Okay. Once again, you never received an email
9  from Professor Ghanem in which -- I'm sorry --
10 Provost Ghanem, in which she addressed an article
11 written by Dr. Hill?
12 A. Our office did not receive a communication
13 from the Provost Ghanem.
14 Q. Okay. Would you mind giving us your email,
15 please?
16 A. Sure. Idiaz4@depaul.edu.
17 Q. And that was the email address that you had
18 or you've had for the past six years?
19 A. I've had that email for 21 years, yes.
20 Q. So did you take -- that is, did
21 DePaul University take any steps as to Dr. Hill
22 possibly being subjected to a hostile work
23 environment?
24 MS. BOSSARD: Objections, calls for speculation.

Electronically signed by Christine Golden (001-007-098-0713)        186fc383-8708-8708-4b76-98c0-66ba0f9512a6



**Page 17**

1  THE WITNESS:  I can tell you that my office did
2  not conduct an investigation.
3  BY MR. COOPER:
4    Q.  Okay.  But that means your office did not
5  take reasonable steps to stop discrimination or
6  harassment because your office was unaware of such
7  things, correct?
8    MS. BOSSARD:  Object to the form of the question.
9  Assumes facts not in evidence.
10   THE WITNESS:  So I wouldn't necessarily think of
11 it that way.  Our office, if we had a complaint we would
12 have done an investigation and talked to individuals
13 involved and tried to get to the bottom of the issue and
14 address the issue.  Absent us having a complaint on
15 file, there was nothing our office could do.
16 BY MR. COOPER:
17   Q.  And that's why your office did not do anything,
18 correct?
19   A.  Correct.
20   Q.  Okay.  One second.
21   MS. BOSSARD:  I'm sorry, we didn't catch that.
22 BY MR. COOPER:
23   Q.  Your office – Are you familiar with the
24 phraseology Sua Spontae?

**Page 18**

1    A.  No.
2    Q.  Can your office initiate a complaint that is
3  without a complainant?  Can your office say, hey, there
4  is an issue?
5    A.  Our office does not do that.
6    Q.  We're going to start investigating?
7    A.  No.
8    Q.  So if you become aware of, say, racial
9  discrimination on campus, you don't take – (technical
10 interruption).
11   MS. BOSSARD:  I didn't hear that question.
12   THE WITNESS:  You're cutting off again.  Sorry.  We
13 didn't hear the question.  You were cutting off again.
14 BY MR. COOPER:
15   Q.  If your office is aware of racial
16 discrimination on campus it will not conduct an
17 investigation unless a person files a complaint,
18 correct?
19   A.  Correct.
20   MR. COOPER:  Okay.  Nothing further at this time.
21   MS. BOSSARD:  I have no questions for the witness.
22 We'll reserve signature.
23        AND FURTHER DEPONENT SAITH NAUGHT
24

**Page 19**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  JASON HILL,              )
4     Plaintiff,            )
                            )
5     vs.                   )  No. 2:23-cv-06990
                            )
6  DEPAUL UNIVERSITY,       )
7     Defendant.            )
8
        This is to certify that I have read the
9
   transcript of my deposition taken in the above-entitled
10
   cause by Christine Golden, Certified Shorthand Reporter,
11
   on the 23rd day of February, 2024, and that the
12
   foregoing transcript accurately states the questions
13
   asked and the answers given by me as they now appear.
14
15
16
17 _____
          ISABEL DIAZ
18
19
   SUBSCRIBED AND SWORN TO
20 before me this_____ day
   of_____ 2024.
21
22
23 _____
          Notary Public
24

**Page 20**

1      CERTIFIED SHORTHAND REPORTER
           REPORTER CERTIFICATE
2
3      I, CHRISTINE GOLDEN, an Officer of the Court,
4  do hereby certify that heretofore, to-wit, on the 23rd
5  day of February, 2024, remotely appeared before me
6  ISABEL DIAZ, in a cause now pending and undetermined
7  in the United States District Court for the Northern
8  District of Illinois, Eastern Division, wherein
9  Jason Hill is the Plaintiff, and DePaul University is
10 the Defendant.
11     I further certify that the said witness was
12 first duly sworn to testify the truth, the whole truth
13 and nothing but the truth in the cause aforesaid; that
14 the testimony then given by said witness was reported
15 stenographically by me in the presence remotely of the
16 said witness, and afterwards reduced to digital format
17 by Computer-Aided Transcription, and the foregoing is a
18 true and correct transcript of the testimony so given by
19 said witness as aforesaid.
20     I further certify that the signature to the
21 foregoing deposition was not waived by counsel for the
22 respective parties.
23     I further certify that the taking of this
24 deposition was pursuant to notice, and that there were

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)        186fc383-8708-4b76-98c0-66ba0f9512a6

Page 21

1    present remotely at the deposition the attorneys
2    hereinbefore mentioned.
3          I further certify that I am not counsel for nor
4    in any way related to the parties to this suit, nor am I
5    in any way interested in the outcome thereof.
6          IN TESTIMONY WHEREOF:  I have hereunto set my
7    verified digital signature this 2nd day of July, 2024.
8
9
10
11
12
13

     Illinois Certified Shorthand Reporter
14
15
16
17
18
19
20
21
22
23
24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Christine Golden (001-007-098-0713)          186fc383-8708-4b76-98c0-66ba0f9512a6

EXHIBIT 3

**Faculty Council Resolution on Academic Freedom and Responsibility**

**Whereas** DePaul University's Faculty Handbook (6.1) affirms that "DePaul accords academic freedom a prominent position as an integral part of the university's scholarly and religious heritage" and furthermore states that "The university attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process." And

**Whereas** the Handbook also affirms the AAUP 1940 Statement of Principles on Academic Freedom, which states that "When [faculty] speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution."

**Whereas** DePaul University's "Guiding Principles for Speech and Expression" affirm that "We deem free and open expression as essential to intellectual inquiry." As well as the "responsibility to provide a setting in which a broad and diverse range of ideas can be exchanged civilly and respectfully," "to foster a respectful and inclusive learning environment," and "to continuously and actively amplify marginalized voices and to create opportunities for conversations that advance social justice."

**Whereas** the guidelines also "affirm the right of individuals to express their viewpoints, even at the risk of controversy," while also affirming "the right of individuals to choose whether and how to respond to speech and expression" And

**Whereas** DePaul University's Catholic and Vincentian mission includes a commitment to affirming the equal dignity and human rights of all human beings, regardless of ethnic or religious heritage. And

**Whereas** the recent article by Professor Jason Hill, entitled "The Moral Case for Israel Annexing the West Bank – and Beyond" 1) misrepresents the history of the Israeli-Palestinian conflict, 2) distorts the facts about the current state of Israeli-Palestinian relations, 3) promotes racism toward Arabs generally and Palestinians in particular, and 4) advocates for war crimes and ethnic cleansing against the Palestinian populations of the West Bank and the Gaza Strip.

THEREFORE, BE IT RESOLVED

**That** DePaul University's Faculty Council affirms Professor Hill's right to publish and express his opinions consistent with the Faculty Handbook, the AAUP Statement on Academic Freedom and Tenure, and the Guiding Principles on Speech and Expression.



**EXHIBIT**
3
Dr. Salma Ghanem
DN          Mar 23 2022

**That** the Faculty Council nevertheless affirms that Professor Hill's article failed to exercise adequate concern for accuracy, restraint, or respect for the opinions of others, as per the AAUP guidelines. As such, this article represents an abuse of his academic freedom.

**That** Faculty Council condemns in the strongest possible terms both the tone and content of Professor Hill's article, and affirms the claims that it expresses positions that are factually inaccurate, advocate war crimes and ethnic cleansing, and give voice to racism with respect to the Palestinian populations of the West Bank and Gaza Strip, as well as Arabs generally.

**That** Faculty Council urges Professor Hill to seriously reconsider his positions on these issues, to take cognizance of the perspectives of other scholars on these issues, as well as the real harm his words have caused to students and other members of our community, and to refrain from abusing his freedom as a scholar in writing on controversial issues in the future.

EXHIBIT 4



MAY
28

# Hill Was Censured-Celebratory Dinner!

Public · Event · by SJP DePaul and 5 others

 **Rifqa Ahmad invited you**

★ Interested    ✓ Going    ✗ Ignore    ••• More

Tuesday, May 28, 2019 at 7:30 PM – 9 PM



DePAUL_084066

# LET'S STAND AGAINST RACISM AND SAY NO TO PROFESSOR JASON HILL.

#DePaulDumpHill

#WhatMustBeDone

## Sign the petition here:
(Use phone camera)



← Tweet

Jason D. Hill
@JasonDHill6

Missing from the travel ban: Egypt, the SAudi Arabia, United Arab Emirates, Turkey—anyone care to research how big a sponsor Quatar is of international terrorism?

1:02 AM · 27 Jun 19 · Twitter Web Client

1 Retweet 3 Likes

Marina Medvin @Marin... · 28 Jun 19
Replying to @JasonDHill6
Trump was overly cautious in the ban. I agree.



Tweet your reply

# EXHIBIT 5

Case No. 22-cv-06990

HILL DEPOSITION EX 28

---

**From:** The Office of the Provost <provost@depaul.edu>
**Sent:** Wednesday, May 15, 2019 1:43 PM
**To:** Sorkin, Howard
**Subject:** A Message from the Acting Provost on Free Speech and Vincentian Values



DePaul University

May 15, 2019

Difficult situations often times bring out the best and worst in us. The recent discussions on campus regarding the clash between free speech and Vincentian values made me even prouder to be part of the DePaul community. While I am deeply saddened that Professor Hill used his right to academic freedom and free speech to disparage one group over another, resulting in some members of our

community feeling unwelcome and unsafe, I am extremely impressed by the way members of the DePaul community made their voices heard. I want to reiterate, Professor Hill's views are his own and do not represent the views of the university. At DePaul, we value all individuals equally and are truly disheartened that a member of our own community asserts "Not all cultures are indeed equal. Some are abysmally inferior and regressive based on their comprehensive philosophy and fundamental principles—or lack thereof—that guide or fail to protect the inalienable rights of their citizens."

I met with several students on Monday and was very impressed by their thoughtful comments and opinions on this issue. Our students outlined their concerns, provided arguments and engaged in a productive dialogue. They have also taken it upon themselves to organize and counter the views with which they disagree. Our faculty have and continue to address this situation with our students in a variety of forums. Our students and faculty have exemplified the best of what an intellectual dialogue at a university can look like.

Unfortunately, the article by Professor Hill has also brought out the other extreme and emboldened some to hide behind the cloak of social media anonymity and attack our students and faculty on the Internet. These hurtful attacks are cowardly and stand in stark contrast to civilized discourse. Intimidation is the tool of the weak both in spirit and in intellect.

We have a choice between the best and the worst, and I am confident that our Vincentian values will guide us to choose the right path.

Sincerely,

Salma Ghanem
Acting Provost

# EXHIBIT 5b
# (Under Seal)

# EXHIBIT 6

**FACULTY COUNCIL MEETING**
**AY18-19, No. 9**


**1. May 2019, 2:00-5:00 p.m.**
**LOOP, 801 – 55 E Jackson Blvd**

**Members Present**: John Berdell (BUS), Peg Birmingham (LAS), Paul Booth (CMN), Greg Brewster (CDM), Michelle Navarre Cleary (SNL), Mark Delancey (LAS), Christopher Drupieski (CSH), Cathy Ann Elias (MUS), Jason Goulah (EDU), Peter Hastings (CDM), Nila Hofman (LAS), Christopher Jones (MUS), Andrea Kayne (EDU), Kelly Kessler (CMN), Sara Kimble (SNL), Joseph Mikels (CSH), Jeff Mills (THTR), Mark Moller (LAW), Denise Nacu (CDM), Laura Owen (BUS), Scott Paeth (LAS), Mark Potosnak (CSH), Quinetta Shelby (CSH), Steve Socki (CDM), Sonia Soltero (EDU), Susan Solway (LAS), Anna Souchuk (LAS), Naomi Steinberg (LAS), Ahmed Zayed (CSH)

**Absent:** Alberto Coll (LAW), Toy Deiorio (THTR), Sue Fogel (BUS), Elissa Foster (CMN), Jaclyn Jensen (BUS), Rob Ryan (BUS)

**Alternates Present:** Sanjay Deshmukh (BUS, voting for Sue Fogel), Gil Gott (LAS), Valerie Johnson (LAS), Michelle Lopez-Rios (THTR, voting for Toy Deiorio), Juan Mundel (CMN, voting for Elissa Foster), Jessica Westbrook (CDM)

**Liaisons Present:** Jack McGaw (WEC), Lucy Rinehart (Academic Affairs)

**Guests**: Carolyn Bradley (DePaulia), Caryn Chaden (Academic Affairs), Jerry Cleland (CSH), Salma Ghanem (Academic Affairs), Matthew Girson (LAS), Miles Harvey (CCP), Xiaoping Jia (CDM), David Kalsbeek (EMM), Don Martin (CMN), Jalene LaMontagne (CSH), Catherine Marienau (SNL), Craig Miller (CAP/CDM), Michael Miller (BUS), Dominica Moe (LAS), Don Opitz (SNL), Varsha Radamandle (Good Day DePaul), Steve Resnicoff (COL), Lynn Safranek (AVP OPRC), John Shanahan (LSP/LAS), Paul Steero (Good Day DePaul)

1.  **Announcements and Minutes, Scott Paeth:** *Actionable Item*

Meeting called to order at 2pm by FC President Scott Paeth. He explained the altered seating style was due to predictions about heavy attendance by visitors. He opened the floor to anyone who was interested in running for an officer position for the upcoming year. No one responded. Paeth reminded members and guests about FC policy regarding being succinct and allowing more people to speak, rather than speaking multiple times in succession. He reminded those in attendance that FC places a premium on civility and noted it is not the practice of FC to record these meetings and asked that all recording devices be turned off if any were on. He also noted the max capacity for the room was 75 and if we were to exceed the capacity,



EXHIBIT
4
Dr. Salma Ghanem
DN          Mar 23 2022

we would have to prevent further people from attending. Paeth also alerted guests that they must be recognized by the presiding officer to have the floor and that FC members would take precedence. He reminded people to alert Greg Brewster if they were interested in the AAUP summer event and to RSVP for the end of year party. He asked if anyone had any changes to the minutes. **Moved to approve the minutes. Seconded. Approved by voice vote with one abstention.**

## 2. CCP Business, Miles Harvey: *Actionable Items*

It was noted that the CMN proposal listed as "Creative Minor" should have been called "Advertising Creative" rather than "Creative." Miles Harvey asked for a friendly amendment to make this change. **A member moved, another seconded, approved by unanimous voice vote. Paeth asked for someone to move to approve the CCP proposals as a slate. Moved. Seconded. Approved by voice vote unanimously.**

a) Proposal for MS in Community Psychology, CSH

b) Proposal for BA-MS in Community Psychology, CSH

c) Proposal for DePaul Universal Combined Degree Pathway to MAAPS, SNL

d) Proposal for Master of Arts in Educating Adults (MAEA) Program, SNL

e) Proposal for Proposal for Creative Minor, CMN

f) Proposal for New Degree: Pre-Physical Therapy Conc. within BS in Exercise Science, COE

g) Proposal for Credit Bearing Certificate, Adult Nurse Practitioner, CSH

h) Proposal for Credit Bearing Certificate, Family Nurse Practitioner, CSH

i) Proposal for Degree Revision to B.S. in Network Engineering and Security

## 3. COC Business, Greg Brewster: *Actionable Items*

**Greg Brewster moved that all COC nominees be approved as a slate. Seconded. Approved unanimously by voice vote.**

### 4. CAP Business, Craig Miller: *Actionable Item*

Craig Miller said there was not much to say about the first item. **Motion to approve, seconded, approved unanimously by voice vote.** Regarding the second item, Miller noted it was just adding countries to an existing list. A member asked if CDM was the only college which had such a policy. Miller was not sure of this. A member asked if these were English speaking countries. **Motion to approve. Seconded. Approved by unanimous voice vote.** Miller turned to the issue of the calendar and noted that after further consideration the option B with 4-day spring break was not viable because grades would be due after spring quarter started. He also noted CAP had considered option C with a 4-day finals week, but students who had Monday evening courses would have to have had their finals rescheduled. This ended up being more trouble than the early start date. Paeth opened the floor for discussion. An FC member asked if we knew how many students would be impacted by the Monday night conflict. Caryn Chaden said they did not get actual numbers. She noted that she had been in favor of shortening the break but that ended up creating other problems. She noted that after this year it would be fine for a while, but it was just the nature of the calendar. **Motion to approve, seconded, approved by voice vote with one dissenting vote.**

### 5. Discussion of the state of diversity on the DePaul campus, Valerie Johnson: *Discussion*

Valerie Johnson asked what diversity meant. A member said variety. She said she would be limiting her discussion to race and ethnicity, recognizing that diversity could be addressed re: other groups. She noted that her discussion of diversity and inclusion would also relate to other groups. She wanted to note "pitfalls of discussing race and ethnicity in a racialized society". She noted that the majority of the population was not impacted by the topic, so they were not concerned or simply ambivalent. She said the problem becomes convincing the majority that there is a problem. She also noted that change requires extraordinary effort, like working uphill to enact substantive change. She stated that this promotes separate communities and stymies intercultural communication. She noted that majority communities tend to focus on how "we are doing" among members of the *majority*. Another pitfall is that addressing diversity "evokes discomfort, defensiveness, and guilt among white people," evoking the book *White Fragility*. She noted that as an

African American woman she has asked herself why it's uncomfortable: (1) it goes against the grain of what we are told about our nation (fairness, equality, democracy) and many believe that the problems associated with race and ethnicity have already been solved, (2) no one wants to feel as if they are racially insensitive. She then noted "essential truths": (1) we are still working on democracy, equality, fairness, and justice. Like religion, many of its tenets are aspirational. (2) We at DePaul are not immune to the problems associated with living in a racialized society. (3) There is no need for us to act as if we are immune. Only our own self-imposed notions would encourage us to act that way. (4) In order to resolve the problem, we have to face the problem, as there is no problem you can resolve if you can't face it.

Johnson then moved to the context of the discussion. She said she, like many members of diverse groups at DePaul, feels as if she is unheard. Forums and "stuff" do not impact the day to day lives of diverse faculty. She said that per many of her colleagues, diversity, equity, and inclusion are not working well at DePaul, noting. it's just not the easiest thing to do to buck the status quo.

She then turned to a slide titled "Characteristics of Diversity, equity, and inclusion at DPU": (1) It's symbolic (events, speakers, and program oriented, noting a speaker she attended the previous day). She noted she had been speaking to a white woman at her table and asked if this would be impactful re: her day to day at DePaul. She said no. She noted the difficulty of making that shift, especially when people are resistant.  (2) It doesn't involve and impact the whole DePaul community, just the usual suspects. She noted that when you go to these programs, you'll see the same people. It's like speaking to the choir, rather than permeating all areas and units of the University. (3) It does not address structural or systemic issues at DePaul. (4) It's defensive because of the guilt or feelings of white fragility. (5) It vilifies those who are the most vocal advocates or critics. She noted that different communities express themselves differently, stating that when people of color express themselves it evokes fear, as people of color are often cast as urban thugs, terrorists, etc. (6) It is silencing. (7) It is delegitimizing. Johnson stated that part of being a good colleague is trusting a person's point of view and considering it. These elements evoke tension. She said she always says we create our own terrorists by silencing and delegitimizing. It makes diverse faculty work against the grain and ultimately be perceived gadflies.  (8) It's risk averse. Purported values are often subordinated to protecting the university. In a zeal to protect the university, the university ends up promoting and evoking the kind of tension that land us in the

*Chronicle of Higher Education* or *People Magazine*. (9) It suspends all rules of basic interpersonal skills and communication. She noted that none of the student protestors had been talked to by the administration of DePaul. (10) It often builds its leadership amongst those who are unskilled or unqualified in the areas of diversity, equity, or inclusion or those who are willing to remain silent or support the status quo. It assumes everyone is an expert and all people of color are qualified to do diversity programming. It assumes it's best to keep the peace rather than confront the problem. Johnson also noted that this often leads to those in power implying "haven't we done enough for you." (11) It leaves members of diverse groups feeling devalued. (12) It replicates rather than alleviates tension.

Johnson then noted this would be a good time to flip the script and do something different as we get ready to do an external search for an AP of Diversity. She said we owe it to ourselves, our colleagues, and our mission to live out our convictions. What she said she would like to see was (1) Enough love and concern to address problems affecting diverse groups. Wherever there is human contact there is a necessity to discuss love. She stated that she wants the best for all of us and hoped the reverse was also true. (2) Some acknowledgement the administration has not handled problems impacting diverse groups effectively. (3) Diversity leadership that is knowledgeable and knows how to handle issues that arise in diverse settings. (4) Diversity leadership willing to challenge the status quo. She noted that all advances in our nation have been by those willing to challenge the status quo. (5) Accountability measures. (6) Elevate the "equity and inclusion" part of diversity in diversity, equity, and inclusion equation.

Quinetta Shelby pointed members to the organizational diversity functional flow chart she had been given by Liz Ortiz after asking at a PDAC meeting about the structure of diversity at the university. Months after asking she had been given the chart, noting that PDAC was not even listed on the chart. She pointed to the AAP (Affirmative Action Plan) and noted she did not know anything about it. It was noted by a rep from Academic Affairs that it was in HR. She noted issues re: discrimination were now under HR. She noted that after the 2 diversity fellows were named, Steve Stoute stated that it was never a President's Diversity Fellowship, yet it fell under OIDE. She noted that she wanted to point out that there were a number of different entities that addressed diversity within DePaul and that she either did not know what they are doing or what they were. She was not clear if ***they*** even knew what they were doing.

Shelby said she was going to talk to FC like we were family. She said when it came to diversity "don't play with me." She noted there were a number of people who were suffering in silence. She evoked the faculty of color luncheon, noting that many of the people who addressed their frustrations there were not those who speak more publically because they get signals from administration that nothing will be done. She pointed to the letter appointing them to the PDAC stating they would have time with the President but that he had only attended 1 meeting all year. She pointed to the Diversity Advocates, a position that came from an FC item. The administration can say Diversity Advocates were appointed in each college, but some of the advocates don't know they have those positions and some Deans don't know who their advocates are. She contacted a Dean from another college who gave a name contrary to the one listed on the PDAC site. Shelby spoke to the Diversity Advocate of CSH and came up with the idea that the Diversity Advocates should get together and talk about what was occurring *across* colleges. She argued that all of this signals that diversity is not being taken seriously at DePaul.

Shelby turned to the selection process for the AP of diversity, noting the process for choosing the AP of Diversity was different than that for the AP of Research. She noted that FC had asked for representatives of diverse faculty to have a voice regarding the choice of AP of Diversity, but that the choice for AP of Diversity was being made by the Provost and President. She noted that the ERGs were not invited into the process. She noted that she personally as a Chair feels a lot of frustration on this front and stated that whereas Valerie is talking about love, she is trying to contain frustration. She stated that her position was that diversity is addressed in our strategic plan and although we have different events around diversity and from the outside looking in, it looks like something taken seriously, from someone who has been at DePaul for 15 years, that is not what she sees. She stated that if the university was going to continue to proclaim its concern for diversity, they needed to commit. They either needed to commit to it or take it out of the strategic plan.

Paeth opened up the floor for discussion. Acting Provost Ghanem thanked them for the presentation and clarified why the 2 searches were different. She noted that the AP for Research would be an internal and permanent position. She noted they had gone with the interim diversity position in the meantime to do what FC had asked regarding doing an external search for the permanent AP. Ghanem noted that she's already in contact with APs of Diversity around the country getting advice. The only reason they have done the interim really quickly is because they needed someone to take over *now*. She reiterated that the *INTERIM* is different than when you select

someone *PERMANENTLY*. She noted that this is not to signal that one is less important than the other. She was asked why they were doing an internal for the AP Research. She thought it was important to broaden the search as much as possible for the AP of Diversity. She said you don't give it to someone because they happen to be there or because they are a person of color.

VP Soltero noted that the carrying out of action item number 1 from the 2018 FC retreat on institutional racism, a resolution passed unanimously by FC and officially acknowledged by the Acting Provost, was the responsibility of the FC and FC had yet to address that resolution. She also noted that the other four resolutions had not been addressed or implemented, aside from the resolution to conduct a national search for the AP of Diversity.

Johnson reiterated that unless we have the will, and our administrators have the will, we will replicate the same things we have done in the past. We will choose someone who will not challenge the status quo and likes to deal in the symbolic rather than the substantive. She noted that the Diversity Advocates had come out of a structure she had been part of and that it had taken a long time to get people to do this. Since their appointments, they have not done much. She said she was asking her colleagues to hold the university accountable. Shelby said she was not going there regarding the 2 searches and for both input should have been solicited. An FC member noted that a young female student came to her to report a sexual assault. In the last week several students of color had come to him noting they felt threatened. He had no legal obligation to report racial harassment, although he was required to report sexual harassment or sexual assault. He noted that HR had held a sexual abuse workshop, which was helpful. He said it seemed to him that we have certain measures in place re: protecting certain members of our community, but not for others. He noted that this was compromising students' ability to get work done and that it's incumbent on FC to take a leadership role and take ownership. How that would manifest itself, however, he was not sure.

An FC member thanked Johnson and Shelby and noted that she had suggested in FCEC that it might be effective to have the university provide funds to FC to hire an external consultant (chosen by FC ) to look at this issue and recommend best practices. For credibility reasons, she thought it might be helpful if an external consultant helped to clarify the structures in place and ones that were needed.

An FC alternate thanked them.

An FC member noted that when she went to a compliance meeting about reporting issues of sexual misconduct, she had asked about racially discriminatory remarks. The leader of the meeting had said, "well that's not legally mandated by the federal government." The member asked why we at DePaul could not do better ourselves and why do we not enact a rule to investigate racially discriminatory remarks.

Paeth stated that he was under the impression that there was federal civil rights law that pertained to racial and ethnic harassment on college campuses. An FC member said under Title IX the coordinator MUST be alerted and that there was not something parallel regarding race and ethnicity. An FC member wondered if the Board of Trustees had a committee on diversity and if PDAC or the officers could see what is going on there. An FC member noted that FCEC had discussed how we could enact this. She noted that Johnson had stated that perhaps in the compliance training there could be a section on diversity. It would put out there that diversity matters at DePaul. An FC member said that there was a sense that keeping the peace was easier or more civil than confronting the problem and what we're being asked to do is transcend that, which is not easy. The member noted that often when talking about diversity, someone who holds a different opinion is silenced and that a healthy conversation involving differing voices would be considered uncivil. She noted it's an enormous task that should be taken seriously and we need to take the bull by the horns even if they are uncomfortable and we disagree. An FC member noted that civility manifests itself in silence. He would say we are MORALLY obligated to address issues around race and ethnicity and that if we are going to put our money where our mouths are then something has to change and the faculty needs to take a leadership position.

Johnson said faculty have a unique and vital role to play; however, we have a proliferation of subcommittees and when we start another committee, task force, etc. then we break into these subcommittees and it does not impact the larger community. For that reason, she argued that it needs to come from the top. She said she is asking administration to transcend societal problems. It's important when administration shares these values and can signal values. She noted that many recommendations have been half-heartedly implemented or ignored and that if we don't have the will, then it's not going to trickle down and really have an impact. She said she has found that someone can totally flub the diversity question and still be considered a viable candidate for administration. Paeth said we needed to end the agenda item and thanked everyone for their participation and contribution. He noted that we need to determine the next thing we need to do as a body on this

front.

Soltero asked that we compile the action items and take those to the president.

**6. Discussion of the New University Vehicle Driver Policy, Scott Paeth,**
*Discussion*

Paeth noted that he and made an error in not bring this policy to Faculty Council prior to approval and apologized to those it impacted by this policy change. He said that in sum, as President he is a member of the PRG. This came across the agenda and he did not realize the implications for some of our faculty, especially those in Environmental Science and Biology. As this has already gone through, we need to unring that bell. He's happy to discuss this.  A member asked what the issues were. An FC member noted that they do a lot of field research and the mileage change would make that work difficult. The age limit also impacts students. They now have to be 21. A guest from Biology noted that one of her field sites is 408 miles away. Another is 488 miles away. The new policy states that there is now a need for a 2nd driver if a site is a mere 150 miles away. She said this goes too far and hinders her ability to do her work.  The FC member noted that the guest's grant is worked against by this policy and frames DePaul as a place where it is difficult to do research.

An FC member was confused because it had been 21 years old a couple years ago. Someone pointed out that the difference was that previous policy has placed that age limit with rental vehicles, and this one changed the age limit regarding DePaul vans. The guest said the policy had been that you had to be 21 if you drove a DePaul vehicle outside of the Chicago area. It had been 18 for local trips. An FC member asked why it had been changed. Paeth said it was perceived to be safer. Someone suggested insurance may have factored into the decision. An FC member said FC had dealt with this policy before and the rule had NOT been changed. Paeth noted again that he had screwed up. The question was WHY was this pushed again when it had already been declined. An FC member stated that in the past it had been suggested that anyone who drove the van was going to be drug tested. An FC member asked if FC had gotten a reply back about this. Paeth noted that a representative of PRG had been at the meeting but she seemed to have left. He stated that the goal here was to return to the old policy or engage in discussion. It was noted that the statement made previously by Bamshad and Beck-Winchatz in 2016 could be found in the relevant materials. Paeth wanted to know if the goal was to go back to the previous

policy. Those impacted would like to see that happen.  Paeth stated he will go back to PRG. The guest said that carpooling, per the revision, was a positive change. Paeth asked the guest to email him language to pass on to the PRG.


**7. SOF Exemption Term Faculty Overage Exemptions, Andrea Kayne:**
*Actionable Item*

Kayne stated that SOF met and considered several requests and that the process is making more sense because the SOF can see faculty trends. All requests were straightforward. A couple of the requests were placeholders. A couple were reflecting the university investing in innovation/new programs. They approved the WRD request unanimously but as suggested in the application, they believe there should be a new tenure track faculty member in WRD. That said, that did not prevent them accepting the request. Rinehart stated again that this is a bit of an absurdist exercise, but they have been able to see that the worth of the exercise is revealed in the patterns over time. Those involved are coming to realize that there are other factors they need to ask about in this process: percentage of credit hours taught by parttime faculty.

It was also noted as relevant that the Provost has changed the timeline for approving new tenure track lines. The presenters noted that there is a certain subset of these term line overages that are "seat warmers" or place holders as the college awaits an approved tenure track line.

To summarize, Rinehart said they meet, she writes a memo, Salma reads it, and they discuss the memo. She noted that there were 12 units with overages. 5 had approved multiyear exemptions. Of the 7 requests, 3 were new. 2 were on the list last year that were not this year. WRD, she would highlight, asked that the exemption rely on the number of term lines remaining at 10 and the Provost not replacing tenure lines with term lines. Rinehart showed a few slides from the annual report (fulltime faculty numbers) with number and percentage trend lines. Salma asked that she add a chart that addresses how this is playing out on a college level. She provided FY 18 and 19 with percentages and up or down data. A slide addressed where those overage occurred (new/developing programs, clinical/professional activities, service-level courses). This was further broken down into multi-year exemptions and one-year exemptions. It was made clear that none of the multi-year

exemptions were because of new or developing programs. All but one was using the term positions to address clinical/professional activities. The one-years were new and developing programs. This highlights patterns that have made themselves clear over time. Kayne noted that all of the new/developing programs have approved tenure track lines. Kayne noted that this year's ERIP might impact numbers.

A member asked why we were having this discussion in the spring, when we have no info about tenure track lines that are going to be approved. In LAS they are down tenure track and up term. She noted that she did not have info about what would be approved. Rinehart noted that requests have just landed on the Provost's desk and she is therefore aware of the situation when making these decisions. The member noted FC would be asked to vote without that info regarding new tenure track lines. Rinehart noted the units had already voted. Kayne noted they had refused to vote on the MA of Public Health because the faculty numbers did not line up. There had been concern that faculty were not being counted, but they turned out to be joint appointments. She noted that for SOF, this was not a rubber stamp processes. Rinehart noted that there was far more transparency than in the past, but a time lag. She said you have to have faith in the unit advocating for itself. SOF said they are looking at this in the context of the SOF report. They are talking to Rinehart about the decrease in Assistant Professors and have said they now want info about adjuncts for next year.

An FC member noted this will blow up next year due to the ERIP. She noted that in Business they are just below the threshold, but they will be well above it because of retirements. Rinehart said it should be easy to adjust regarding who takes early retirement. A member said they were hoping that would be considered in decisions regarding replacement lines, but what they would like and what they will likely get differs and will put them out of compliance. Rinehart noted this was a good time to go back to the annual report and the fulltime faculty by rank, by college chart and noted there had been a decline in percentage teaching hours for a decade. She noted that this means something when you have dried up assistant ranks and not to think that just because we are looking at numbers we are not also looking at disciplinary realities.

An FC member noted that this has happened every year with WRD. Rinehart noted they continue to need term faculty based on the options given. Kayne said they had discussed whether there would be a time where they did not need an exemption. SOF discussed not granting it to pressure toward a tenure track appointment, but

it's the WRD faculty who are asking for the exemption. SOF did put it in the record that they believe there should be another TT position in WRD. Rinehart suggested people reread 2.3.2.1 of the handbook that says exemptions will be given for these reasons.

**Paeth asked for a motion. Moved. Seconded. Passed by voice vote. 1 opposed.**

### 8. Presentation and Q&A regarding Marketing Strategies, David Kalsbeek: *Discussion*

David Kalsbeek opened the floor to questions. An FC member asked about a new Environmental Science program, noting that our website is not as nice as Northwestern's competing program. The member asked how we elevate our stature now that we have competition. Kalsbeek stated that our focus is on search engine optimization. He noted that he was open to input from colleges and was in the process of developing new videos and overall digital marketing. They have done a lot of alumni showcase vignettes. He said he would have someone follow-up with the member regarding Environmental Science.

An FC member from Math said he'd noticed that the section on academics must have been created by someone in marketing, as it was clearly not created by someone in Math. He said he had tried to ask questions through the web hierarchy in his college, but he had not been given any answers. Kalsbeek said CSH is the next college in the que for website updates. They will then combine what the college wants with key words that will optimize the process.

An FC member asked about the name transition from SNL and wondered about the timeline for that transition. Kalsbeek said they have reviewed this with Interim Dean Opitz. EMM has it all ready to roll out (a revised version with some redesign) by the July 1 launch. He stated that this is part of a larger list of things that will have to be done with any name change. Within that website they will be trying to roll out a more integrated and coherent articulation of non-degree programs.  One of the complicated factors is that the website is not just a presentation, but a working tool. Everything is embedded in a data system that has to be replaced. They only want to do so much on the front end because they will be unplugging that underlying system. He said in the current campaign it didn't make sense to include a program that would be changed in the middle.  They will be replacing all of the materials in the near future. An FC member asked if EMM has a plan to do things differently in

this more competitive market, as this is a priority in the strategic plan. There was disagreement about whether the adult market was a growing market. Kalsbeek noted that although enrollment in SNL had not been as strong, it had been high in our other programs.

An FC member asked about the process of studying return on investment relative to particular colleges and specific programs in those colleges. Kalsbeek said the purpose of advertising is twofold (a) prospect generation and (b) brand awareness. Through the advent of the slate system, we have the capacity to track very specific leads, cost per lead, and how many of those apply, are admitted, have enrolled, and the lifetime net revenue. They ultimately don't know if an enrollment was because of a specific ad. They know that the enrollment in the first year of the campaign pays for the campaign. It can take several years to see what the revenue payoff is for the lead related to that ad. At times the interest may not have come from that ad but they have clicked on that ad. The brand campaign is an awareness campaign and one providing visibility. The brand campaign is new for EMM and was done with money allocated by the Board of Trustees. These resources have been shifted toward recruitment. He noted that it just benefits some programs to do digital ads more than others. He then turned to the bidding process of buying keywords. Some of the programs are in higher demand by for-profit universities that can bid up that price to more than DePaul can or should pay. One of their pilots is to see what it would cost to bid on Chicago MBA. He does not think the ROI is going to be there to outbid some of the other terms they use for Kellstadt. This allows them to experiment with some things that they have not been able to. CDM believes film and TV are marketable beyond the local. An FC guest noted that the Liberal and Fine Arts had been left out of the marketing, as most of what he had seen was associated with computing and the sciences. Kalsbeek said they had worked with LAS and have LAS specific messaging. He noted that they were continuing to expand and the previous day they went live with a comprehensive presence at State and Lake. The guest noted that the example he gave was science and not LAS. He said they've tried to include some of that.

Paeth stated that we had run out of time for that agenda item.

**9. Faculty Council Resolution on Academic Freedom and Responsibility, Scott Paeth:** *Actionable Item*

Paeth noted that the officers decided that it would be prudent to bring this agenda item forward in place of the Bob Janis talk. He noted that it was written by him but had been changed based on various suggestions by people around the university. He noted the Jason Hill article that had led to this resolution. Paeth noted that he had been contacted by both faculty and students that the article in question was beyond the pale but still within the bounds of academic freedom. He found that although he found *moral* issues with the article, it did fall under academic freedom. He noted that the resolution implies both *academic freedom* and the *right to reply* with *counter-speech*. As FC we had the authority and right to condemn the content of that article, while affirming the author's academic freedom to publish it. Paeth then opened up the floor to discussion and deliberation.

A member of FC noted his concerns with the resolution and stated that a university committed to social justice has to be committed to freedom of speech. The member noted that the university has to be committed to marginalized communities and that DePaul can't sacrifice the speech rights of *anybody*. The member stated that we need to approach speech based on mutual principles. Specifically, he noted that "extramural speech" must be protected broadly. He pointed to Keith Whittington's article "Academic Freedom and the Scope of Protections for Extramural Speech." Whittington points to very firm protections for extramural speech and that such speech and protections are paramount to our freedom as researchers. The member stated that we as faculty need to model free speech norms to our students at this time when it's being threatened by our executive branch. He noted that he appreciated the effort to thread the needle by saying it's not an act of censure (even though he believed it was). He said we have the ability to criticize in other ways, but that this *official* act would have a chilling effect on the work we do.

An FC alternate said she affirms the need for academic freedom and the right for free speech, but is concerned about the degree to which this kind of response is selective, noting previous cases regarding Norm Finkelstein and Don Herman. She said she was hoping the university would sets uniform and clear processes so faculty could distinguish just what was beyond the pale. She believed that the President's statement was missing that clear statement of boundaries.

A member stated that he thought the statement was clear in not constricting free speech but was also noting that FC disagreed with some essential points of what was published. Another member agreed and said that FC making this statement not restricting academic freedom was going to be impactful to our students. Another

member stated she was torn about whether she agreed or not, but wanted to note that we talk about "failure to recognize concern for accuracy…" She noted that as an instructive example in the Pickering vs Board of Education case the Supreme Court accusations of inaccuracy in the context of them being "knowingly or recklessly made." Paeth said there were data out there to directly refute Hill's statements. Another member said she was nervous that when we don't agree with something we want to shut it down, that everything appeared black and white. She asked what happened to dialogue. Say what's wrong with it. Paeth stated that nothing in the resolution shuts the author or the ideas down. Paeth noted the first thing he did was write a response. He also noted that Dr. Hill had been invited to respond on a number of forums and had chosen not to do so.

An FC member said she disagreed with the resolution, that this was an opinion piece and Hill had a right to his opinion. She stated that we do better for our students if we model debate rather than shutting down. She noted the problematic nature of the resolutions statement that "we seriously consider you reconsider your position."

An alternate asked how many people could define hate speech and noted that such an inability made it difficult to address this issue. The member said he'd been talking to the students impacted by this. They believe they are now endangered at this university. He asked that FC ask student groups to present their sense of damage because its our job to remediate that. He noted that it's not a binary choice between free speech and no free speech. He noted that the task force got rid of the people who wanted to bring hate speech into the policy about speakers on campus. If we don't want inconsistent decisions we need to look at the chilling effect of 4.4.1. An FC member said you could think of that section of the handbook as providing a place to address assaultive speech. If people are aggrieved there is a place to go. She stated that she believes that academic freedom is not a blank slate. She disagreed with the piece but this could be interpreted as censure even if it is not. Even though she wanted to find a way to condemn it, she did not believe the resolution should be what that was. She believed that responding with other speech would be more beneficial.

A member of FC said it's difficult to define hate speech, when limitations adopted in EU have been turned against marginal communities. She said there is a problem with importing the idea of hate speech into a speech code.

A member of FC was uncomfortable with the notion of "abuse of academic freedom"

here. He would rather see a simple statement that said "this article is against the mission and values of this university." A member stated he agreed with Valerie, noting many in attendance had likely not been around to know about Finkelstein, who was fired. The member stated that FC should not ask Hill to reconsider his position. **A friendly amendment was proposed to get rid of the final clause. Paeth accepted.** A member of FC said we needed to support the resolution with some friendly amendments. She was disappointed that the Philosophy Department had not put out a statement and that the FC had the opportunity to say something to the students impacted. She said we need to evolve our opinion on free speech but with that comes responsibility. She said this is a statement about responsibility and we have a responsibility as faculty. She noted that Hill signed the article as a "distinguished honors professor of philosophy," a title that does not exist, and spoke not only in *his* name but that of the Honors Program and the Philosophy Department.

The following friendly amendments were suggested:

1. Omit: "As such, this article represents an abuse of his academic freedom. **This was accepted**
2. In the following clause, remove everything except: "FC condemns in the strongest possible terms the tone and content of Dr. Hill's article." **This was accepted.**
3. Take out the 4th whereas. **Paeth did not accept.**

An FC alternate said we fool ourselves if we think that speech is not selectively judged at DePaul. She wondered what it was that made it apparent to us when something did or did not cross the line. The individual noted that there had to be somebody on the administrative level making those decisions and cautioned us to rely on faculty-driven initiatives. It was noted that we need to not do this selectively every time, but that we should know what our values are. An FC member agreed about a need to articulate the boundaries of hate speech and noted that a number of students have signed a petition and are holding a rally. She proposed we have a conversation with the students soon and maybe have an extra meeting. She suggested we have a lively debate, perhaps having some experts in the room who know about the intricacies of the law and hate speech. A member of FC said that was a great idea and we need an open forum regarding the larger topic of hate speech. The member said they were happy with the friendly amendments passed and we have to be cognizant that we are looked at as stewards of DePaul's mission.

A member of FC suggested cutting what needed to be cut to pass the resolution and noted that the last section was the only one addressing students, which is important. The member stated that at a moment when mosques and synagogues were bing shot up and African American churches being burned down, it's going to cause some fear. Standing up and saying we don't agree with that is important for our students to hear.

Paeth said we have to move to a vote and it's more important to pass something with the general idea. To clarify the changes:

- Third That: "FC condemns in the strongest possible terms the tone and content of Dr. Hill's article.) Remove everything else. **Accepted**.
- Last That: Leave it at "FC urges Prof Hill to take cognizance of the real harm his words have caused to students and other members of the community." **Accepted**.
- 2nd That: Remove last sentence. **Accepted**.
- Motion to amend 4th Whereas: Change "advocates for war crimes….gaza strip" to "That, counter to DPU mission, that 'not all cultures are indeed equal.'" Paeth noted the distinction between the 2 and why the war crimes and ethnic cleansing section should stay. Another member said that the definition was clear. **Hand vote for amendment. 15 in favor, 8 opposed, 6 abstain - amendment carried.**

**Motion to approve as amended, second, call for secret ballot. Resolution passed with 21 yes votes and 10 no.**

**Paeth moved to postpone the retreat resolutions, seconded, approved unanimously by voice vote. Meeting adjourned at 5pm.**

EXHIBIT 7

Message

| From: | President [PRESIDENT@depaul.edu] |
|---|---|
| on behalf of | President <PRESIDENT@depaul.edu> [PRESIDENT@depaul.edu] |
| Sent: | 4/24/2019 1:25:39 PM |
| To: | Trustees [Trustees@depaul.edu] |
| Subject: | Civil exchange of ideas |

Dear Trustees, Life Trustees and Members of the Corporation,

As you'll recall, I sent an email on Monday about Professor Jason Hill and his *Federalist* article. I write today to share an email (below) that will be sent to the university community later today.

As always, please feel free to reach out with any questions.

Sincerely,

A. Gabriel Esteban
President
DePaul University

**DEPAUL UNIVERSITY**

Dear Members of the DePaul Family,

Last week, Jason Hill, a professor of philosophy, published an article in the Federalist: "The Moral Case For Israel Annexing The West Bank—And Beyond." Professor Hill's views expressed in that article are his own and do not reflect the views of the university. As an educational institution, rooted in the Catholic intellectual tradition, we are committed to a civil exchange of ideas and learning from one another to create not only a just society, but a just world. As a Vincentian institution, we believe in the God-given dignity of all people—the core tenet of Vincentian personalism.

DePaul also holds academic freedom in the highest regard. Academicians are called to seek knowledge and truth. When professors speak or write on topics that prompt strongly-held, divergent perspectives, the question of academic freedom often arises. Should faculty be allowed to express a provocative position? The short answer is yes. Yet, DePaul aspires to be a community marked by mutual respect, always aware of the potential impact of our words and actions. Both of these outcomes are achievable.

Professor Hill's article has prompted a variety of responses from within and outside the university. We understand several student organizations, for example, are circulating a petition asking the

DePAUL_084070

administration to censure him. The university will not censure Professor Hill for making unpopular statements. Our professors and students share academic freedom, guaranteed to them by their membership in the university community. They also share freedom of speech, guaranteed to them by the Bill of Rights. DePaul will ensure that all faculty and students are empowered to exercise these rights, and DePaul will provide an appropriate environment where ideas can be exchanged freely in an atmosphere of safety for all. Arrangements are underway to provide a forum for such an exchange of ideas and opinions on Middle Eastern politics.

For centuries, responding to ideas with different ideas is the path students and professors have taken as they seek understanding. Threats or harm are never appropriate or justifiable. I ask everyone who chooses to participate in any debate on campus to review the guidelines in place to ensure a productive, educational environment at all times.

- [Guiding Principles for Speech and Expression at DePaul University](#)
- [Protest Guidelines](#)

DePaul is committed to maintaining an environment where all members of our community can and will exercise their freedom in a manner that enriches the life of our DePaul family.

Sincerely,

A. Gabriel Esteban, Ph.D.
President

DePAUL_084071

# EXHIBIT 8

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JASON HILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) No. 20 L 4358 |
| | ) |
| DePAUL UNIVERSITY, SCOTT PAETH, | ) |
| and SALMA GHANEM, | ) |
| | ) |
| Defendants. | ) |

Discovery deposition of STEVEN H.
RESNICOFF, the witness having been affirmed on
Friday, August 21, 2020, via videoconference,
pursuant to the Rules of the Supreme Court of
Illinois and the Code of Civil Procedure, before
Laura L. Kooy, Certified Shorthand Reporter
No. 084-002467, RDR, CRR, commencing at 9:00 a.m.
pursuant to subpoena.

APPEARANCES:

     THE THOMAS MORE SOCIETY by
     MR. MARTIN WHITTAKER
     309 West Washington Street
     Suite 1250
     Chicago, Illinois  60606
     (312) 782-1680
     Privatrecht@Gmail.com

     DiMANDRI & JONNA by
     MR. GREG ANTHONY
     16236 San Dieguito Road, Building 3
     Suite 3-15
     Rancho Santa Fe, California  92067
     (858) 759-9930
     GJAnthony.Esq@Gmail.com

        on behalf of the Plaintiff;

     BURKE, WARREN, MacKAY & SERRITELLA by
     MS. RACHEL E. BOSSARD
     330 North Wabash Avenue
     Suite 2100
     Chicago, Illinois  60611
     (312) 840-7000
     RBossard@BurkeLaw.com

        on behalf of the Defendants.

ALSO PRESENT:

     Salma Ghanem,
     Scott Paeth,
     Abigail Bongiorno, Law School Student.

          *    *    *    *    *

```
 1                        INDEX

 2   EXAMINATION                                PAGE

 3   by Mr. Whitaker:                              5

 4   by Ms. Bossard:                             110

 5                       EXHIBITS

 6   Resnicoff Exhibit 1                          38
         Faculty Council Resolution on
 7          Academic Freedom and Responsibility

 8   Resnicoff Exhibit 2                          47
         DePaul Faculty Council:  Capricious
 9          Treatment of Pro-Israel Professor
            By Steven H. Resnicoff
10
     Resnicoff Exhibit 3                          57
11       Faculty Council Meeting
            AY18-19, No. 9
12
     Resnicoff Exhibit 4                          71
13       DePaul University,
            Faculty Council Bylaws and
14          Appendices of Standing Rules

15   Resnicoff Exhibit 5                          78
         5/3/19 - 5/17/19 Email Strings,
16          Subject:  Your Help
            Subject:  Faculty Council Bylaws
17
     Resnicoff Exhibit 5A                         88
18       Rules of Order, Section 43,
            Rules Governing Debate
19          Pages 394-395

20   Resnicoff Exhibit 6                          80
         Faculty Council Resolution on
21          Academic Freedom and Responsibility

22   Resnicoff Exhibit 7                          29
         Breaking:  Faculty Council to vote
23          on resolution condemning Jason Hill

24
```

```
1                        INDEX

2                                                  PAGE

3    Resnicoff Exhibit 9                            90
          4/24/19 Email String,
4           Subject:  Civil exchange of ideas

5    Resnicoff Exhibit 10                           94
          5/6/19 Email String,
6           Subject:  Jason Hill

7    Resnicoff Exhibit 11                           95
          5/17/19 Email to President Esteban
8           from Steven Resnicoff,
            Subject:  About Professor Jason Hill
9
                 (Exhibits attached/scanned.)
10
                     *    *    *    *    *
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    MS. BOSSARD:  For the record on my end we have

2  our two defendants, Salma Ghanem and Scott Paeth.

3    MR. WHITTAKER:  Great.

4    THE REPORTER:  Are all counsel in agreement to

5  affirm the witness via the videoconference?

6    MR. WHITTAKER:  Yes.

7    MS. BOSSARD:  Yes.

8         (Witness affirmed.)

9          STEVEN H. RESNICOFF,

10  called as a witness herein, having been first duly

11  affirmed, was examined and testified as follows:

12              EXAMINATION

13  BY MR. WHITTAKER:

14    Q    Would you state your name, please, for the

15  record.

16    A    It's Steven H. Resnicoff.

17    Q    How would you like me to address you today,

18  Mr. Resnicoff?

19    A    Professor or Mr. Resnicoff.  It doesn't

20  matter.

21    Q    All right.  You say professor.  Are you a

22  professor?

23    A    Yes.

24    Q    Where?

1       A    DePaul University College of Law.

2       Q    How long have you worked at DePaul College

3  of Law?

4       A    I think I began in the Fall of 1988.  But

5  I'm not exactly sure.

6       Q    You're licensed to practice law in the

7  State of Illinois?

8       A    No, I am not.

9       Q    Are you licensed to practice law anywhere?

10      A    Yes, I am.

11      Q    Where?

12      A    I am licensed to practice law in the State

13  of New Jersey.

14           I was also licensed to practice in the

15  State of Maryland, but I didn't want to continue to

16  pay my annual fees, so I'm not sure if the official

17  process was to withdraw or to become inactive in

18  Maryland, but ...

19      Q    I will confess, and I'll confess my delict,

20  it's actually my bandwidth delict, my wiring is bad,

21  I did not get that answer.  I lost the audio from

22  you, Professor.

23      A    I'm sorry, let me tell you again.

24           I am a member of the Bar of New Jersey.  I

```
1    used to be a member of the Bar of Maryland.  But I
2    did not want to continue to pay annual fees to the
3    Bar of Maryland.  And so I think I was on the
4    inactive list or somehow arranged so that I'm not now
5    eligible to practice law in Maryland until I come off
6    the inactive law list, which I think I do by paying
7    back all the annual fees.
8         Q    I'm in precisely the same situation in
9    Missouri, and have no intention of doing that myself.
10             When did you graduate law school?
11        A    Yale.
12        Q    When?
13        A    When, I'm sorry, 1978.
14        Q    Have you been continuously licensed since
15   1978 or '79 somewhere?
16        A    No, I think I first became licensed in
17   1980.  I believe it was 1980 in New Jersey.
18        Q    Have you been continuously licensed
19   since then?
20        A    Yes.
21        Q    Did you ever engage in the private practice
22   of law?  Or have you always been a law professor?
23        A    I engaged in the private practice of law.
24        Q    For how long?
```

```
 1         A    From 1980 -- no, excuse me.  From 1983 to

 2    the time I began teaching at DePaul.

 3         Q    Where did you practice?

 4         A    I practiced about a year in Maryland.  And

 5    then the rest of the time, I practiced in New Jersey.

 6         Q    Did any of your practice consist

 7    of litigation?

 8         A    Yes.

 9         Q    Did any of your practice consist of tort

10    litigation for -- on the civil side?

11         A    Yes.

12         Q    Have you ever been involved representing

13    plaintiff or defendant in a defamation case?

14         A    No.

15              I did -- well, I didn't represent somebody.

16    But I think at one point, as a law clerk, I may have

17    done some work on a case that had to do with an

18    allegation of defamation.

19         Q    Do your current responsibilities at DePaul

20    Law include teaching?

21         A    Yes.

22         Q    What do you teach currently?

23         A    Well, the new semester starts, for me, on

24    Monday.  And I teach two classes.  One is legal
```

1    profession, which is basically the legal ethics kind

2    of course.

3              And the other is a course on anti-Semitism,

4    the Holocaust and the law.

5         Q    I should have asked this initially,

6    Professor, but I often get ahead of myself.

7              Are you represented here today by any of

8    the lawyers in the room?

9         A    No.

10        Q    Or our virtual room.  All right.

11             Have you ever taught torts at DePaul Law?

12        A    No.

13        Q    Have you ever taught contracts at

14   DePaul Law?

15        A    Yes.

16        Q    When?

17        A    I taught contracts for a number of years.

18   I don't recall exactly which years.  But for a number

19   of years.

20        Q    Can you give me some better idea of what

21   that number is?  More than three years?  More than --

22        A    Yes.

23        Q    -- ten years?

24        A    It may be more than ten years.  But it's

1    probably somewhere around ten years.  It's been

2    a while.

3              I teach -- I most recently taught sales,

4    which is basically UCC Article 2 which deals with

5    contracts for the sale of goods.  So I'm not

6    including that.  That I have taught a couple times

7    more recently.  But in the past, I taught contracts.

8         Q    What are your, if any, other

9    responsibilities at DePaul Law?

10        A    Well, I am the Director of the College of

11   Law Center for Jewish Law & Judaic Studies.

12             In addition, I have -- every year I'm

13   assigned to a number of different faculty committees.

14   And sometimes I supervise students in their

15   independent work.

16        Q    What faculty committees are you referring

17   to?  Give me for instances, at least.

18        A    Okay.  For instance, the tenure -- excuse

19   me, the -- not -- the Term Faculty Committee, which

20   is a committee that evaluates people -- the faculty

21   that are not on a tenure track, but we have to

22   determine whether to renew or extend contracts to

23   these people.

24             I have been on the Grade Challenge

1    Committee.

2            I've been on the Readmission Committee.

3    Students who have had to leave for academic reasons

4    and are petitioning for readmission to the school.

5            Just a lot of different committees.

6            I've been on the Curriculum Committee.

7            I've been on the Business Law Journal

8    Committee.  Those sorts of things.

9       Q    Are you currently on the Term Faculty

10   Committee?

11      A    Well, I believe that I am on this semester.

12   We just got an email recently about that, so I think

13   I am on that.

14      Q    Tell me, to the best of your recollection

15   as you sit here today, the date of your service on

16   the Term Faculty Committee.

17      A    Well, I was the Chair of the Term Faculty

18   Committee about three years ago.  And I think I -- I

19   think it's two or three years ago.  And I've been on

20   the committee since then.

21           I don't know if we had a Term Faculty

22   Committee before then.  The university recently --

23   relatively recently implemented new rules regarding

24   term faculty, and that's what necessitated, I

1    believe, the creation of the committee.

2        Q    Is one of the responsibilities of the Term

3    Faculty Committee to make disciplinary decisions

4    regarding term faculty?

5        A    No.  It's not.

6        Q    What committee has that responsibility?  If

7    you know.

8        A    I don't believe the College of Law has a

9    committee that deals with discipline.  I think that

10   would be at the university level.  I'm not sure of

11   any such committee.

12       Q    I'm sorry, I did not get that answer.  My

13   computer froze.

14       A    Oh, okay.  Your picture froze on my

15   screen, too.

16            What I said was I don't believe the College

17   of Law has a committee that would discipline term

18   faculty.  I believe that any such committee would be

19   pursuant to the Faculty Handbook and would be at the

20   university level.

21       Q    All right.  Is that your understanding

22   about discipline for tenured faculty as well?

23       A    Yes, it is.  That's maybe a different

24   university committee.  I'm not sure of exactly

1    the process, but I believe it's handled at the

2    university level.

3        Q    What is the Center for Jewish Law & Judaic

4    Studies?

5        A    Well, the College of Law has a number of

6    different centers, and each one is sui generis.  The

7    Center for Jewish Law & Judaic Studies, we don't

8    offer courses at the College of Law.  We offer

9    programming.  And the programming is for students and

10   for lawyers and for other professionals and other

11   interested people in the community.  So we have a lot

12   of different programming.  And that's -- you know,

13   that's -- and we offer CLE programs.  We have offered

14   a continuing medical education program, and so on.

15            We cover a lot of different kinds of

16   things.  For example, we were the only -- I believe

17   we were the only part of the university that offered

18   a program on the persecution of Christians in the

19   Middle East.  We deal with sex trafficking.  We deal

20   with other types of issues.  Anti-Semitism, and

21   so on.

22       Q    Pardon me while I pause and formulate the

23   next question.

24            You've testified, I believe, that the

1    Center for Jewish Law & Judaic Studies is part of the

2    College of Law.  Do you report to anyone in

3    connection -- do you have a superior vis-a-vis your

4    activities with the Center for Jewish Law & Judaic

5    Studies?

6         A    I believe that the only superior that I

7    have is the College of Law dean.  I mean, I assume

8    there are people above her.  But I just talk to her

9    and -- but I don't report -- I do send an annual

10   report to her.

11        Q    How many full-time employees work for or

12   have responsibilities regarding the Center for Jewish

13   Law & Judaic Studies?

14        A    Oh, so at this point, I'm the only one who

15   is a full-time employee who works with the Center.

16             We have had part-time assistants in some

17   years in the past.  But this last year, I don't

18   believe we had anybody.  I have a -- I've engaged a

19   student to provide some part-time assistance for this

20   coming year.

21        Q    So you're it.  You're the boss as well as

22   the full-time staff?

23        A    That's right.  I have to clean up after the

24   programs.

1     Q    All right.  How long has the Center

2  existed?

3     A    I don't know exactly.  I didn't come -- I

4  didn't look it up.  But I think it's been maybe from

5  2006?  I think from 2006, but I'm not certain.

6     Q    Did you create it?

7     A    Two of us.  Another colleague, Roberta

8  Kwall, at the College of Law, and I were the

9  co-founding directors.

10     Q    Roberta Kwall?

11     A    R-o-b-e-r-t-a.  Yes.  K-w-a-l-l.

12     Q    Is Professor Kwall still employed and

13  active at the College of Law?

14     A    Yes.

15     Q    But she's just departed from or retired

16  from any responsibility for the Center for Jewish

17  Law & Judaic Studies.  Is that correct?

18     A    That's right.

19     Q    How long has it been you alone without

20  Professor Kwall?

21     A    Probably about four years.

22     Again, these dates -- I haven't looked it

23  up, but I think it's about three or four years.

24     Q    How frequent is the program that you put

1    on for --

2         A    Well, we have -- we do a couple of

3    different things.  We do have an e-newsletter that we

4    send out.  And that, during the school year, may go

5    out every six weeks or so.  But it's irregular in

6    terms of exactly, when sometimes we'll have a couple

7    in a month and sometimes we'll have one over

8    two months.

9              The programming -- also the programming,

10   some of it's done at DePaul.  Some of it's done in

11   the suburbs.  Some of it's done in different parts of

12   the city.  And sometimes we co-sponsor with other

13   organizations.

14             So we try to -- you know, I raise the money

15   for the Center.  So I -- and we have certain

16   restrictions at the university as to how we can

17   independently raise money.  So we have some budgetary

18   constraints.

19             As a consequence, we take advantage of

20   speakers who are coming to Chicago that we find out

21   about to whom we may not have to pay any honoraria,

22   and so we -- so it can depend.  That's why we're not

23   certain.

24             This last semester, for example, we had a

1    couple programs scheduled that had to get cancelled

2    when the university decided that we should have no

3    more programming because of COVID-19.  So, you know,

4    it sort of -- it varies.

5         We may have six, eight, or four or five,

6    you know.  It depends.  But we have a number of

7    programs.

8         We have a website -- I'm sorry, we have a

9    Facebook site that has videos of some of our past

10   programs if you're interested.

11        Q    I think that I shall.  I thank you

12   for that.

13        Is it fair to say to characterize the

14   Center by saying that its topical purpose is Judaica

15   broadly writ?

16        MS. BOSSARD:  Object to the form of the

17   question.

18        THE WITNESS:  Yeah, I'm not sure what Judaica

19   broadly writ means, exactly.

20        But I can -- essentially, we have a

21   statement on the DePaul website which talks to --

22   which describes the Center.  So you might want to

23   look there for more information.

24        But essentially, we deal with issues that

1    are of concern that seem to resonate with the Jewish

2    soul, as I understand it, I guess, and as Roberta and

3    I understood it when we were both co-directors.

4           And that's why, as I said, we've done the

5    things that -- we had the program on persecution of

6    Christians, even though that -- we had four

7    speakers -- four non-Jewish speakers, three of whom I

8    think had -- I think had actually risked their lives

9    by being present physically in Iraq during a period

10   of persecution.

11          But that kind of persecution is, of course,

12   a very important concern to the Jewish people.

13   BY MR. WHITTAKER:

14       Q    Is there any other organized entity at

15   DePaul University, to your knowledge, whose

16   responsibilities similarly include topics dealing

17   with the Jewish soul as you've described it?

18       A    Not that I know of.  Not that I know of.

19          Oh, I should have mentioned, I forgot, I

20   should have mentioned that in addition to my

21   activities at DePaul, I've also been the faculty

22   advisor to a number of student groups such as the

23   Hillel group, the Decalogue Society which is a

24   society -- that is a chapter, a student chapter, of

1    the Decalogue Society.  It used to be called the

2    Decalogue Society of Jewish Lawyers.  I think now

3    it's just the Decalogue Society.  And some other

4    Jewish-related student groups.

5            But I don't believe that there's any

6    university faculty or staff-driven organization that

7    deals with the types of things that we do.

8        Q    All right.  There is a Hillel Society at

9    DePaul University?

10       A    There was.  There's now -- there was.  And

11   it used to have a specific physical space.  The

12   university eliminated that when it created a specific

13   Jewish liaison in the university ministry.

14           So there are -- I think -- Hillel, I think,

15   has somebody who deals with a couple of different

16   schools including DePaul.  But no one exclusively for

17   DePaul.  At least that's my understanding now.

18       Q    Is there a rabbi in the -- to your

19   knowledge, employed --

20       A    No.

21       Q    -- in DePaul's Department of Ministry?

22       A    Well, I mean, I'm a rabbi.  But in the

23   Department of Ministry, I do not believe so.  I

24   believe that the Jewish liaison is not a rabbi, but I

1    could be mistaken.

2         Q    To your knowledge, are you the only rabbi

3    employed full time at DePaul University?

4         MS. BOSSARD:  Objection.  Calls for speculation.

5         THE WITNESS:  To my knowledge, yes.  But there

6    could be other people.  I don't know -- I don't know

7    the backgrounds of all the different faculty members.

8    BY MR. WHITTAKER:

9         Q    Have you ever served on the DePaul Faculty

10   Council?

11        A    Yes.

12        Q    When?

13        A    Well, it's several different times.

14             Before I was tenured, I was a member of

15   the -- I was a member of the Faculty Council, and I

16   was Chair of the Status of the Faculty Committee at

17   that time and a member ex officio of the Agenda

18   Committee, I guess.

19             Later on, at some point, I became an

20   alternate to the Faculty Council.

21             Later on, I became a member of the Faculty

22   Council.

23             I think I was a member of the Faculty

24   Council most recently about -- it was during

1    Dean John Roberts' tenure.  I'm not sure -- at the

2    end -- near the end of his tenure.  I'm not sure of

3    exactly the dates.  About five years ago?  Something

4    like that.

5         Q    And how long did you serve as a full member

6    of the Faculty Council?

7         A    I don't know.  I think -- I don't know.

8         Q    Was it at least a year?

9         A    Yes.  Sure.

10        Q    Was it more than a single year?

11        A    Yes.

12        Q    All right.

13        A    Because each term would have been a term

14   for at least a year.  I'm not sure if it was a

15   two-year term or a one-year term.  But I served at

16   least twice as a regular member.

17        Q    It's correct, isn't it, that -- strike

18   that.

19             Who are the College of Law representatives

20   currently on the Faculty Council?

21        A    Currently?  Well, we just -- we just

22   elected people this last week.  I believe last year

23   at least the most recent people were Alberto Coll and

24   Mark ███████.  With ███████ Tirres being an alternate.

1     I don't know if there was a second alternate.
2              I believe that we've now elected Alberto
3     Coll -- re-elected him.  And I believe Max Helveston.
4     But I -- again, I'm not certain who we -- who the
5     second person was.
6              I think ████  ████ is an alternate.  And
7     I'm not sure who the other alternate is.
8          Q     Your time at DePaul Law coincided --
9          MS. BOSSARD:  We've lost audio.
10             (Technical difficulty.)
11         THE REPORTER:  We are off the record.
12             (Discussion held off the record.)
13         THE WITNESS:  May I make a correction?  I should
14    make one correction.  When I said that I -- the last
15    time I served on the Status of the Faculty
16    Committee -- excuse me, on the Faculty Council, I
17    mentioned John Roberts.  It wasn't the end of John
18    Roberts' tenure as a Dean at the College of Law.  I
19    thought it was near the end of his tenure as a
20    professor at the College of Law.  So it was much more
21    recently at the end of his tenure as the dean of the
22    college.
23         MR. WHITTAKER:  That's fine.
24             (Technical difficulty.)

```
 1        THE REPORTER:  We're back off the record.

 2                  (Discussion held off the record.)

 3                  (Short break to establish new

 4                   connection.)

 5        MR. WHITTAKER:  Could I now, then, if we could

 6   go back on the record and have the court reporter

 7   read me the last question and answer.

 8        THE REPORTER:  The last complete question that

 9   we have was, "Who are the College of Law

10   representatives currently on the Faculty Council?"

11            Do you want that answer read back?  Or did

12   you get that answer?

13        MR. WHITTAKER:  No, I got that answer.

14        THE REPORTER:  Okay.  Then the next question

15   that was started where you froze was, "Your time at

16   DePaul Law coincided --" and then that's where we

17   lost you.

18   BY MR. WHITTAKER:

19        Q    Did you know ████████  ████████?

20        A    Yes.

21        Q    How long were both of you members of the

22   DePaul College of Law faculty?

23        A    Well, he was a member of the College of Law

24   faculty when I joined.  I'm not sure when he began.
```

```
1    And then we were both on the faculty until he

2    retired.  I'm not certain which year, exactly,

3    he retired.

4         Q    Is it fair to characterize

5    Professor ████████'s scholarship as being concerned

6    at least with international law as applied to

7    Middle East politics?

8         A    In part it was as applied to Middle Eastern

9    politics, I believe.

10        Q    It's correct, isn't it, that he published

11   frequently on topics of international law.  Correct?

12        A    He definitely published frequently on

13   issues of international law.

14        Q    And published at least occasionally on

15   topics touching Middle East politics?

16        A    So I believe that's true.  But I'm not very

17   familiar with his written work.

18        Q    To your knowledge, was ██████ ████████

19   ever disciplined at the college level, as you have

20   testified before, by DePaul University?

21        A    I think you put in two different things.

22   You said at the college level.  Then you said by the

23   university.

24             But I can answer in one way by saying I
```

```
 1    don't know of his being disciplined either by the
 2    College of Law or by the university.
 3         Q    Was Professor ████████ ever the subject of
 4    censure by the Faculty Council of DePaul?
 5         A    Not to my knowledge.
 6         Q    Was he ever the subject of any resolution
 7    considered by the Faculty Council at DePaul?
 8         A    Not to my knowledge.
 9         Q    Do you know Professor ████████'s
10    ethnicity?
11         A    I believe he told me that he was born in
12    Egypt.  And I know that he was a proud Muslim.
13              I don't know more than that.
14         Q    And he was male.  Correct?
15         A    Yes.
16         Q    Do you know anything about his sexuality?
17         A    No, I don't.  I know he was married, but I
18    don't know about his sexuality.
19         Q    Thank you.  Did you attend the May 1,
20    2019, Faculty Council meeting of the DePaul
21    University Faculty Council?
22         A    Yes.
23         Q    How frequently do you attend Faculty
24    Council meetings?
```

1      A    Very rarely.

2      Q    Given that answer, why did you choose to

3    attend the May 1, 2019, Faculty Council meeting?

4      A    Well, I wanted to attend because there was

5    an item that was going to affect -- that was going to

6    involve Professor Jason Hill.  And I wanted to be

7    able to contribute to the conversation and to hear

8    what the conversation was about.

9      Q    What was that matter concerning

10   Professor Jason Hill?

11     A    Well, that's a -- could be, you know, a

12   long -- a long answer to that.

13          But there was a resolution that was quite

14   critical in its initial form of both him personally,

15   in my opinion, and of his scholarship.  And even in

16   its final version was critical, I believe, of him and

17   his scholarship.

18          Particularly of a column that he had

19   published online with The Federalist.

20     Q    How did this resolution come to your

21   attention?

22     A    You know, I think that I had heard of a

23   controversy regarding Professor Hill.  Someone had

24   brought it to my attention.  I don't remember who.

1    And I may have read something online right
2  before, like the day before, that there was going to
3  be a -- I think there was an article in The DePaulia
4  Online that discussed the upcoming resolution.  And
5  that led me to go back and look at the email that I
6  had received, I think as a member of the faculty,
7  from the Faculty Council, talking about what was
8  going to be addressed.  And that led me to look
9  into more.
10    And then I found out that, you know,
11  apparently this -- there was going to be a resolution
12  that was very seriously critical of Jason Hill.
13  Professor Hill.
14    Q    What is DePaulia?
15    A    DePaulia is a student-run newspaper at
16  DePaul University.  I say student-run.  I don't know
17  exactly the relationship with the university.
18  There's probably a university faculty advisor and so
19  on.  I'm not sure of the details.
20    Q    Do you read it regularly?
21    A    No, I don't.
22    Q    Does it appear in print as well as online?
23    A    It does.  Yes.
24    Q    You testified just a few minutes ago that

1   you believe you recall reading in The DePaulia,

2   shortly before the May 1, 2019, Faculty Council

3   meeting, something concerning Jason Hill.

4          What occasioned you to read The DePaulia

5   that day?

6      A   I think because I -- I had heard that there

7   was this controversy about what Professor Hill had

8   written.  I frequently -- I very -- I search online

9   and have various Google searches to bring to my

10  attention things on the internet that pertain to

11  anti-Semitism and so on.  And I believe that either

12  an independent search or a -- maybe something --

13  maybe one of the alerts, the Google Alerts, brought

14  to my attention this matter.

15         It may also be that because somebody told

16  me about Jason Hill having received, you know, a lot

17  of flack about this article, I may have done a search

18  for Jason Hill.  I'm just not sure what the -- you

19  know.  But I did see it online.

20     Q   Do you distinctly remember reading a

21  DePaulia article within one or two days prior to the

22  May 1, 2019, Faculty Council meeting?

23     A   I do remember reading such an article.

24     Q   Professor Resnicoff, have you gotten copies

1  of pre-marked exhibits for today's deposition?

2      A    I did.

3      Q    Do you happen to have printed copies in

4  front of you?

5      A    Oh, no, I don't.

6      Q    I'm not suggesting that you're obliged to.

7  But I will tell you that we're going to refer to

8  several of those exhibits today.  It would have been

9  easier, but I think that I can display them to you.

10          I'm now going to pull up and display to you

11  what the court reporter has already marked as

12  Exhibit 7 of the deposition of today's date.  Let me

13  see if I can pull that up for you.

14          (Indicating.)  Are you seeing what you

15  understand to be my desktop at the moment?

16      A    I think so.  Well, I don't know.  I see --

17  yes, I see your list of files.

18      Q    All right.  Then I have succeeded in

19  sharing.

20          (Indicating.)  Do you and everyone else

21  have before you now on your screen, where my face

22  used to be, an image of a document that in the upper

23  left-hand corner bears an exhibit marker that says

24  7 Resnicoff 082120-7?

1          A     Yes.

2          Q     Professor Resnicoff, I'm going to ask you

3     if that is a copy of an article you recall reading

4     shortly before the May 1, 2019, Faculty Council

5     meeting.

6                And I'm happy to scroll through it for you.

7     You just tell me what I need to do to satisfy

8     yourself that you can answer that question.

9          A     Well, when you -- when I received this

10    exhibit, I thought at the bottom it said something

11    about it having been revised.  At the last -- "This

12    article has been updated with additional quotes from

13    Dr. Scott Hibbard since first being published."  So I

14    assume that this wasn't exactly the one that I saw

15    before the meeting.

16         Q     Do you see Exhibit 7 bears on the first

17    line, just to the right of the exhibit marker, a

18    dateline of April 30, 2019?

19         A     Yes.

20         Q     And do you see the headline of that

21    article?  The "Breaking," and then it goes on,

22    "Faculty Council to vote on resolution condemning

23    Jason Hill."

24                Do you see that?

1        A    Yes, I do.

2        Q    Do you recall reading any article in

3   The DePaulia on or about -- on April 30, 2019,

4   bearing that headline?

5        A    Well, I can't recall exactly what the

6   headline was.  But I believe this was that article.

7   Except that it was without the extra statements by

8   Scott Paeth -- excuse me, Scott Hibbard?  Was that

9   his name?

10       Q    Yes.

11       A    So other than that, I don't have any reason

12  to believe that the quotations from Professor Paeth

13  were changed.  I don't know.

14            But generally, this was the type of article

15  that I remember seeing.

16       Q    Do you see at the bottom of what's been

17  marked as Exhibit 7 the -- I scrolled down to the

18  bottom.  (Indicating.)  The third line from the

19  bottom contains these words, quote, "The full text of

20  the resolution is also available here:  Agenda 9 -

21  Faculty Council Resolution on Academic Freedom and

22  Responsibility."

23            Do you see that?

24       A    I see it, yes.

1    Q   Do you recall when you read any article in
2    The DePaulia shortly before the May 1 meeting whether
3    any article had a hyperlink to a resolution or items
4    from the proposed agenda for the meeting?
5    A   I don't remember.  I just don't remember.
6    Q   Let me pull it up online.  Do you see --
7    I'll give you -- we'll do a comparison.
8        (Indicating.)  Do you see in front of you
9    now, Professor Resnicoff, a screen that shows the
10   home page of Google?
11   A   Yes.
12   Q   (Indicating.)  Do you see in the
13   URL address line, slash, search line, that Google
14   provides, text that I've already pre-inserted there?
15   Do you see that?
16   A   I see it.  It says
17   DePauliaOnline.com/tag/Jason-Hill/.
18   Q   All right.  I can just press that and we
19   have now changed pages on that screen.  (Indicating.)
20   Correct?
21   A   Right.
22   Q   Do you recognize what's on the screen in
23   front of you now?
24   A   Well, I don't remember this letter, no.  I

1    don't remember if I ever read it.
2        Q    I'm sorry, what letter?  Do you have in
3    front of you now a screen that bears in bold,
4    enlarged print, "The DePaulia"?
5        A    I have that.  I have a screen that says
6    "The DePaulia."  And in the bottom of the --
7    underneath it says on the left, "Letter to the
8    editor:  Jason Hill should not be silenced."
9        Q    All right.  Let me scroll through it.
10       A    So I just --
11       Q    Let me scroll through this.
12       A    Sure.
13       Q    And my question, after I scroll through it,
14   is, do you recognize this to be a page of
15   The DePaulia Online?  (Indicating.)
16       A    I don't recognize it as a page of
17   The DePaulia Online.  It looks to me as though there
18   was a search done on The DePaulia Online, and that
19   pulled up these little blurbs about different
20   articles on different dates.  But that's just what it
21   appears to me to be.
22       Q    I will confirm to you that that's exactly
23   what it is, Professor, because that's exactly what
24   I've done.

1           I will next navigate to an item in that

2    search list.

3           (Indicating.)  Do you have in front of you

4    on your screen now -- hold on, I've got the wrong

5    item.  Let me pull up the correct one.

6           (Indicating.)  I have just navigated to

7    another page.

8           Do you have a page in front of you again

9    with the broad in bold large letters "The DePaulia"?

10        A    Yes.

11        Q    And you see, again, items from this search?

12   Correct?

13        A    I see the first item.  That's all that

14   comes up on my screen at this point.

15        Q    And what's the headline of that item?

16        A    "DePaul students stand against hate."

17        Q    All right.  (Indicating.)  What's the

18   second item that I've just scrolled to?

19        A    "Breaking:  Faculty Council to vote on

20   resolution condemning Jason Hill."

21        Q    And that is precisely the same headline as

22   Exhibit 7 bears, too.  Correct?

23        A    I believe so.

24        Q    I shall now click on that to pull up that

1    article.

2           (Indicating.)  Has your screen changed,

3    Professor Resnicoff?  The content?

4           A    Yes.

5           Q    Could you read, for the record, the

6    URL address on this screen?

7           A    DePauliaOnline.com/41091/news/breaking-

8    faculty-council-to-vote-on-resolution-condemning-

9    Jason-Hill/.

10          Q    All right.  I shall scroll through this

11   page, too, Professor Resnicoff, to your satisfaction

12   and your comfort.  But my question at the end of this

13   scrolling exercise will be, do you recognize this to

14   be an article or a version of an article you read on

15   or about the date it bears, April 30, 2019?

16   (Indicating.)

17          If I scroll too fast, please let me know.

18          A    Again, I think it's a version of it.  But

19   this also says at the bottom that it's "been updated

20   with additional quotes from Dr. Scott Hibbard."

21          Q    Which is precisely the same language as

22   appears in Exhibit 7.  Correct?

23          A    I don't remember the exact language.  But I

24   think it's the same -- the same gist.  The same

1    message.

2         Q    Okay.  And just above that language,

3    correct, is, again, I'll quote -- the following

4    language.  Quote, "The full text of the resolution is

5    also available here:  Agenda 9 - Faculty Council

6    Resolution on Academic Freedom and Responsibility."

7    Correct?  Did I read that correctly?

8         A    I believe so.

9         Q    And now I'm going to put the cursor over

10   what I just read.  (Indicating.)  And the cursor

11   has now changed to indicate that this is a hyperlink.

12   Correct?

13        A    I don't see -- it doesn't show that on

14   mine.  But it looks -- it's underlined and sort of

15   reddish in mine.  But I don't see anything -- I don't

16   see your cursor.

17        Q    Well, I'm going to click on the cursor and

18   it's going to pull up another page.  (Indicating.)

19        A    Oh, now I see it.  Okay.

20        Q    Has your page changed?

21        A    Yes.

22        Q    All right.  What do you see in front of

23   you now?

24        A    It says -- it's labeled "Faculty Council

1    Resolution on Academic Freedom and Responsibility."

2         Q    All right.  I shall scroll through this

3    now, Professor Resnicoff, and at the speed and for

4    the duration to let you feel comfortable to answer

5    this question.  My question's going to be, is this a

6    copy of the resolution of -- the proposed resolution

7    that you remember reading about Dr. Jason Hill prior

8    to the May 1, 2019, Faculty Council meeting?

9    (Indicating.)

10        A    A little bit slower, please.

11        Q    (Indicating.)  I can go back up if you

12   want to.

13        A    No, you can go to the next page.

14        Q    (Indicating.)

15        A    Okay, stop.

16             I believe that there's -- I can't tell you

17   word for word.  But I believe that it is the version

18   that I saw when that was originally proposed.  I

19   believe so.

20        Q    Would you read the URL address from this

21   page as well?  I'm sorry to put you to the task of

22   doing this.  I suppose I can do it myself.  But why

23   don't you go ahead and read it into the record.

24        A    Sure.  DePauliaOnline.com/wp-

1    content/uploads/2019/04/Agenda-9-Faculty-Council-
2    Resolution-on-Academic-Freedom-and-Responsibility-
3    1-1.pdf.
4         Q    Thank you, Professor.
5         A    Sure.
6         Q    I am now going to pull up -- I'll go back
7    to the prior screen.  But I'm not going to ask you
8    any questions about that.  And you know what?  I'm
9    going to go back to the prior screen, just to cue
10   things up.  I am not going to ask you about that.
11            I am now going to pull up what the
12   court reporter has previously marked as Resnicoff
13   Deposition Exhibit 1.  And I want you to confirm,
14   when this comes up, that we're seeing something
15   bearing that mark.
16            (Indicating.)  Let me ask you, what do you
17   see in front of your screen now?
18        A    So on the top right it says, Exhibit 1
19   Resnicoff 082120-1."  It's titled "Faculty Council
20   Resolution on Academic Freedom and Responsibility."
21        Q    I'm going to go through the same exercise
22   and scroll through this.  Again, at the same rate for
23   you to feel comfortable to answer the question.
24            Is this, likewise, a copy of the draft

1    resolution you recall reading before the Faculty

2    Council meeting of May 1, 2019?  (Indicating.)

3         A    Just one minute, please.

4              Okay.  If you could continue now.

5         Q    (Indicating.)

6         A    Stop.  If you could -- no, go back down a

7    little.

8         Q    (Indicating.)

9         A    Thank you.

10             So I -- I believe that it's the same.  But,

11   you know, I don't have the -- I would -- before

12   getting -- saying that it would be the same under

13   oath, I would really be more careful to have the two

14   side by side.  But it seems to me to be the same.

15        Q    The same as the draft resolution that you

16   saw prior to the May 1 Faculty Council meeting.

17   Correct?

18        A    I believe so, yes.

19        Q    You're referring to -- your testimony has

20   referred to another version.  Correct?  Have you seen

21   another version of this resolution?

22        A    Well, I -- I saw what I believed was the

23   final version of the resolution at some point.

24        Q    Do you recall when you saw what you refer

1    to as the final version?

2         A    Well, I received it from Professor Hill by

3    email attachment.

4         Q    But you don't have any independent

5    recollection of when?

6         A    It was probably -- no, I don't know exactly

7    when.  It was probably a week or two after the

8    meeting.

9         Q    I've got an email string among the

10   exhibits.  We'll get to that.

11        A    Okay.

12        Q    And that may refresh your recollection.

13   That's fine.  But why don't we close off this

14   exercise.

15             I'm going to go back now to the screen of

16   what we referred to as the search on DePaulia's page,

17   the online page.

18             (Indicating.)  Do you see that on your

19   screen now?

20        A    I do.  Yes.

21        Q    Thank you.  I need to find the item that I

22   want to draw your attention to next.  And I'm not on

23   the correct page, so bear with me.

24             I am now going to navigate to the prior

1    page, page 1 of the search.

2            (Indicating.)  Do you have a new page of

3    this search in front of you now?

4        A    I don't know.  The one I have starts with,

5    "Letter to the editor:  Jason Hill should not be

6    silenced."  I don't remember if it's the same.

7        Q    Thank you.  We're on the same page.

8        A    Okay.

9        Q    That's all I'm trying to accomplish.

10       MS. BOSSARD:  Counsel, is there any reason why

11   you can't use the pre-marked exhibits and why we're

12   searching the internet?

13   BY MR. WHITTAKER:

14       Q    Yes, there is.

15            (Indicating.)  All right.  What do you have

16   on your screen now, Professor Resnicoff?

17       A    Well, the first item seems to be entitled,

18   "DePaul Faculty Council condemns content of Hill

19   article, reaffirms academic freedom."

20       Q    And what date did that entry bear?

21       A    May 6, 2019.

22       Q    And that is five days after the Faculty

23   Council meeting we've been talking about so far.

24   Correct?

1    A    It's five days after May 1 when the Faculty

2    Council meeting was held.  Yes.

3    Q    All right.  I'm going to navigate to that

4    now by clicking on it.

5         (Indicating.)  I have now pulled up an

6    article online of -- online today, as we speak at

7    this deposition.

8         Could you read me the headline?

9    A    "DePaul Faculty Council condemns content of

10   Hill article, reaffirms academic freedom."

11   Q    Do you recall reading this on or about the

12   date it bears, May 6, 2019?

13   A    I don't remember reading it.

14   Q    All right.  I'm scrolling now to the bottom

15   of this article.

16        (Indicating.)  Are we now at the bottom of

17   the article on your screen as well, Professor?

18   A    I think so.  It says -- I see lines in red.

19   "Agenda 9 - Faculty Council Resolution on Academic

20   Freedom and Responsibility."  And underneath that I

21   see "Comments."

22   Q    Do you see, again, that same text, quote,

23   "The full text of the resolution is also available

24   here:  Agenda 9 - Faculty Council Resolution on

1    Academic Freedom and Responsibility"?  Correct?

2         A    Yes, I see that.  I see that, yes.

3         Q    I'm clicking on that now and navigating

4    through that hyperlink.

5              Could you read me, Professor, the URL of

6    the page that now appears on your screen?

7         A    DePauliaOnline.com/wp-content/uploads/2019/

8    04/Agenda-9-Faculty-Council-Resolution-on-Academic-

9    Freedom-and-Responsibility-1-1.pdf.

10        Q    All right.  I don't have many questions for

11   this, Professor, but prefatory to my next question,

12   I'm going to perform a search on what appears on your

13   screen -- well, let me just ask you as a preface, do

14   you recognize what's on your screen now to be a

15   version of the resolution that was the subject of

16   some discussion at the May 1 Faculty Council meeting?

17        A    Could you scroll down to the rest of

18   the page?

19        Q    Sure.

20        A    To the next page, whatever it is.

21        Q    (Indicating.)

22        A    I think you scrolled up.  Could you scroll

23   down?

24        Q    (Indicating.)  Well, this is down.  This is

1    now the bottom of it.  You should have --

2         A    Oh, I'm sorry, I didn't realize, okay,

3    so this ...

4         Q    (Indicating.)

5         A    Yes.  It seems to me that this is the same

6    or very similar to the version that was originally

7    proposed.

8         Q    (Indicating.)  Drawing your attention on

9    this page, are you -- do you have in front of you now

10   language that says, "Therefore, be it resolved"?

11        A    Yes.

12        Q    I'll draw your attention to that language.

13             And beneath that, if I'm wrong, there are

14   one, two, three, four paragraphs, each begins with a

15   bolded word "That"?

16        A    Yes.

17        Q    Drawing your attention to the second

18   paragraph that begins with the bolded word "That," do

19   you see the closing words of that paragraph, the

20   words "an abuse of his academic freedom."?

21        A    Yes.

22        Q    Thank you.  I'm now going to navigate away,

23   back to what the court reporter has marked as

24   Resnicoff Exhibit 1.

1          (Indicating.)  Do you have that in front of

2     you now?

3          A     Yes.

4          Q     On Resnicoff Exhibit 1, do you have in

5     front of you now that same language, "Therefore, be

6     it resolved," and then four paragraphs subsequently,

7     each beginning with the bolded word "That"?

8          A     Yes.

9          Q     In the second "That" paragraph, does that

10    likewise conclude with the language "an abuse of his

11    academic freedom."?

12         A     Yes.

13         Q     All right.  Who spoke at the May 1 meeting,

14    regarding this resolution, to your memory?

15         A     Well, there were a number of people who

16    spoke.  Scott Paeth introduced it.  And he spoke a

17    number of times.

18               Mark ████ from the College of Law spoke.

19               The acting -- the then acting provost spoke

20    at some point during the conversation -- during the

21    discussion.

22               But there was a number of other people who

23    spoke.  I know that they -- I looked at the exhibit

24    that you sent me with the minutes, and that had

1    several names.  But I don't remember all the

2    different names of the people.

3             That was probably the only Faculty Council

4    meeting that I attended that year, and I don't know

5    all the personalities.

6             Oh, I know ██████████████ -- I don't

7    remember her name -- her last name.  But there was

8    someone who was sitting in the audience, I believe.

9    I don't know if she was a member -- she probably was

10   a member.  I don't remember ███████s last name.  I

11   apologize.  She's a faculty member, a professor, at

12   DePaul.  And there was a few other people.

13        Q    You mentioned the then acting provost.  Who

14   was the then acting provost?

15        A    You know, I apologize.  I may mispronounce

16   her name.  So is her -- this is embarrassing.  But I

17   think her last name was Salem, S-a-l-e-m?  Is that

18   correct?

19        Q    Was it Salma Ghanem?

20        A    Oh, I'm sorry.  Yes, that's probably it.

21   Yes.  That's probably it.

22        Q    I will tell you that Ms. Ghanem is -- and

23   if I mispronounce your name, I apologize.  She's

24   attending this deposition.  And so if you can manage

1   the Zoom, you might even look at her face.

2          Let me ask you if you can navigate to the

3   provost's face and let me know if that Salma Ghanem

4   was the then acting provost.

5          Do you recognize her by looking at her face

6   here and now as being the then acting provost?

7      A    I do, yes.

8      Q    All right, thank you.

9      A    And I apologize for not remembering

10  the name.

11     Q    Now, let's get more exhibits identified.

12  So I'm going to pull up -- we'll return to this.

13         Let me pull up another exhibit, if I may,

14  and display to you what the court reporter has

15  previously marked as, I'll scroll down, Resnicoff

16  Exhibit 2.

17         (Indicating.)  Do you have in front of you

18  what I've now scrolled down to in front of you,

19  digitally in front of you, that bears an

20  exhibit sticker that says Exhibit 2

21  Resnicoff 012120-2?  (Sic.)

22     A    Well, the exhibit sticker I'm looking at

23  doesn't say that.  The page I'm looking at is the

24  second page.  I don't know.  But if you look -- mine

1    says 2 Resnicoff 082120-2.

2         Q    You are more careful and accurate than I.

3              But I'll scroll through this and ask you,

4    what is this, Professor Resnicoff?  (Indicating.)

5         A    So this appears to be the final version of

6    an op-ed piece that I wrote after the meeting of

7    May 1, 2019.

8         Q    Was this op ed piece published?

9         A    It was.

10        Q    Where?

11        A    I obviously should know this.  I believe it

12   was published in The Algemeiner Online.  But I could

13   be mistaken.

14        Q    That's my belief, too.  But regardless of

15   our beliefs, tell us what The Algemeiner Online is.

16        A    Well, it is a very -- it's like an online

17   newspaper.  I don't know how else to describe it.

18   But it's an online newspaper.

19        Q    How frequently published?

20        A    I think every day.

21        Q    Let me -- I should have asked the

22   follow-up, and I'm asking it now.

23             You have in front of you still Resnicoff

24   Exhibit 2.  And you said it's a version of an op-ed

1     that you wrote and had published.
2              Is everything recited in Resnicoff
3     Exhibit 2 true?  (Indicating.)
4              Professor Resnicoff, do I still have you?
5     While I'm displaying these, I can't see faces.  So
6     I'm not sure if I --
7         A    Now I hear you.  There was a silence.  Yes,
8     I'm here.
9         Q    Okay.  My question is, is everything in
10    Resnicoff Exhibit 2 true?
11        A    To the best of my knowledge, it's true.
12        Q    Directing your attention to the second
13    paragraph of Resnicoff Exhibit 2, you wrote there,
14    quote, "The proposed resolution contained ugly,
15    explosive charges."
16             Did I read that correctly?
17        A    Yes.
18        Q    What were the ugly, explosive charges?  And
19    if you would like, I can display for you what you've
20    identified in Resnicoff Exhibit 1 as the proposed
21    resolution.
22             Shall I do that for you?
23        A    Well, I think before you do that, I think
24    that the paragraph that I included in this exhibit,

1    right after the language that you cited, says, "In

2    part, it stated:" and then there's a "Whereas"

3    paragraph.  And I think that whereas paragraph are

4    examples of the ugly, explosive charges.

5            I don't recall if there were additional

6    charges at this point.

7            You know, in writing an op-ed, you have a

8    limitation as to how long to write it if it's going

9    to get published.  But these -- these four statements

10   I think are pretty explosive.

11           Number 1, it says that the article

12   "misrepresents the history of the Israeli-Palestinian

13   conflict."  That it "distorts the facts about the

14   current state of Israeli-Palestinian relations."  It

15   "promotes racism towards Arabs generally and

16   Palestinians in particular."  That's especially ugly

17   and explosive.  And 4, "advocates for war crimes and

18   ethnic cleansing against the Palestinian populations

19   of the West Bank and the Gaza Strip" which is also

20   especially, in my opinion, ugly and explosive.

21       Q    Would you characterize those charges as

22   defamatory?

23       MS. BOSSARD:  Objection.  Calls for a legal

24   conclusion.

1        THE WITNESS:  So I -- as I said before, I don't

2   teach torts and I don't -- I don't know exactly

3   what -- I can't give you a legal opinion about

4   whether it's defamatory.

5            But it seems to me that by saying someone

6   promotes racism generally and Palestinians in

7   particular and advocates war crimes and ethnic

8   cleansing, that seems clearly to be defamatory.

9            The first two, "misrepresents the history

10  of the Israeli-Palestinian conflict" and "distorts

11  the facts about the current state of

12  Israeli-Palestinian relations," that's certainly

13  negative about his -- I believe, about his work as

14  a scholar.

15           But I don't know if it arises to the level

16  of being a defamation.

17       Q    I'm going to navigate now to Resnicoff

18  Exhibit 1, Professor, which is what you identified as

19  a version of the draft resolution that you saw before

20  the May 1 meeting.  Correct?

21       A    Yes.

22       Q    I'm going to draw your attention, again, to

23  the second "That" paragraph that ends with the

24  language "an abuse of his academic freedom."

1          (Indicating.)  Is your attention there?

2     A    I see it.  Yes.

3     Q    Is accusing a tenured member of an American

4  university as an abuser of academic freedom a

5  defamatory charge?

6     MS. BOSSARD:  Objection.  Calls for a legal

7  conclusion.

8     THE WITNESS:  So, again, I can't give you a

9  legal opinion as to whether it's defamation.  But it

10  is a -- it is, I think, a very, very strong negative

11  accusation regarding his -- this -- a professor's --

12  here, Professor Hill's performance of his

13  academic work.

14          And the question then would be a legal

15  question as to whether that rises to defamation.

16  BY MR. WHITTAKER:

17     Q    Do you have an understanding of what the

18  word "defamation" means?

19     MS. BOSSARD:  Objection.  Calls for a legal

20  conclusion.

21  BY MR. WHITTAKER:

22     Q    Regardless of the way you're describing it?

23     MS. BOSSARD:  Same objection.

24     THE WITNESS:  It's hard for me to know whether

1    as -- for example, I don't know whether Jason Hill

2    was a public figure, for purposes of defamation these

3    days, or not.  I don't follow the details of

4    defamation law.

5            But it -- this is definitely a very --

6    saying that he abused, not just that he misused, I

7    think the abuse is the issue -- is the choice of

8    words that makes it closer to defamation than -- you

9    know, than -- because it sounds like it's not an

10   error.  It sounds like it's not a mistake.  But it's

11   an abuse.  That's the way I read it.

12           But, again, that's just my opinion.

13   BY MR. WHITTAKER:

14       Q    I'm scrolling up now on Resnicoff

15   Exhibit 1, Professor, and I want to draw your

16   attention.  There are, I thought -- maybe I can

17   do this -- maybe I shouldn't have done that.  Oh, I

18   can.  We'll see if this connects.  I want to draw

19   your attention to -- let me get it right.

20           (Indicating.)  Are we now on the first page

21   of Resnicoff Exhibit 1?

22       A    Yes.  Correct.

23       Q    Is that the document in front of you now?

24       A    Yes.

1      Q    And each of the paragraphs that appear

2 before you now begin with a bolded word "Whereas."

3 Correct?

4      A    Yes.

5      Q    I want to draw your attention to the second

6 Whereas paragraph which says, "Whereas the Handbook

7 also affirms the AAUP 1940 Statement of Principles on

8 Academic Freedom."  (Indicating.)

9           Are you there?

10      A    I am there.

11      Q    Do you have an understanding about what's

12 referred to by the title AAUP 1940 Statement of

13 Principles on Academic Freedom?

14      A    Yes.

15      Q    What is it?

16      A    Well, I believe that AAUP is the American

17 Association or the Association of American -- I think

18 it's the American Association of University

19 Professors I think in 1940 issued a Statement of

20 Principles on Academic Freedom.  And this paragraph

21 is citing language from that statement.

22      Q    Are you familiar with the contents of the

23 AAUP 1940 statement?

24      A    Not the entire contents.  But I am familiar

1    with some of them, at least as having been cited by

2    other things that I have written -- that I have read.

3        Q    In the course of your service at DePaul, in

4    faculty committees especially, have you ever had the

5    need to consult with or to apply the 1984 (sic) AAUP

6    Statement of Principles?

7        MS. BOSSARD:  Objection.  That's a misstatement.

8        THE WITNESS:  I don't recall any such need.

9             Aside from this occasion, of course.

10   BY MR. WHITTAKER:

11       Q    All right.  So this is the lone occasion

12   where reference and application of the

13   AAUP principles has touched upon your

14   responsibilities as a professor at DePaul University?

15       A    It's -- I -- the reason I hesitate is that

16   you now said has touched upon my responsibilities as

17   a professor at DePaul University.

18            I did spend some time as a member of the

19   university's Tenure & Promotion Board.  And I don't

20   recall -- I don't recall whether in any of those many

21   cases this was an issue.  I don't recall it being an

22   issue in any of the cases.  But I just can't say that

23   it was not.

24            But I don't remember in my time on -- on

1    the Faculty Council, either as a direct

2    representative or as an alternate, that I ever needed

3    to refer to this.

4        Q    All right.  You saved us all some time I

5    think, Professor, and saved yourself some trouble,

6    so -- for whatever that's worth.

7             Bear with me for a minute.  You might see

8    my face shortly again.  Let me get out of stop share

9    because I think for the moment -- or get out of

10   sharing I think for the moment.  I'll gather my

11   thoughts and see what next I might want to display

12   to you.

13       A    While you do that, can I fill up my

14   coffee cup?

15       Q    Of course.  Why don't we take a break.

16            Everybody, if we do that, needs to stay

17   online.  And I need to keep my phone on, too.  So

18   please don't go away or turn off your technology,

19   which seems to be functioning much better than

20   mine is.  But we'll wait for Professor Resnicoff to

21   return.

22                    (Short pause.)

23   BY MR. WHITTAKER:

24       Q    Professor Resnicoff, did you get

1    your coffee?

2         A    I did, thank you.

3         Q    I am going to display for you what the

4    court reporter has marked as Deposition Exhibit 3.

5    So you're going to lose my ugly face.

6         MR. ANTHONY:  Objection.

7         MR. WHITTAKER:  Thank you.

8         MR. ANTHONY:  Lacks foundation.

9    BY MR. WHITTAKER:

10        Q    Oh, no, there's plenty of foundation

11   for it.

12             Let me clear the screen to display some

13   things better.

14             I'm pulling up what the court reporter has

15   pre-marked as Resnicoff Deposition Exhibit 3.  And

16   just to make sure that we're all on literally the

17   same page and the same document, Professor Resnicoff,

18   on your screen, do you have a digital copy of a

19   document that bears on the lower right-hand corner of

20   the first page an exhibit sticker that says Exhibit 3

21   Resnicoff 082120-3?  (Indicating.)

22        A    Yes.

23        Q    Again, I'm going to scroll through this,

24   taking as much time and at the rate you're

1    comfortable with, for you to assure yourself that you

2    can honestly answer the question:  Do you recognize

3    this?  And second question:  What is it?  So I'll

4    scroll through it now.  (Indicating.)

5         A    You can keep going.

6         Q    It's big.  (Indicating.)

7         A    I can only see the first page.

8         Q    I'm sorry?  Is it not scrolling?

9         A    Now it is.  But now it's going fast.

10        Q    (Indicating.)

11        A    Okay.

12             I can tell you that I recognize this as a

13   copy of the exhibit that was sent to me by the

14   court reporter.  But I don't know that I ever

15   received or ever saw minutes of the meeting before

16   now.  I just -- I don't recall receiving minutes of

17   the meeting before.

18        Q    That makes things more efficient,

19   Professor.  That means, again, you saved yourself

20   trouble and the rest of us time.

21             Nevertheless, I do have a few questions

22   about this.

23        A    Okay.

24        Q    (Indicating.)  I scrolled back to the first

1    page, and now we're at the top of the page of what

2    has been pre-marked Resnicoff Exhibit 3.  And you'll

3    see there are one, two, three, four, five paragraphs

4    with a whole bunch of lists of names.

5          Let me direct your attention to the first

6    paragraph and ask if you recognize the names in

7    that paragraph.

8       A    I recognize some of the names.  I don't

9    recognize others.

10         I know -- do you want me to tell you whose

11   names I recognize?

12      Q    Yes, why don't you go through and do that.

13      A    Okay.  So I know Peg Birmingham.

14         I know Greg Brewster's name.

15         Some of the names I've heard of, but I just

16   don't know who's the people.

17         ██████ ██████ I know.

18         Scott Paeth I know.

19         ████████ ███████ I know.

20         And Ahmed Zayed I know.

21      Q    Of all those names that you've identified

22   as names of people you know, are all those names of

23   people, the people themselves, faculty members of

24   DePaul University?

1    A    Yes, I think so.

2    Q    Do you recall those people whom you've just

3    listed as those you know as people who attended the

4    May 1, 2019, Faculty Council meeting?

5    A    Yes.

6    Q    You know what, I may not have even

7    established this yet, so we'll do it now.

8         You yourself attended the May 1, 2019,

9    Faculty Council meeting.  Correct?

10   A    Yes.  Correct.

11   Q    From beginning to end?  Yes?

12   A    I believe so.

13   Q    How long did it last?

14   A    Too long.  It was -- I don't know.  It

15   seemed like it was a long meeting.  A couple of hours

16   probably.

17   Q    All right.  Go to the second paragraph.

18   A    Oh, and by the way, I'm sorry, I shouldn't

19   have been flippant and said "too long."  But I know

20   that the discussion of this particular topic was too

21   short.  But there was many other things that seemed

22   to go on and on to me.

23        I'm sorry, what should I look at now?

24   Q    I'll just observe that most people who

1    attend a deposition get in the frame of mind where

2    they consider conversations like those that go on in

3    depositions go on too long.  And I appreciate that

4    fact, too.  And I'll try and be as quick and

5    efficient as possible.

6            Let's go to the second paragraph that

7    begins, "Absent."

8        A    Yes.

9        Q    Because that includes a name that you

10   mentioned before, Alberto Coll.

11           Do you recognize that name?

12       A    Yes.

13       Q    And he, you've already testified, was a

14   representative of the Faculty Council from the

15   College of Law.  Correct?

16       A    Yes.

17       Q    Is it your recollection, independent of

18   this document, that Professor Coll did not attend the

19   May 1, 2019, Faculty Council meeting?

20       A    Yes.

21       Q    Did Professor ███████ attend?

22       A    Yes.

23       Q    Did Professor ███████ speak?

24       A    Yes.

1     Q    Did Professor ███ speak about the Jason
2 Hill resolution?
3     A    Yes.
4     Q    What did he say, as best you recall, in
5 words or in substance?
6     A    So he -- generally, he was opposed to the
7 motion, is my understanding.  He thought that --
8 Jason Hill's statement having been external to the
9 university, not in a class and not in a campus
10 activity, was more protected speech.  It was
11 especially protected speech.  And he thought it was
12 inappropriate -- I believe he said he thought that it
13 was inappropriate for the Faculty Council, but I'm
14 not certain.  But I think he said it was
15 inappropriate for the Faculty Council to be
16 criticizing a faculty member's expression of academic
17 speech.  That's how I understood it.  That's how I
18 recall it.
19     Q    Did any member of the Faculty Council, or
20 any person attending the meeting, speak in response
21 to Professor ███?
22     A    Well, a number of people spoke.  I'm not
23 sure about speaking in response to Professor ███
24 or not.  But some people definitely discussed the

1    same topic.  And some people said -- agreed that it

2    was -- we should not -- that the Faculty Council

3    should not be passing resolutions like this.

4         And others providing a variety of reasons

5    why they thought that it was important to enact a

6    resolution like this.

7         Q    As best you recall, who at that Faculty

8    Council meeting spoke in favor of the proposed

9    resolution as drafted?

10        A    So Scott Paeth moved it, introduced the

11   motion, and acted as the proponent of the motion --

12   as not just the proponent of the motion, but as the

13   movant during the meeting because he is the one who

14   decided whether he was going to accept or reject

15   amendments as friendly amendments.  And he spoke

16   repeatedly during the meeting.

17        I think Ahmed Zayed spoke at one point.

18        I'm not -- you know, it's -- I actually --

19   I know that the then acting provost, Dr. Salma

20   Ghanem, spoke.

21        I'm sorry, were you talking just about the

22   people in the first paragraph?  Or are you asking

23   me --

24        Q    No.

1        A     I thought ████████ ████████, who was an

2     alternate that was present, she spoke, I believe.

3           And I don't recall -- I know that a number

4     of other people spoke.  But I don't know -- I didn't

5     know them by name, so ...

6        Q     As best you can recall, in words verbatim,

7     or in substance otherwise, what did Acting

8     Provost Ghanem say at the May 1, 2019, meeting in

9     regards to the Jason Hill resolution?

10       A     The truth is, all I remember her

11    discussing -- I believe that -- I don't recall

12    exactly what she said.  But I think she mentioned

13    that there's going to be a -- fora that the

14    university was going to have at which different

15    members of the university could discuss their views

16    and opinions and so on.  But I don't think she -- I

17    don't remember her talking to the merits of the

18    motion -- of the resolution.

19       Q     Is there anything that might help you have

20    a more specific and fulsome recollection about --

21    that you're aware of about what Acting Provost Ghanem

22    said about this resolution at the May 1 meeting?

23       A     At this time, I don't think there's

24    anything you could show me that would refresh my

1    memory.

2              If I spoke to somebody else who was there

3    and they mentioned something, maybe.  But that's

4    speculation whether I would remember something else

5    or not.

6              I believe she spoke, though, more than one

7    time.  I -- it could be only twice.  And I do think

8    that she mentioned that -- she did mention, I

9    believe, the concern that a number of students had

10   expressed to her.  And that was in conjunction with

11   saying that there was going to be these fora.

12             But I don't think there's anything else

13   that could today, from the exhibits, that could

14   refresh my memory any more than that.

15        Q    Have you spoken to Professor ████ about

16   what transpired at the May 1 meeting at any time

17   after the May 1 meeting?

18        A    I think so, yes.  I sent Professor ████

19   an email with my op ed attached.  And I believe -- I

20   don't believe if he sent me a response by email, but

21   I think he called me.  But that's just what I

22   believe.

23             And I know that he -- well, I'm sorry.  I

24   think I answered the question.

1      Q    You did.  What did he say to you in this
2  telephone conversation?
3      A    Well, I believe that he agreed -- he had
4  affirmed in the conversation that he was -- he had
5  been opposed to the motion.  And I got the impression
6  that he agreed -- I don't remember exact words --
7  but that he agreed with my op ed.
8          You know, my op ed didn't -- okay, I'm
9  sorry, my -- yeah, because my op ed dealt with these
10  procedural issues.  And I don't -- I think he agreed
11  with me.
12     Q    All right.  Let's go back up to the tedious
13  part and back to the top of -- what exhibit number is
14  this?  Are we on 3?  We'll skip what's labeled the
15  Absent Members.
16          But I want to draw your attention to the
17  paragraph on Exhibit 3 that begins -- the list begins
18  with "Alternates Present" and have you look at those
19  names and tell me if you recognize the names of any
20  of those as people you know.  (Indicating.)
21     A
22                      I'm just not certain if I
23  would know her by face.
24     Q    All right.  And you've already testified,

```
1   correct, and pardon me because I'm a bad note taker,

2   your recollection is that Ms. ██████ did speak --

3        A    Yes.

4        Q    -- regarding Jason Hill?

5             Generally in favor or against, please?

6        A    In favor of the resolution, and not in

7   favor of Jason Hill.

8        Q    All right.  Tell me, as best you recall, in

9   words verbatim, if you recall, but in substance

10  otherwise, what Ms.        said.

11       A    No, I'm sorry, I can't remember exactly

12  which tack she took.  I'm not sure.

13       Q    Let's go down to the next paragraph which

14  says "Liaisons Present."  (Indicating.)

15            Do you recognize either of those names?

16       A    If I could go back.  I recall -- I believe

17  she was one of maybe two or more people, but I

18  believe she evoked the experiences with

19  Professor Finkelstein and complaints that if we -- if

20  the university could take action against

21  Professor Finkelstein, that it should similarly be

22  able to take steps against what Professor Hill wrote.

23  I believe that she said something like that in the

24  conversation.
```

1      Q    Who is Professor Finkelstein?

2      A    Professor Finkelstein is no longer at

3  DePaul.  He was someone who was denied tenure.  And I

4  think he was denied tenure maybe the year before I

5  joined the -- a year or two maybe before I joined the

6  university Tenure & Promotion Board.

7           What other information about him would

8  you like?

9      Q    He was a member of the faculty, albeit not

10  a tenured member of the faculty, however, at the

11  time -- sometime while you were also

12  contemporaneously, with some of your services, a

13  faculty member at DePaul.  Correct?

14     A    Yes.  It may have been before I was

15  tenured.  I'm not certain.  But, yes, that's the

16  case.  I was a professor at the same time he was a

17  professor.  I believe he was in the Political Science

18  Department.

19     Q    Was Professor Finkelstein, to your

20  knowledge, ever the subject of a resolution

21  considered by the DePaul University Faculty Council?

22     A    Not to my knowledge.

23     Q    Is Professor Finkelstein light-skinned or

24  dark-skinned?

1       A       Light-skinned.

2       Q       Is he Jewish?

3       A       I'm not -- I believe he is self-avowedly

4  Jewish.  I don't know from what perspective would

5  someone -- you know, I don't know much about him.  I

6  know that his -- that -- so I don't know.  I assume

7  that he is.

8       Q       Do you know --

9       A       I know he's repeatedly referred to as -- as

10  Jewish in media.  And as, I believe, the child of

11  Holocaust survivors.

12          But a lot of people were survivors of the

13  Holocaust.

14       Q       Do you know Professor Finkelstein's

15  sexuality?

16       A       I do not.

17       Q       Let me now draw your attention to the final

18  list paragraph that begins with the bolded word

19  "Guests" and ask, again, do you recognize the names

20  there as names of anyone you know?

21       A       Again, Salma Ghanem.

22          I don't know how to pronounce the name that

23  ends last name J-i-a from CDM, but I believe that I

24  know that name, that person.

1       █████ █████.  Michael █████.  Myself.  I

2    think that's it.

3         Q    You'll see in the final parenthetical there

4    after the name Paul Steero says, in parentheses,

5    "Good Day DePaul."

6              Do you see that?

7         A    I see it.

8         Q    Do you know what Good Day DePaul is?

9         A    I do not.

10        Q    Did any of these people who you recognize

11   from this paragraph speak?

12        A    Well, again, then Acting Provost Salma

13   Ghanem spoke.  I -- I'm not sure whether █████ █████

14   spoke or not.

15        Q    All right.

16        A    That's all I can recall.

17        Q    I should have limited that to the subject

18   of the Jason Hill resolution.  But you've answered it

19   in sort of a plainer fashion.

20             But anyway, let me ask you, specifically,

21   did you speak at that meeting on the subject of the

22   Jason Hill resolution?

23        A    I did not.

24        Q    Did you try?

1        A    I did.

2        Q    Why did you not succeed?

3        A    The Chair didn't recognize me.  That's to

4   say, he didn't call on me.

5        Q    The Chair of that meeting is whom?

6        A    Professor Scott Paeth.

7        Q    I'm going to now pull up for you,

8   Professor, what the court reporter has previously

9   marked as Deposition Exhibit 4.  And, again, we're

10  going to go through our little exercise and make sure

11  that we're on the same page and the same document.

12            (Indicating.)  So I've scrolled down to the

13  first page of what I've just pulled up on my screen,

14  and I want to confirm with you that it's on your

15  screen, too, and there on the bottom right corner of

16  that page 1 of this digital document is an exhibit

17  sticker that says Exhibit 4 Resnicoff 082120-4.

18            Do you have that in front of you on

19  your screen?

20       A    Yes.

21       Q    Again, my question, as in several prior

22  exhibits is, have a look at this.  I'll scroll

23  through at a pace that you're comfortable with at a

24  time that you're comfortable with that you can answer

1    the question that I want to ask you after you review
2    it:  Do you recognize this?  And then the second
3    question's going to be:  What is it?
4         A    Okay.
5         Q    (Indicating.)
6              I am scrolling on my screen.  Is yours
7    scrolling, too?
8         A    Yes, it is.
9         Q    (Indicating.)  And if you feel comfortable
10   stopping me at any time, Professor, where you can
11   answer the first question, have you seen this
12   document before?  Feel free to stop me and answer the
13   question.
14        A    Well, this is the document that -- yes, I
15   have.  You can -- I mean, this -- I've seen -- I
16   mean, if this is the document that, in fact, is the
17   document that was sent to me and was marked as the
18   exhibit, so then I've seen it, yes.
19        Q    Had you seen it before it was marked as an
20   exhibit and provided to you as an exhibit to this
21   deposition?
22        A    I believe this is the attachment sent to me
23   by Professor Allen Moye when I asked him to help me
24   find the bylaws, the official bylaws of the Faculty

1    Council.  And he sent that to me.  And I believe I

2    sent it to you as a production of documents and it

3    was ultimately marked as an exhibit.

4         Q    All right.  I will confirm for you that

5    that's my understanding.  And that's how it got to be

6    in front of you as an exhibit today.

7              So you do recognize this to be a copy of

8    the Faculty Council Bylaws of the Faculty Council of

9    DePaul University?

10        A    Yes.

11        Q    Did you have a copy of this, the Faculty

12   Council Bylaws, before you finished the op ed that

13   you testified about in this deposition?

14        A    Yes.

15        Q    And you referred to the Faculty Council

16   Bylaws in that op ed.  Correct?

17        A    Yes.

18        Q    Directing your attention -- we're still on

19   the first page, or at least I am at my end, of

20   Resnicoff Exhibit 4.  I want to direct your attention

21   to "Section 1.2 Notice of Meetings" -- strike that.

22   I think we've already gotten your testimony on this

23   subject, so I won't bother.

24             I'm going to scroll down to -- it's not

1    paginated -- oh, it is paginated.  Page 4 of this

2    document.  And direct your attention to a portion of

3    it with the heading, "1.4.7 Participation of

4    Non-Members."  (Indicating.)

5            Do you have that in front of you,

6    Professor?

7        A    I do.

8        Q    You'll see that that section begins, "The

9    Council may, by decision of the presiding chair or a

10   majority of the Council members present, permit

11   non-members to speak on agenda items."

12           Did I read that correctly?

13       A    Yes.

14       Q    Were any non-council members permitted to

15   speak at the May 1 meeting regarding the Jason Hill

16   resolution?

17       A    Well, as I mentioned, the then acting

18   provost spoke.  And I don't believe she was a member.

19           I think several alternates spoke.  And I'm

20   not sure what -- it could be members includes

21   alternates.  I don't recall that.  I'd have to look

22   at the document.

23           Whether any other non-members spoke, I

24   believe that I mentioned one other non -- one of the

1    guests that I thought may have spoken.  I don't

2    recall more.

3              I know that there were -- that I and

4    professor -- well, actually, I don't know his status.

5    But ██████  ██████, who is listed also as a guest

6    present, attempted to be called upon, but were not.

7         Q    When you say attempted to be called upon,

8    how did you make that attempt?

9         A    We raised -- well, we raised our arms.

10   Raised our hands.

11        Q    And what happened after you raised

12   your hands?

13        A    Well, at least -- I had my hand raised for

14   a while.  I believe that the Chair saw me, made eye

15   contact with me, but did not call on me or did not

16   call on Mr. ██████.

17        Q    At the Faculty Council meeting, how are

18   these categories of humans present?  The guests,

19   liaisons, Faculty Council members.  Were they

20   physically segregated so they could be in

21   recognizable groups?

22        A    Well, you know, I think at this time, there

23   was a table, a long table -- I could be mistaken --

24   but I think there was a long table which mostly the

1    members were there.  And the members had, at least

2    some of them, maybe all of them, had a name tag in

3    front of where they were sitting.  I think they

4    picked up the name tag and put it there.

5            And other people were just sitting back.

6            It was a large room.  In fact, the Chair

7    had mentioned at the beginning that he had a -- you

8    know, he thought that there might be a lot of people

9    in attendance and wanted to have a large room.

10           But everybody else was just sitting back,

11   not around the table.

12       Q    All right.

13       A    The room did not seem to me to be a lot of

14   people other than the members at the -- it don't

15   think there were a lot of guests present.  Certainly

16   not the kind of number that might have been

17   anticipated.

18       Q    But did the name tag that you wore, did you

19   actually wear it on your person?

20       A    I didn't have it.  No, I didn't have a name

21   tag.  The members of the -- that were sitting at -- I

22   believe at a long table -- again, maybe I'm mistaken

23   about the table.  But they had -- they generally -- I

24   don't recall the name tags.  But they generally would

1    have a kind of folded stand-up tag that would -- not

2    a tag to wear, but that they would put in front of

3    them on a desk or a table indicating what their

4    name was.

5         Q    You've testified that what we're seeing as

6    Resnicoff Exhibit 4 was provided to you by Allen

7    Moye.  Correct?

8         A    Yes.

9         Q    When you served on the DePaul Faculty

10   Council yourself in years past, did you have a copy

11   of some Faculty Council Bylaws?  Whether this version

12   or not, I don't care.  But did you have a copy of

13   Faculty Council Bylaws?

14        A    I don't recall.  I don't recall whether I

15   had it or not.

16        Q    Do you recall, one way or another, whether

17   it's the custom of the Faculty Council to provide all

18   new members with a copy of the bylaws?

19        A    I don't recall.

20        Q    Bear with me, Professor, as I'm going

21   through the paperwork and looking at my notes, too.

22   So don't think it's a pause.  It means I've been

23   lobotomized here.

24             Do you know, and if it might help you I can

1    pull up any exhibits, who was acting as secretary of

2    the Faculty Council at the May 1, 2019, meeting?

3         A    No, I don't recall.

4         Q    Let me see if I can figure that out and

5    discern it myself.  But thank you.

6         A    The minutes may mention who was the

7    secretary, but I just don't personally recall.

8         Q    I'm glad I'm not on screen because at the

9    moment, I'm fumbling with some notes.

10             I think we can move on now.  So I'm going

11   to display for you -- let me clear up the screen a

12   bit.  But I'm going to display for you now what the

13   court reporter's pre-marked as Resnicoff Exhibit 5.

14   I'll go down to confirm that that's on your screen.

15   (Indicating.)

16             I've now scrolled down on my screen to the

17   bottom of the first page of a three-page digital

18   document, the first page of which bears in the lower

19   right-hand corner an exhibit sticker that says

20   Exhibit 5 Resnicoff 012120-5.  (Sic.)  Is that what

21   you have on your screen?

22        A    Well, mine says 5 Resnicoff 082120-5.

23        Q    I must have misspoken.  I apologize.

24   That's what I have in front of me as well, too.

1    A    Okay.

2    Q    And I'll just ask you, and I'll scroll

3    through this again, too, is that a copy of an email

4    string that you produced to me and the other lawyers

5    present here in response to the deposition subpoena I

6    had served on you?  (Indicating.)

7    A    Yes.

8    Q    And you can feel free to look at any

9    portion that you want.  But I want to direct

10   your attention particularly to what seems to be

11   item two in that email string that begins on Tuesday,

12   May 7, 2019.

13        Do you have that in front of you?

14   A    Yes.

15   Q    Do you recognize that item in this email

16   string to be an email that you received from Jason

17   Hill on or about the date it bears, May 7, 2019?

18   A    Yes.

19        There was an attachment --

20   Q    Do you see --

21   A    -- as he mentioned -- I'm sorry.

22   Q    Go ahead.

23   A    There wasn't -- he -- never mind.

24   I'm sorry.

1    He had just recently sent me the final

2    resolution.  I don't recall whether it was -- he says

3    he just sent it.  So I'm not sure whether it was in a

4    previous email or not.  But I know he sent it to me.

5        Q    What did you understand the words "final

6    resolution" to mean in that email?

7        A    I understood that to mean the resolution

8    that was voted upon -- by and approved by the Faculty

9    Council.

10       Q    And with amendments that were proposed and

11   accepted by a majority of the Faculty Council at that

12   meeting.  Correct?

13       A    Amendments that were part of the resolution

14   as it was voted upon.  Yes.

15       Q    All right.  And so the final resolution

16   departs in at least some regards from the versions of

17   the resolutions we've looked at so far today.  Is

18   that correct?

19       A    Yes.

20       Q    All right.  I'm going to display for you

21   now what's been pre-marked as Resnicoff Exhibit 6.

22   And -- well, let's get it properly on the record.

23            I have now pulled up onto my own screen and

24   want to affirm that it's now appearing on your

1    screen, Professor Resnicoff, a -- how many pages?  A

2    two-page document that on the lower right-hand corner

3    of the first page bears an exhibit sticker that says

4    Exhibit 6 Resnicoff 082120-6.  (Indicating.)

5              Do you have that in front of you on your

6    screen, Professor Resnicoff?

7         A    I had that exhibit number on my screen.  I

8    can't tell yet how many pages the document has.

9         Q    Let me scroll to the bottom.  (Indicating.)

10        A    Yes.

11        Q    All right?

12        A    It's two pages.  Yes.

13        Q    All right.  Do you have that in front

14   of you?

15        A    I do.

16        Q    My question to you is, do you recognize

17   this document to be an attachment to Professor Hill's

18   May 7 email to you in what he refers to in that email

19   as the final resolution?

20        A    Could you scroll to the second page for a

21   minute?

22        Q    (Indicating.)

23        A    Oh, stop.  Just stop.

24             Actually, could you go up just a

```
 1    little bit?

 2         Q    (Indicating.)

 3         A    I believe, yes, it is.

 4         Q    All right.  I'm going to ask you to read,

 5    taking as much care as you need, but ask you to look

 6    at that document and tell me whether you see the

 7    words "an abuse of academic freedom." (Indicating.)

 8         A    Okay, scroll a little slower.

 9         Q    (Indicating.)

10         A    Could you go down a little bit?

11         Q    (Indicating.)

12         A    Okay, one second.

13              Could you go down further?

14         Q    (Indicating.)

15         A    So I -- and could you go to the end?

16         Q    (Indicating.)

17         A    So I don't -- I don't see that language.

18         Q    So in at least that respect, that this

19    document does not have the words "an abuse of

20    academic freedom," that is a departure from the

21    version of the resolutions that we've so far seen

22    during the course of this deposition.  Correct?

23         A    I believe so.

24         Q    Have you ever seen a copy of what is
```

1    Resnicoff Exhibit 6 published in DePaulia?

2         A    Not to my knowledge, no.

3         Q    Have you seen it published anywhere else?

4         A    Not to my knowledge, no.

5         Q    So the only version of the Jason Hill

6    resolution that you've ever seen published includes

7    the phrase, the charge "an abuse of academic

8    freedom."  Correct?

9         A    That's correct.

10        Q    And that version of the resolution is

11   published still on DePaulia's website, because we've

12   just seen that in the course of this deposition.

13   Correct?

14        A    That's what -- it seems so.  That's the

15   only -- I mean, the version that you showed me by

16   using the hyperlink in the article did have that

17   word -- did have that phrase, and this one does not.

18        Q    Again, bear with me as I go through

19   my notes.

20             I'm going to go back to Exhibit 5 if I can

21   find it.  The Zoom is cluttering my own desktop and

22   it makes it difficult.  But let me see if I can pull

23   up -- there it is.  Do you have in front of you, as I

24   now have in front of me, Resnicoff Exhibit 5?

1    A    I do.

2    Q    Let's go to the first item in that email

3    string that begins "Re:  Faculty Council Bylaws."

4    And it says "From:  Resnicoff Steven."  But that

5    first item in the email string, do you recognize that

6    as an email --

7    A    Yes.

8    Q    -- that you wrote to Jason Hill on or about

9    the date it bears, Tuesday, May 7th of 2019?

10   A    Yes.

11   Q    Okay.  You see there it refers to "scanned

12   pages 394-395."  Do you see that?

13   A    Yes.

14   Q    What does that refer to?

15   A    Well, these were two pages from a copy of

16   Robert's Rules of Order that I sent to Jason Hill.

17   Q    On that date, May 7, 2019?

18   A    Right.

19   Q    Did you consult Robert's Rules of Order in

20   preparing your op ed that we --

21   A    Yes.

22   Q    -- previously marked as a Deposition

23   Exhibit?

24   A    Yes.

1      Q    From your time serving on the DePaul

2  University Faculty Council, to your knowledge, were

3  Robert's Rules of Order available to Faculty Council

4  members?

5      A    What do you mean by "available"?

6      Q    Did the Faculty Council have a convention

7  or a rule that required Faculty Council members to

8  have a copy of Robert's Rules of Order?

9      A    I don't believe that there was a

10  requirement that Faculty Council members have a copy

11  of Robert's Rules of Order.

12      Q    How about Faculty Council officers?

13      A    I don't remember that -- I don't know if

14  there's any kind of requirement that they have the

15  rules.  It was a customary practice that people

16  would -- that we would follow the rules.  Or at least

17  to the extent that people understood the rules would

18  be following them.

19          There were people who sometimes said that

20  Robert's Rules of Order required this or required

21  that.  But I don't think there was an official

22  parliamentarian.  And I don't know if -- but I

23  believe that it was understood that the rule that --

24  that the meetings were being run generally in

1   accordance with Robert's Rules of Order.

2          Q     I apologize.  My phone just cut off.

3                Do I have audio again via the computer?

4          A     You do.

5          Q     I'm sorry, I need to turn it up.  But do

6   you hear me now via my computer microphone?

7          A     I hear you.

8          MS. BOSSARD:  I hear you.

9   BY MR. WHITTAKER:

10         Q     All right.  I don't have a whole lot more,

11  so maybe we can try to muddle through.  I can try to

12  place the call again, but I'll leave it to everybody

13  else.  Should we try and muck through?  Is that okay

14  with everybody just with my bad computer microphone?

15         A     Sounds fine.

16         Q     Okay.  There are copies of Robert's Rules

17  of Order at DePaul's main library.  Is that correct?

18         A     I have no idea.

19         Q     How about at the law library?

20         A     I don't know what's -- you know, whether it

21  has Robert's Rules of Order or not.

22         Q     Who is Allen Moye?

23         A     Allen Moye is a professor at the College of

24  Law.  And he is the head of the library -- of the

```
 1    College of Law library.
 2                    (Technical difficulty.)
 3         THE REPORTER:  One moment.  We're getting some
 4    reverberation.  Do you have a second audio on, still?
 5                    (Discussion held off the record.)
 6         MR. WHITTAKER:  Let's take a five-minute break.
 7    I'll try to get in with my phone again.
 8                    (Short break to establish new
 9                     connection.)
10         THE REPORTER:  Would you like the last question
11    and answer?
12         MR. WHITTAKER:  Yes, could you?
13                    (The record was read as follows:
14                        "Q.  Who is Allen Moye?
                            "A.  Allen Moye is a professor at
15                      the College of Law.  And he is the
                        head of the library -- of the College
16                      of Law library.")
17    BY MR. WHITTAKER:
18         Q    And in the course of this deposition,
19    Professor Resnicoff, you've testified that Mr. Moye
20    supplied you with materials to help you prepare the
21    op ed you testified about during the course of this
22    deposition.  Correct?
23         A    Well, I just want to make it clear.  I
24    asked him if he could help me find the bylaws.  And
```

1    he sent me the bylaws.

2          I didn't mention to him, I don't believe,

3    that it was going to be in preparation of an op-ed.

4          I then used the bylaws that he sent me,

5    the -- at least he sent me a link to the bylaws.  He

6    might have attached them.  I used those in writing my

7    op ed.

8       Q    The proposition -- I'm being paraphasic,

9    and I needn't be.  It's true that the professionals

10   at the DePaul libraries are able to get -- to offer

11   their services to supply interested faculty any

12   published materials that they're able to get.

13   Correct?

14      A    Yes.

15      Q    And among those published materials, if

16   DePaul's own collections don't have it, would be

17   current versions of Robert's Rules of Order.

18   Correct?

19      A    Yes.

20      Q    Okay, fine.  I made it far more complicated

21   than it needed to be, and I apologize.

22          I'll go back to sharing.  And the next will

23   be quick.  I'm going to show you Exhibit 5A

24   pre-marked.  Let me pull that up.

1          (Indicating.)  I have now displayed a

2     picture of a photocopy of a book,

3     Professor Resnicoff.  I'm hoping that that's what you

4     have in front of you with the deposition sticker

5     identifying itself in the lower right-hand corner as

6     Exhibit 5A.

7          Do you have that in front of you?

8     A    I believe so except that on my screen, I

9     have the "You're sharing your screen" thing covering,

10    I believe, where the exhibit sticker is.

11    Q    (Indicating.)

12    A    Oh, there you go.  Yes.

13    Q    I thought that was only on my screen.  I

14    apologize.

15    A    Okay.

16    Q    But that's what you have.  Correct?  In

17    front of you now?

18    A    That's right.  I have it.

19    Q    My sole question on this is, is this a copy

20    of pages from Robert's Rules of Order that you sent

21    to Jason Hill?

22    A    Yes.  I believe so.

23    Q    I'm going to show you, Professor Resnicoff,

24    what the court reporter has previously marked as

1   Deposition Exhibit 9, a three-page digital copy of a

2   document you produced to me.  And at the bottom

3   right-hand corner of page 1 it bears an exhibit

4   sticker, Exhibit 9 Resnicoff 082120-9.  (Indicating.)

5          Is that what you have in front of you?

6      A    Yes.

7      Q    I'm going to ask you, regarding the first

8   page of Resnicoff Exhibit 9, is that a communication

9   that you sent to President Esteban, President of

10  DePaul University, on or about the date it bears,

11  April 24, 2019?

12     A    Yes.

13     Q    What was your purpose in sending that?

14     A    First, I wanted to express my appreciation

15  for the President's statement on academic freedom.

16         And second, I wanted to make it clear to

17  the President that I was interested, and I thought it

18  was appropriate, for me and JLJS to be involved in

19  the arrangements for the type of fora that were

20  supposed to be held.

21     Q    Why did you think it was appropriate for

22  JLJS?  And by that you mean the Center for Jewish

23  Law & Judaic Studies.  Correct?

24     A    Yes.  Well --

1    Q    Why did you think it appropriate for you

2    and JLJS to participate in those fora?

3    A    Well, I thought that there is -- we are --

4    I and the organization are concerned about

5    anti-Israel and anti-Semitic bias that permeates much

6    of the discussion on campuses, including -- oh, I'm

7    sorry, I have to -- just one second.  My battery has

8    to be plugged in.

9         Okay, sorry.  My computer plug was out of

10   the wall.

11        I -- there is a great deal of anti-Semitic

12   bias on many university campuses.  And there had been

13   anti-Israeli bias and anti-Semitic bias expressed on

14   the DePaul campus.

15        And as a consequence, I was concerned that

16   the discussion in the fora with respect to

17   Professor Hill would not be -- or might not be fair.

18   And I was interested -- and I thought that it was

19   important that the fora be arranged in a fair -- in a

20   fair way.

21        And a lot of the issues that come up in

22   connection with discussions of Israel involve law.  A

23   lot of discussions which arise with respect to

24   academic freedom involves law.  And as a member of

1    the College of Law, I thought -- and as an
2    institution at the College of Law, JLJS, I thought
3    that we would be important in providing some
4    information and guidance as to the nature of the
5    discussions that should be held:  What materials
6    might be provided to people online in advance, and
7    other sorts of things to make sure that the
8    discussion is an informed one, rather than have
9    people make allegations about law people who have no
10   experience with respect to law.
11           You see, that happens very often on
12   campuses.  And so I thought that since it was of
13   interest to us, since we were knowledgeable as to law
14   and as to the nature of anti-Semitism, that would be
15   appropriate to have us involved.  And I wanted to
16   make sure that the President knew about us and knew
17   about our interest.
18       Q    Were you allowed to participate in any fora
19   on Middle Eastern politics at DePaul University in
20   the Spring or Summer of 2019?
21       A    Well, everybody was invited to attend or
22   participate in some fora that were held.  But to my
23   knowledge, I received no response to this email.
24       Q    And you've never asked to be a presenter,

1    the people sitting up on the dais, at any such fora

2    at DePaul.  Correct?

3         A    I didn't make that request.

4              I made this request.  To be involved.  I

5    didn't presume to be a speaker.  But I wanted to be

6    involved in helping to give input as to the

7    formulation of a -- of a fair process.

8         Q    But President Esteban did not respond to

9    that request.  Correct?

10        A    Not to my knowledge.

11        Q    Well, did anyone else communicate the

12   request for JLJS?

13        A    Well, I'm the only one who communicated the

14   request, and I did it in this way.  And nobody -- I

15   didn't receive a response to this email from anyone,

16   as far as I know.

17        Q    All right.  So --

18        A    I do not know -- I do not recall whether

19   there was a blind copy sent to anyone else.  I

20   can't -- and I don't -- I didn't look at the top of

21   the email to see if a copy was sent to anyone.  But I

22   sent this to the -- to the President.

23        Q    But if you included a blind copy, that

24   blind copy recipient would not appear in

1    President Esteban's receipt of the copy.  Correct?

2        A    That's correct.

3        Q    So the only person he could respond to, to

4    this request, would be to you.  Correct?

5        A    That's right.

6        Q    And you received no such response.

7    Correct?

8        A    I received no response, to my knowledge.

9             And I -- as you can see, I was concerned

10   about communicating to the President the fact that I

11   might not be available -- that I would not be

12   available during certain days, and so on.  That's

13   the -- you know, because of the Jewish holidays in

14   which I don't use electricity.  I don't use phones

15   and email and so on.

16            But I didn't receive -- I don't recall

17   receiving any response.

18       Q    Thank you.  I'm now going to show you what

19   the court reporter has previously marked as Resnicoff

20   Exhibit 10.

21            And I'll scroll down.  (Indicating.)  This

22   is a two-page copy, digital copy, of a document

23   bearing in the lower right-hand corner of the first

24   page an exhibit sticker that says Exhibit 10

1    Resnicoff 082120-10.
2            Is that what you have in front of you,
3    Professor Resnicoff?
4        A    Yes.
5        Q    Is this, as it purports to be, an email
6    that you sent on or about the date it bears, May 6,
7    2019, to ███████ ███████?
8        A    Yes.
9        Q    Is everything that you say in that email
10   true, including the fact that you like the hat in
11   whatever photo you're referring to?
12       A    To the best of my knowledge, yes.
13       Q    I don't think I have anything more on that.
14            Let me clear up a few screens.
15            Let me show you what's been pre-marked, let
16   me pull it up, as Resnicoff Exhibit 11.
17   (Indicating.)
18            This is a barely two page, but a two-page
19   digital copy of a document bearing in the lower
20   right-hand corner an exhibit sticker identifying it
21   as Exhibit 11 Resnicoff 082120-11.
22            Is that what you have in front of you,
23   Professor Resnicoff?
24       A    Yes.

1      Q    What is it?

2      A    Well, it was a letter that I -- an email, I

3    think, that I sent to President Esteban.  It speaks

4    for itself.

5      Q    That's fine.  Did you attach to it a copy

6    of the op ed that you had written and that you had

7    testified about today during this deposition?

8      A    I believe I did attach it, but I don't

9    recall exactly.  But you can see that I provided a

10   link to it.

11     Q    Oh, you're quite correct.  It does refer to

12   a link.

13          Did you ever receive a response, to this

14   email, from President Esteban?

15     A    Not to my knowledge, no.

16     Q    Is Dr. Esteban still the President of

17   DePaul University?

18     A    Yes.

19     Q    And he was at all times in April and May of

20   2019.  Correct?

21     A    I believe so.

22     Q    And continuously to the time that you're

23   testifying here today?

24     A    Yes.

1    Q   All right.  I want to find, and my notes

2    are so bad that it's going to be a little difficult,

3    but not too difficult to find, one more exhibit that

4    I want to show you.  And then I just have a few

5    questions and I'll consult with my co-counsel.  But I

6    think I'm nearly done.

7         But let me pull up that -- no, that's not

8    the one I'm thinking of.  So forgive me while I go

9    through the exhibits to find the one I want.

10        (Indicating.)  You've already seen that

11   one.  It must be 6.  And if not, this isn't a major

12   moment -- no.

13        Let me just ask you.  And it can be done

14   without reference to the exhibit.  And I'll just get

15   off of sharing and look for it.  And if I find it

16   again we can refer to it.

17        You testified already that acting provost,

18   Provost Ghanem, spoke at the Faculty Council meeting

19   about fora or maybe forum that was planned.  Is that

20   correct?

21   A    I believe so.

22   Q    Did any such fora get convened?

23   A    There were.  I believe there were at least

24   two.  I believe.  But I know there was at least one,

1    because I watched the video of one of them.  Either I

2    watched the video synchronously or asynchronously.  I

3    don't recall.

4         Q    When was that one that you watched

5    synchronously the video of?  When did it occur, as

6    best you recall?

7         A    I don't know the date.  I assume the -- I

8    don't know.  I assume it was in May of 2019.

9         Q    At that forum, does the renowned former

10   newscaster and DePaul employee -- current DePaul

11   employee, Carol Marin, who will be known to all

12   Cook County and Chicago jury members, if this is

13   eventually tried, did she participate in that forum

14   that you just referred to that you saw on video?

15        A    I'm not certain.  She may have been the one

16   asking questions.  I don't say she was a panelist, at

17   least in the one that I saw.  I believe that the one

18   I saw had three professors.  But I do not remember

19   their names.  And -- but I -- and she may have

20   moderated it.  But I'm not certain.

21             I think that the -- but the acting -- the

22   then acting provost was also present at this forum.

23        Q    The then acting provost is the

24   Defendant Ghanem.  Correct?

1        A     Correct.

2        Q     She is no longer acting provost.  She is

3   the provost of DePaul.  Am I correct?

4        A     Absolutely.  Yes.  You are correct.

5        Q     All right.  I think I found the exhibit.

6   We'll at least identify it.

7              So let me share again.  I'll go back to

8   share.  It's going to be Exhibit 12.  It's not up

9   there yet, but we'll see.  We'll just get it on the

10  record.

11             I'm going to pull up what's been

12  pre-marked -- no, I apologize.  I have to go into my

13  files.  You'll see more of my computer than you have

14  any curiosity to see, I'm sure.

15             (Indicating.)  All right, that's not the

16  one I wanted so I'll just leave it.  I'll get out of

17  share because it's not important, especially in light

18  of your testimony.

19             Do you have any distinct memory, as you

20  testify, about any other forums that were convened on

21  the subject matter of politics in the Middle East of

22  concern to DePaul students?

23       A     I don't have any -- I thought there might

24  have been a second one, as I mentioned before, but I

1    didn't -- I don't remember watching it or attending

2    it.  I certainly didn't attend it.  And I don't

3    remember watching it.

4              We at JLJS have had different kinds of

5    programming that deals with the Middle East.  But not

6    in connection with Professor Hill.

7         Q    Has President Esteban ever attended

8    presentations given by JLJS?

9         A    Not to my knowledge.

10        Q    Have you had any communications on the

11   subject of Jason Hill, other than what we've seen as

12   exhibits today, with President Esteban?

13        A    Not to my knowledge.

14        Q    Have you had any communications outside of

15   the May 1, 2019, faculty -- one-way or two-way

16   communications, outside of the Faculty Council

17   meeting, with Provost Ghanem on the subject of

18   Jason Hill?

19        A    I'm not sure if I sent her a copy of my

20   op ed.  I just -- I just don't recall.

21             I know I sent one to Professor Paeth.  But

22   I just don't recall whether I sent it to her as well.

23             But I haven't had any other correspondence

24   with her, as far as I can tell, about this subject.

1      Q     All right.  Forgive me as I go through and

2   look at my notes.  I do think that we're coming near

3   the end.

4            To your knowledge, has Scott Paeth ever

5   published in writing any matter on the subject of

6   Middle East politics?

7      A     Yes.

8      Q     How frequently, to your knowledge?

9      A     I don't know how frequently.  I don't

10  generally follow his writings.  But I know that --

11     Q     Has Scott -- go ahead.

12     A     -- at the meeting -- at the Faculty Council

13  meeting on May 1, he referred to the fact that he had

14  addressed Jason Hill's remarks.

15           And subsequent to my -- the publication of

16  my op ed, some third party, who I identified to you

17  in the production of documents, some blogger, sent me

18  some correspondence I think between him and

19  Scott Paeth.

20           But I don't know much about the -- and

21  somebody else also in an email that I produced in the

22  production of documents referred to things that Scott

23  Paeth had written about the Middle East.

24           That's as much as I recall at this point.

1      Q    Has Scott Paeth ever been the subject of a

2  resolution considered by the Faculty Council at

3  DePaul University?

4      A    Not to my knowledge.

5      Q    Has any member of the faculty, to your

6  knowledge, been the subject of a resolution

7  considered by the Faculty Council of DePaul

8  University?

9      A    Yes.

10     MS. BOSSARD:  Objection.  Calls for speculation.

11     THE WITNESS:  Well, no, it -- the answer to that

12  is yes.

13  BY MR. WHITTAKER:

14     Q    Who?

15     A    But not in connection with Jason Hill.  Not

16  in connection with the Middle East.  But there have

17  been some contentious resolutions proposed in Faculty

18  Council in the past to censure people.  But they

19  were -- to my knowledge, they were all defeated.

20     Q    Do you have the name of the faculty members

21  who were the subject of such resolutions?

22     A    I believe that there was such a resolution

23  moved against former Dean of the College of Law,

24  Dean Roberts, and that there was a resolution

1    against -- moved at the same time, I believe, against

2    another member of the College of Law, Len Cavise.

3            Len Cavise is no longer at the college.

4    He's retired, I believe.  And so has Dean Roberts

5    retired.

6            I don't know if there was -- I was a member

7    of the Faculty Council at the time those two

8    resolutions were introduced.

9            There was -- I don't -- I think there may

10   have been a resolution introduced against a third

11   party, but none of them passed.  And I'm not sure.  I

12   know there was a threat issued that there was going

13   to be a resolution against a third person.  But I

14   don't know if it was actually introduced or not.

15        Q    And Dean Roberts, former Dean Roberts of

16   the College of Law, his ethnicity?  If you know.

17        A    He is light-skinned.  And I don't know any

18   more than that.  I believe he has some German

19   background, but I'm not certain.

20        Q    Do you know anything about his sexuality?

21        A    No.

22        Q    Len Cavise.  Ethnicity and skin color, do

23   you know?

24        A    He's light-skinned.  And I'm not sure.  I

1    really don't know what his ethnicity is.

2         Q    How about his sexuality?

3         A    Again, I don't know.

4         Q    Did Dean Roberts ever publicly announce any

5    information about his sexuality?

6         A    No.  He was married and he has -- to a

7    wife -- to a female.  There was no discussions, to my

8    knowledge, about his sexuality.

9              Len Cavise was also married to a woman

10   and -- but I don't know if there was any discussion

11   about his sexuality.

12        Q    To your knowledge, did Professor Cavise

13   ever publicly state any information about his

14   sexuality?

15        A    Not to my knowledge.

16        Q    Do you know a faculty member at DePaul by

17   the name of Farah?  Laila Farah?

18        A    I don't recall knowing such a person.

19        Q    All right.  Professor Resnicoff, have you

20   produced, to your knowledge, as you sit here and

21   testify today, everything in your possession

22   responsive to the instructions in the deposition

23   subpoena that I had served on you?

24        A    To the best of my knowledge, yes.

1     Q    All right.  Subject only to what I hope is

2     a brief discussion with my co-counsel, Mr. Anthony, I

3     don't think I have anything further,

4     Professor Resnicoff.

5          Do you mind, everyone, if I take another

6     break and get off and place a quick phone call, I'm

7     sure, to Greg Anthony?  Greg, is that okay if we

8     speak quickly?

9          MR. ANTHONY:  Here's what I'll do.  I'll go up

10    to my office so I don't need to worry about just

11    unintended technology issues.  And I can call you in

12    about 60 seconds off of my line if that's okay.

13         MR. WHITTAKER:  That's fine.  And it may be I'll

14    just have to call back in.  I apologize again about

15    the technology.  But I think we're about done.  So

16    I'm signing off my phone.  Greg and I will speak.  So

17    we're taking a short break.

18              (Whereupon, a short recess was taken.)

19    BY MR. WHITTAKER:

20         Q    Professor Resnicoff, since April 30th of

21    2019, have you had any communications with Scott

22    Paeth other than those you've already testified about

23    at your deposition on the subject of the resolution

24    or Jason Hill?

1        A     Not to my knowledge.

2        Q     Well, now I'm a little stumped.  If you

3   were a party to a communication, would you not

4   know it?

5        A     Well, you're talking about a year and a

6   half or a year and a quarter.  I just don't recall

7   any other correspondence between us.  If there

8   is some, you can refresh my memory.  But I don't

9   recall any.

10       Q     I'm not trying to be tricky.  I'm not aware

11  of any.  I'm just asking if you're aware of any.  If

12  you recollect any.

13       A     No.  You know, it could -- no.

14             I do get communications from Scott Paeth.

15  You know, he sends -- we get some emails saying that

16  there's -- the Faculty Council has -- he has a

17  call-in or he's open to any questions or maybe I get

18  some other kind of announcements from Faculty Council

19  that he would be cc'd on or he sends, but I don't

20  have any -- I don't consider them correspondence with

21  him about -- because -- you know, I don't -- I just

22  get form letters.

23       Q     Fair enough.  Early in the deposition I

24  asked you about your experience teaching torts.  And

1    you said that you have never taught torts in your

2    teaching career.

3              Have you ever been a litigant in a

4    defamation suit?

5         A    When I was working as a -- I did some

6    clerking work for an attorney on a defamation -- for

7    the defense in a defamation suit.  That was -- I just

8    did, like, a memo.  But that's all.

9              After I started practicing law, I don't

10   recall any defamation work.

11        Q    And your answer seems to be restricted, and

12   correct me if I'm wrong, to a role as an advocate in

13   a suit.  But I'm asking you as a party litigant.

14   Have you ever been a party litigant to a tort suit

15   generally or a defamation suit specifically?

16        A    No.

17        Q    Have you ever been deposed before?

18        A    Yes.

19        Q    How many times?

20        A    I don't know.  I was deposed in connection

21   with being an expert witness in a Federal case in

22   Westchester County in New York.  That was the most

23   recent time.  And I did appear in a -- and was

24   questioned before a judge in that proceeding as an

1    expert witness.

2            But I also was in several depositions

3    pertaining to various cases involving DePaul

4    University and the work of the university Tenure &

5    Promotion Board while I was on it.

6            I believe those are the only depositions

7    that I've had that I've participated in.

8            As a -- I mean, as an attorney, I conducted

9    depositions in cases.  But -- yeah.

10        Q    In your role in your activity on the

11   Tenure & Promotion Board, were you involved in

12   consideration of faculty members who were denied

13   tenure?

14        A    Yes.

15        Q    And so you're familiar, correct, with the

16   Faculty Handbook regarding grant and denial of

17   tenure?

18        A    Well, the Faculty Handbook was

19   substantially changed since that time.  It

20   was substantially changed.  And I'm not really

21   intimately familiar with the new version.  And my

22   memory suffers a bit about what the old version was.

23   You'd have to ask me some specific questions.

24        Q    I'd love to, but I don't have the old

1    version.  So you dodged a bullet.

2              How many times have you been tendered as an

3    expert witness in litigation?

4         A    Tendered?  I'm not sure of the meaning

5    really.  I was in this one case.  And I think a long

6    time before I was going to be an expert witness and I

7    was going to be deposed, but we had one of these

8    Chicago snowstorms and the planes were aborted and so

9    they got somebody else.

10        Q    What was your offered expertise in the

11   matter in which you were deposed?

12        A    Jewish law.

13        Q    And in the matter where the snowstorm saved

14   you?  What was your offered expertise?

15        A    It was also going to be in the area of

16   Jewish law.

17        Q    All right.  I will not follow up on that.

18        A    And I didn't -- I won't say -- I don't

19   think it saved me.  I wanted to do it.

20        Q    Then I apologize to suggest otherwise.  But

21   I didn't know at the time what the subject

22   matter was.

23             I have nothing further,

24   Professor Resnicoff, except to say thank you very

1    much for your time.  I do realize it's an imposition.

2    I do realize that I'm hampering the imposition by the

3    deficiencies in my technology.  Thank you for

4    testimony.

5         A    Thank you very much.  'Bye, everybody.

6         MS. BOSSARD:  Wait a minute,

7    Professor Resnicoff.

8         THE WITNESS:  Oh.

9         MS. BOSSARD:  I just have a few questions,

10   please.

11        THE WITNESS:  I'm sorry.

12                        EXAMINATION

13   BY MS. BOSSARD:

14        Q    It will just take a couple minutes.

15             You testified about the Faculty Council

16   meeting that took place on May 1, 2019.  Correct?

17        A    Yes.

18        Q    And at that time, you were not a member of

19   the Faculty Council.  Right?

20        A    Correct.

21        Q    And you were not an alternate either?  Is

22   that correct?

23        A    Correct.

24        Q    Are you aware of Dr. Paeth calling on

1    anyone to speak who was not a Faculty Council member

2    or an alternate or the acting provost?

3         MR. WHITTAKER:  Other than what he's already

4    testified to?

5         THE WITNESS:  I thought there are at least one

6    other person I believe that was called on.  And also

7    there were, as I mentioned, I think at least one

8    alternative.  Although alternatives might be members.

9    So that would -- that would answer that.

10        But I thought there was at least one other

11   person.  I don't remember the name.

12   BY MS. BOSSARD:

13        Q    Okay.  Are you aware of any resolution

14   passed by Faculty Council with regard to

15   Marten denBoer?

16        A    I'm not.  No.

17        Q    Okay.  Would it be fair to say,

18   Professor Resnicoff, in your opinion that the Faculty

19   Council Resolution that was passed on May 1 had no

20   actual effect?

21        A    No.  I don't know what you mean by actual

22   effect.  I mean -- you mean de jure effect or

23   de facto effect?  It certainly had consequences.

24   So -- I mean, it certainly could have consequences.

1    I'm not saying it doesn't have any effect.

2         Q    Did it call for any action on behalf of the

3    university?

4         A    The final version?  So I'm -- I don't

5    believe that the final version called for any

6    specific action by the university.

7         Q    Are you aware of any specific action

8    taken by the university in response to Dr. Hill's

9    op ed piece?

10        A    I don't know these -- for example, these

11   four that were -- were held, I don't -- that may have

12   been as a result of the piece.  There are other

13   allegations of things.  But I don't know first hand

14   what else might have been or might not have been done

15   based on the publication of the piece.

16        Q    Are you aware of any disciplinary action

17   taken by the university against Dr. Hill?

18        A    I am not.

19        Q    Okay.  And I know you produced a number of

20   documents with respect to the subpoena issued by

21   Dr. Hill's counsel.  And I received copies of those

22   documents as well.  And you can correct me if I'm

23   wrong, but I believe in several of those

24   communications that you produced you indicated that

1    you disagree with some of the opinions Professor Hill

2    has expressed.

3              Is that accurate?

4        A    I said in some of them that I disagree with

5    some of what was written in the -- in his piece.

6              I didn't -- I'm not sure that if I said

7    that I dis -- I'm not sure.  It could be that I said

8    the opinions.  But I think the word -- what he --

9    with some of the things that he said.

10             I'll give you an example.  I think he said

11   something -- he used the word "ruthless" at one point

12   in one sentence.  And I wouldn't have used the word

13   ruthless.  I don't think anybody should be ruthless.

14   How can you recommend somebody be ruthless?  No one

15   should be ruthless.

16             So, I mean, there were certain things

17   expressed.  But I don't know what he meant by it and

18   so on.  But I wouldn't agree with -- with expressing

19   yourself that way.

20             So it would have to be -- it had to be a

21   nuanced question about which particular thing, you

22   know, bothered me or didn't bother me.  Some of it --

23   so I'm not sure about ultimately -- for example,

24   yeah, I think he recommended that people be stripped

1    of the right to vote.  I didn't recommend -- I

2    wouldn't agree with that.

3            So there are things that I didn't agree

4    with and things that I thought should be expressed

5    differently.

6        Q    Did you --

7        A    I hope that was responsive.

8        Q    Yes, that was responsive.

9            Did you agree that some cultures are

10   abysmally inferior to others?

11       A    Well, I don't know that I would apply it in

12   the way he applied it.  But I do believe that some --

13   you know, if you have a -- a cannibalistic society, I

14   do not believe that it's the same as another.  So I

15   do believe that there are differences.

16           I mean, I think it's -- I think -- I

17   believe that there are differences.  But I wouldn't

18   necessarily agree with the way he had applied that.

19       Q    Okay.  Thank you.  That's all I have.

20       MR. WHITTAKER:  We have nothing further.

21       THE WITNESS:  I can go now?

22       THE REPORTER:  Signature?  Counsel, would you

23   explain signature?

24       MR. WHITTAKER:  Professor Resnicoff, you have

1    the right to review and sign and correct clerical

2    errors.  So you can reserve signature if you want.

3              Do you want to reserve signature is what

4    she's asking.

5         THE WITNESS:  Yes, I'll reserve signature.  I

6    might as well.  Because I don't know what kind of

7    inaccuracies could come out in a process like this.

8    I never had a video deposition.

9         THE REPORTER:  Mr. Whittaker, are you ordering

10    the transcript?

11         MR. WHITTAKER:  Yes.

12         THE REPORTER:  Ms. Bossard, would you like a

13    copy?

14         MS. BOSSARD:  We will hold off for right now.

15              (Proceedings adjourned at 11:59 a.m.)

16                   *    *    *    *    *

17

18

19

20

21

22

23

24

```
 1          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT, LAW DIVISION
 2
    JASON HILL,                      )
 3                                   )
                    Plaintiff,       )
 4                                   )
                  -vs-               )   No. 20 L 4358
 5                                   )
    DePAUL UNIVERSITY, SCOTT PAETH,  )
 6  and SALMA GHANEM,                )
                                     )
 7                  Defendants.      )

 8

 9          This is to certify that I have read my

10  deposition taken on Friday, August 21, 2020, in the

11  foregoing cause, and that the foregoing transcript

12  accurately states the questions asked and the answers

13  given by me, with the changes or corrections, if any,

14  made on the Errata Sheet attached hereto.

15

16

17  _____
            STEVEN H. RESNICOFF
18
    No errata sheets submitted _____ (Please initial)
19  Number of errata sheets submitted _____ pages

20  SUBSCRIBED AND AFFIRMED TO
    before me this _____ day
21  of _____, A.D. _____.

22

23  _____
            Notary Public

24  ///
```

1              I, LAURA L. KOOY, a Certified Shorthand
Reporter within and for the State of Illinois, do
2    hereby certify:

3              That previous to the commencement of the
examination of the witness, the witness was duly
4    affirmed to testify the whole truth concerning the
matters herein;

5

6              That the foregoing deposition was reported
stenographically by me, was thereafter reduced to a
printed transcript by me, and constitutes a true
7    record of the testimony given and the proceedings
had;

8

9              That the said deposition was taken before
me at the time and place specified;

10            That the reading and signing by the witness
of the deposition transcript was agreed upon as
11   stated herein;

12            That I am not a relative or employee or
attorney or counsel, nor a relative or employee of
13   such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in the
14   outcome of this action.

15            IN WITNESS WHEREOF, I do hereunto set my
hand this 23rd day of August, 2020.

16

17

18   _____
      LAURA L. KOOY, CSR, RDR, CRR
19   Notary Public
      CSR No. 084-002467
20

21

22

23

24

Errata Sheet

NAME OF CASE: JASON HILL vs DePAUL UNIVERSITY, et al.

DATE OF DEPOSITION: 08/21/2020

NAME OF WITNESS: Steven H. Resnicoff

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

                                      _____

# EXHIBIT 9
# (Under Seal)

# EXHIBIT 10



EXHIBIT

5

Dr. Salma Ghanem

DN      Mar 23 2022

MAY 15, 2019 7:34 AM

# DePaul Faculty Council's Capricious Treatment of Pro-Israel Professor

*by Steven H. Resnicoff*





DePaul University. Photo: southie3, via Wiki Commons.

I am a professor at the DePaul University College of Law, and recently attended a public meeting of the university's Faculty Council. I feel compelled to comment on the procedurally improper and profoundly unfair way in which it publicly pilloried professor Jason Hill, a senior faculty member. Why? Because he had the temerity to publish unpopular opinions — pro-Israel opinions, at that — in an op-ed piece in *The Federalist*.

The proposed resolution contained ugly, explosive charges. In part, it stated:

---

## GET THE BEST OF THE ALGEMEINER STRAIGHT TO YOUR INBOX!

> **Whereas** the recent article by Professor Jason Hill, entitled "The Moral Case for Israel Annexing the West Bank — and Beyond" 1) misrepresents the history of the Israeli-Palestinian conflict, 2) distorts the facts about the current state of Israeli-Palestinian relations, 3) promotes racism toward Arabs generally and Palestinians in particular, and 4) advocates for war crimes and ethnic cleansing against the Palestinian populations of the West Bank and the Gaza Strip.

Such extreme accusations could not only significantly imperil academic freedom and irreparably tarnish Hill's reputation, but it could also lead to Hill feeling threatened. He has already reportedly received anonymous death threats.

Among other things, the proposed resolution condemned "in the strongest possible terms both the tone and content" of Hill's article, affirmed that the article "represents an abuse" of Hill's academic freedom, and urged him "to seriously reconsider his positions on these issues, to take cognizance of the perspectives of other scholars on these issues … and to refrain from abusing his freedom as a scholar in writing on controversial issues in the future."

Let me just make three points. First, the Faculty Council violated its own bylaws by failing to provide proper notice regarding the resolution. Section 1.2 of the Faculty Council bylaws require that the Faculty Council's secretary send all public documents and resolutions to the full faculty "at least five calendar days before each meeting."

Instead, the Council sent an email to faculty on April 30, the day before its May 1 meeting, announcing three additions to that meeting's agenda. One of the additions was a resolution against Hill and his scholarship. The Council could have complied with the bylaws by putting the resolution on the agenda for its June 2019 meeting.

To make things worse, the April 30 email simply described the resolution as "A Faculty Council Resolution on Academic Freedom and Responsibility." The notice

mentioned neither Hill, nor the demeaning language included in the resolution. To view what the resolution was all about, one had to use their DePaul University credentials to access the online site at which the resolution was posted.

To make things still worse, Hill told me that he was not personally informed — even on April 30 — that a resolution referring to him or his scholarship was to be on the May 1 agenda. He explained that he only learned about the resolution on the morning of May 1 itself, when he read an article referring to the resolution on the Internet.

Second, the Faculty Council also violated its bylaws by allowing Professor Scott Paeth to preside over debate on the resolution. Section 1.4.1 of the bylaws states: "Robert's Rules of Order shall guide the conduct of Faculty Council meetings unless otherwise specified in these Bylaws, which in such case shall take precedence."

Section 43 of *Robert's Rules of Order* (11th ed.) explains that an organization's presiding officer should not ordinarily speak to the merits of a matter under consideration. If in a particular case it is necessary for the person to do so, he or she must relinquish the chair and "should not return to it until the pending main question has been disposed of, since he has shown himself to be a partisan as far as that matter is concerned."

At the May 1 meeting, Paeth announced that, with the help of a few others, he had written the resolution about Hill. Paeth acted as the movant of the resolution, unilaterally deciding whether or not to accept proposed amendments as "friendly amendments." Nevertheless, Paeth did not relinquish the chair. Instead, he presided, calling on people (and not calling on others — such as me and another faculty member well-known for his conservative views), interspersing his own comments when he saw fit without having to wait in a queue to do so, and ultimately declaring that there was no more time for further discussion before a vote was taken. Whatever Paeth's intentions may have been, he was responsible for following Robert's Rules of Order, and his failure to do so rendered the Faculty Council's action fundamentally unfair.

Third, although the resolution was amended before being approved, it still stated, among other things, that Hill's article "misrepresents the history of the Israeli-Palestinian conflict, 2) distorts the facts about the current state of Israeli-

Palestinian relations, 3) promotes racism toward Arabs generally and Palestinians in particular." Nevertheless, the resolution failed to identify which statements in the article purportedly did these things. In fact, the Council's debate regarding the resolution essentially ignored such specifics. Why? Paeth, who presided, repeatedly stated that there was not enough time for much debate, and not enough time to consider the evidence for the nasty, defamatory accusations contained in the resolution.

Yet it was Paeth and other proponents of the resolution who chose to add the resolution to the agenda at the last minute, and to allot its consideration a ridiculously short period of time. Paeth's protestations about the lack of time for a deliberate evaluation of the resolution reminds one of the way in which the Yiddish word "chutzpah" (similar to "hubris") is anecdotally explained: "Chutzpah" is manifested in the action of the boy who, after murdering his father and mother, pleads for mercy from the court because he is an orphan.

One might seriously question the *authority* of the Faculty Council to *sua sponte* evaluate the quality of a particular faculty member's scholarship. Moreover, one might — as I do — question the *competency* of the Faculty Council to evaluate such scholarship, especially without the benefit of expert testimony by persons who are properly credentialed in the relevant discipline(s). After all, the Faculty Council is composed in such a way that, in effect, dramatically limits the number of members with expertise in any particular area.

One thing cannot be reasonably questioned. If the Faculty Council was to address the proposed resolution – a resolution that risked severe injury to the principle of academic freedom and that impugned the integrity of a faculty colleague — it should have engaged in a careful, scrupulous and reasoned examination of the issues in accordance with all the procedural rules designed to ensure fairness. The DePaul Faculty Council failed to do so in this case.

*Steven H. Resnicoff is a professor at the DePaul University College of Law, and Director of the College of Law's Center for Jewish Law & Judaic Studies (JLJS).*

*The opinions presented by Algemeiner bloggers are solely theirs and do not represent those of The Algemeiner, its publishers or editors. If you would like to share your views with a blog post on The Algemeiner, please be in touch through our Contact page.*

## SPONSORED CONTENT

Recommended by

EXHIBIT 11

# Disband Students for Justice in Palestine and All BDS Movements

An open letter to Attorney General William Barr.

Wed Jun 12, 2019     Jason D. Hill



*Editors' note: Jason D. Hill is a professor of philosophy at DePaul University in Chicago. Below is his Open Letter to Attorney General, William Barr making the argument to disband* Students for Justice in Palestine (https://www.discoverthenetworks.org/organizations/students-for-justice-in-palestine-sjp/) *and all* BDS movements (https://www.discoverthenetworks.org/organizations/boycott-divestment-sanctions-movement-bds)*.*

Mr. Attorney General, On May 16, 2019, The German Parliament voted, as you know, to condemn as anti-Semitic, the BDS movement in Germany. The BDS is a Boycott, Divestment and Sanctions movement that targets Israeli organizations, academic institutions and companies engaged in entrepreneurial activities in Israel to



weaken the Israeli economy and politically in an attempt to force Israel to change its policies towards Palestinians living there.

BDS movements, mainly conducted by their most visible branch, Students for Justice in Palestine (SJP) are prolific on US campuses and enact a reign of verbal terror, and physical and psychological violence against anyone who dares to be pro-Israel, critical of Palestinian terrorist or defend Israel against false charges of it being a genocidal an apartheid state. Really, it represents an assault against Western civilization and United States interests and should properly be considered a national security threat.

As a recent victim of vicious assaults by members of the SJP at DePaul University where I am full tenured professor, and, with the highest praises and respect from the Acting Provost Salma Ghanem, for the ways in which members of the DePaul community made their voices heard—I call for a disbandment of all SJP campus units by the US Justice department, and a thorough investigation into the motives and political involvements of higher level academic bodies that endorse these organizations which have ties with terrorist organizations such as Hamas.

BDS movements are immoral largely because they use slander, libel and defamation of Israel and, by association, the United States, to bring Israel to the brink of economic and political disaster. Their real , immorality, however, lies in their guiding ethos: hatred of Jews for being Jews. And hatred of the West, Including the United States for our values. Operating under the guise of a movement directed at what they claim are egregious policies of Israel, the BDS movement is an insidious body of nefarious characters funded by organizati linked to terrorist networks and largescale organizations. Their real

hatred lies not in policies but in the achievements of the Jewish state; its success in transforming what was an arid and barren desert region into a thriving democratic civilization. They hate that it is the only country in the Middle East that consistently practices religious reciprocity and hosts the only pro-gay "Pride Parade" in the Middle East. Israel is the only country in the Middle East where gays can properly seek asylum from sexual oppression. They hate the fact that Israel is the only country in the Middle East where thousands of people seek asylum from the oppressive and illiberal application of Islamic Sharia law in neighboring Arab countries.

As you already know, Sir, the most visible and virulent arm of the BDS movement is an organization widespread across more than 200 campuses in the United States called Students for Justice in Palestine (SJP). The SJP was created in 2001 *(https://www.frontpagemag.com/fpm/236263/backgrounder-students-justice-palestine-lee-kaplan)* by Hamas supporter Hatem Bazian. It acts under the auspices of the International Socialist Organization which is designed to wage a campus war against Israel and the United States. Hamas, many people forget, is a US recognized terrorist and dictatorial regime that is militantly anti-Christian, ant-Semitic, that subjects women to honor killings,  and defends a place where homosexuals are tortured and beaten to death, and, along with peaceful dissenters, journalists and protesters are dragged through the streets and executed.

Your department must know that Hamas has a pivotal leadership role within the BDS campuses and has direct links to a group known as American Muslims for Palestine, (AMP). AMP has well known established ties to several Palestinian terrorists. It is the most important sponsor and organizer for the SJP to whom it grants

training , printed material and grants along with a so-called
"Apartheid Wall." There are compelling overlaps between the AMP
and individuals
(https://docs.house.gov/meetings/FA/FA18/20160419/104817/HHRG-
114-FA18-Wstate-SchanzerJ-20160419.pdf) who work and have
worked on behalf of organizations that were designated and held
civilly liable by federal authorities for supporting Hamas.[2] Again,
there are strong direct financial and organizational ties to Hamas
and its leadership and the SJP.

But why would an organization such as the SJP with ties to terrorists
organizations be permitted on US university campuses? New York
University awarded the SJP a Presidential service award in 2019,
while its members around the country engage in anti-Semitic vitriol,
support Hamas whose charter calls for the establishment of a Global
Caliphate, the elimination of Jewry from the Middle East and the
obliteration of the state of Israel. Why would our Judeo-Christian
culture reward and host an organization that pledges allegiance to
Hamas that routinely persecutes Christians and violates all the
values of liberty and freedom constitutive of our great republic?

In fact, recently newly minted PhD Steven William Thrasher in his
graduation speech at New York University described Israel as an
"apartheid state" and endorsed the BDS movements. Miller is to be
appointed as a future professor at Northwestern University.

Why are universities hosting the SJP when it is open in its support
and  glorification and exoneration of  well-known convicted
terrorists? In fact, my own university, DePaul University, the larg
Catholic University in the United States, hosted on February 3, 2
such an event on behalf of the Chicago chapter of the SJP for

convicted Palestinian terrorist Rasmea Yousef Odeh. Odeh was convicted for her role in the 1969 bombing of a crowded Jewish supermarket filled with mostly women and children that killed two Hebrew University students. Four days later there was a foiled attempt to blow up the British Consulate. Rasmea Yousef Odeh was convicted by the Israeli court and sentenced to life imprisonment for her involvement in both acts. She was released 10 years later in a prisoner swap. She eventually made her way to the USA by way of Jordan where she obtained US citizenship. She was later indicted for immigration fraud when she lied on her citizenship application about her conviction. Rasmea Yousef Odeh was found guilty of illegally obtaining naturalization. The SJP fundraisers at DePaul hailed her as a victim whose resilience they praised

In the Spring of 2014 DePaul made headlines when their SJP chapter began a BDS campaign against Israel that lead several Jewish students to come forward and claim that they did not feel safe on the DePaul campus.

As mentioned earlier, I was targeted by the SJP beginning in April of 2019 for an article I penned in The Federalist defending Israel's right to annex the West Bank. Leading a pack of around six student organizations, the SJP took over a university building where they chanted: "Professor Hill, you can't hide! We Know you want genocide." They disseminated and littered school property including the library, cafeterias and academic buildings with thousands of leaflets with my picture on it. The leaflets cast me as a demonic racist, an Islamophobic, transphobic war criminal, and an advocate of ethnic cleansing and genocide. Some of the signs ominously read "Dump Hill," which I was told by some people, was possibly a cult slogan for: "dump his body.!" Death threats were made against me,

and I needed campus escort for at least three weeks while on campus. They demanded that I attend a racial sensitivity training work shop, and called for my dismissal from the university—all for defending the rights of Israel and exercising my First Amendment rights. While students and faculty counsel which passed a resolution to censure me committed acts of libel, slander and defamation of my character, the University's Acting Provost complimented "the way members of the DePaul community made their voices heard."

A few weeks after their protests, the SJP lead a full-frontal Anti-Apartheid week against the state of Israel on the campuses of DePaul University. The students were once more, in my estimation, invoking a reign of psychological intimidation which left many students and faculty (myself included) feeling silenced and unsafe.

In the name of what sort of moral cowardice do we, the American people, allow for this effrontery against our civilizational values and political principles to be waged by a group of jihadist nihilists who hate not only Israel but the fundamental values of America? American universities who harbor this rogue group and allow our educational goals to be hijacked ought to be ashamed of themselves. And by what infernal impertinence does such an organization as the SJP dare to promote racism, vulgar displays of anti-Semitism, anti-Americanism, and create a climate of fear and intimidation on college campuses?

In light of these egregious assaults against the core values of our nation's universities, I call on you and the Department of Homeland Security to consider revoking the student visas of all members of SJP who are not US citizens, to halt the citizenship applications of its green card holders, to continue further investigations into the links

between the SJP and terrorists organizations, and to eventually declare them illegal on campuses. I also call on you to investigate university administrative bodies who collude with such evil? What could be their motives? Are its members involved in secretive treasonous acts against our great republic?

For the parents out there whose students live in this chilling climate of fear, issue your protestations and do not capitulate. For Students and faculty who are disgusted by thuggery--take stock of names! File your complaints and concerns to the Department of Justice, to the President of the United States and the Central Intelligence Agency.

The threat is already here, Sir. The annihilation of our wondrous civilization need not be imminent. The SJP is only one malignant variant of such a threat lurking in that last decaying bastion of human civilization: our universities; they are the transmitters of culture, ideas and knowledge. We do not have to go the way Europe is going by yielding to radical Islamicization. We need not foment into a civilization of fear and hatred. Fear is alien to the American spirit and character. We are still one nation under God governed by reason and the rule of law; one body politic united by constitutional principles that regulate our public behaviors. Our job is to remove those political tumors one at a time when we find them. The moral mandate is ours, and while tomorrow may not be promised to any one of us—we must all command the future, so long as we are faced with cults of death.

*Jason D. Hill is professor of philosophy at DePaul University in Chicago. His areas of specialization include ethics, social and political philosophy, American foreign policy, cosmopolitanism and race theory. He is the author of several books, including "We*

*Have Overcome: An Immigrant's Letter to the American People (https://www.amazon.com/We-Have-Overcome-Immigrants-American/dp/1682617300)* **(Bombardier Books/Post Hill Press). Follow him on Twitter @JasonDhill6** *(https://twitter.com/JasonDHill6).*



EXHIBIT 12
(Under Seal)

# EXHIBIT 13
# (Under Seal)

# EXHIBIT 14
# (Under Seal)

# EXHIBIT 15
# (Under Seal)

# EXHIBIT 16
## (Under Seal)

# EXHIBIT 17

January 13, 2020　　**Editors Pick**　Canadians for Justice and Peace in





Original news, features, opinions from Chicago to Jerusalem

About　　　Features　　　Heritage　　　Podcasts　　　Comment

Submit a Press Release

# Students accuse DePaul professor of racist criticism

Type here



SHARE …

Share 0　　　　Like 0

**0**
Shares

Share 0　　　Like 0　　　Tweet

## SUBSCRIBE

Enter your email address:

Subscribe

Delivered by FeedBurner

## OPINION

▶

Our Arab identity is being smothered by our religion



Our Arab identity is being smother ed by…

▶

The Unbearable Burden: Sudan's Crippling Economic





EXHIBIT
6
Dr. Salma Ghanem
DN　　　　Mar 23 2022

# Students accuse DePaul professor of racist criticism

*DePaul Professor Jason Hill calls activists who criticize Israel's apartheid and racist practices against Christians and Muslims in Israel and in the occupied territories "anti-Semitic." Hill's comments attacking BDS (Boycott, Divestment, Sanction) have come under scrutiny from those who support peace and justice and have been denounced*

## By Ray Hanania

A DePaul Processor who **wrongly conflates criticism of Israel with "anti-Semitism,"**and who denounces activists who defend the rights of Christians and Muslims in Israel and Occupied Palestine, has been denounced this week by students and his peers.

**Professor Jason Hill** who denounced supporters of the BDS (Boycott, Divestment, Sanction) movement as being "anti-Semitic" has been denounced by DePaul's acting provost Salma Ghanem. Hill has written that Israel should formally annex the occupied West Bank but has been silent on Israel's denial of rights to Christian and Muslim Arabs living under Israel's brutal and oppressive military rule. He also said Christian and Muslims should be



### Crisis and the absence of Plan B

The Unbearable Burden: Sudan'...



### Christ to Cronkite: Call for Unconditional Love

Without an evolutionary worldvi...



### Presidential Candidate Pete Buttigieg's Tweet for Christ's Sake

For Christmas Mayor Pete Buttigi...



### Christianity Today and Evolution of the Soul

A week before Christmas, Christia...



### A new prime minister for Lebanon: a change-agent from campus

A new prime minister for Lebano...

... View All

denied the right to vote, a shocking claim to many because it comes from an African American.

During an appearance on the Tucker Carlson cable TV talk program, Jason Hill described a column he wrote attacking BDS and non-Jewish rights under Israeli authoritarian oppression, saying incredulously, "... aside from defending Israel, I made the point that Israel was the only democracy amidst a bunch of illiberal and primitive regimes that do not respect the inalienability of human rights and individual rights. And I think students took offense and, individual faculty and people at large took offense at me defending Israel. And defending my right to defend Israel's rights to defend itself against the war that was launched against it in 1967 by Jordan."



Controversial DePaul professor Jason Hill courtesy of DePaul

Critics said they were not upset with him defending Israel but in his racist language and derogatory false comments about Israel's critics which crossed the line into hatred. **Hill has also called for stripping Christians and Muslims living in Israel** of their rights. **Hill has been supported** and denounced by activists and other professors in the DePaulia and in other forums.

Activists with Students for Justice in Palestine at DePaul said in a statement, "Following our joint meeting on Wednesday, May 15th, Chief of Academic Affairs and Acting Provost Salma

## Subscribe to Podcast

Enter your email address:

[                    ]

[ Subscribe ]

Delivered by FeedBurner

## Upcoming Events

### Arab Bar to celebrate Shalabi's appointment to Bench

January 22 @ 5:30 pm - 8:30 pm

### Community Anti-Human Trafficking Training Session, Awareness and Certification:

Ghanem released a statement in support of the coalition's effort in denouncing **Professor Jason Hill's** racist rhetoric."

Provost Ghanem expressed both her disapproval and condemnation of Professor Hill's statements and also asserted DePaul's commitment to restoring the sense of dignity and equality for DePaul students who have been affected. Hill has also embraced extremist rhetoric by extremists who have also been denounced as racist like **Israeli fanatic Caroline Glick**.



↑ Grab this Headline Animator

This, professor Ghanem acknowledges, is a direct result of the continuous work and pressure placed on DePaul's administration by students, alumni, and faculty members who are working tirelessly to ensure the Vincentian mission is not selectively upheld, but is instead a value extended to all communities.

"In addition, we have garnered a super majority of 81% in a referendum to condemn the racist statements of Professor Hill," the students said.

"We commend Provost Ghanem for standing on the right side of history. We also extend our appreciation to every individual who has contributed in this campaign and hope you can continue with us in this ongoing effort to dismantling racism on campus.

"Although this is a great victory for the DePaul community and the fight against racism on campus, we recognize it is only a first step. We will continue to put pressure on the administration to fulfill our long term demands, such as ensuring racial sensitivity training. We hope the DePaul administration continues this commitment to protect and empower the DePaul community. Echoing Angela Davis's powerful words, "I am no longer accepting the things I cannot change, I am changing the things I cannot accept."

**Here is Ghanam's statement:**

January 25 @ 9:30 am - 4:30 pm

## Islamoph obia to be focus of fundraiser in California

February 8 @ 5:30 pm - 10:30 pm

## Wael Kfoury to entertain at Valentine' s Day in Detroit

February 14 @ 9:00 pm - 11:30 pm

## ACCESS Detroit celebrate s 49th Year of Service

March 6 @ 6:00 pm - 11:00 pm

## Arab Conferenc e at

*A Message from the Acting Provost on Free Speech and Vincentian Values*

May 15, 2019

Difficult situations often times bring out the best and worst in us. The recent discussions on campus regarding the clash between free speech and Vincentian values made me even prouder to be part of the DePaul community. While I am deeply saddened that Professor Hill used his right to academic freedom and free speech to disparage one group over another, resulting in some members of our community feeling unwelcome and unsafe, I am extremely impressed by the way members of the DePaul community made their voices heard. I want to reiterate, Professor Hill's views are his own and do not represent the views of the university. At DePaul, we value all individuals equally and are truly disheartened that a member of our own community asserts "Not all cultures are indeed equal. Some are abysmally inferior and regressive based on their comprehensive philosophy and fundamental principles—or lack thereof—that guide or fail to protect the inalienable rights of their citizens."

I met with several students on Monday and was very impressed by their thoughtful comments and opinions on this issue. Our students outlined their concerns, provided arguments and engaged in a productive dialogue. They have also taken it upon themselves to organize and counter the views with which they disagree. Our faculty have and continue to address this situation with our students in a variety of forums. Our students and faculty have exemplified the best of what an intellectual dialogue at a university can look like.

Unfortunately, the article by Professor Hill has also brought out the other extreme and emboldened some to hide behind the cloak of social media anonymity and attack our students and faculty on the Internet. These hurtful attacks are cowardly and stand in stark contrast to civilized discourse. Intimidation is the tool of the weak both in spirit and in intellect.

We have a choice between the best and the worst, and I am confident that our Vincentian values will guide us to choose the right path.

## Harvard University

March 27 - March 29

## Arab American Heritage Month, April 2020

April 1 - April 30

## Kahlil Gibran "Spirit of Humanity" Awards Gala

April 15 @ 6:30 pm - 11:00 pm

## Conference on the Israeli Lobby: a look at AIPAC

May 28 - May 29

## American Human Rights Council Gala honors "Spirit of

Sincerely,

Salma Ghanem

*Acting Provost*



↑ Grab this Headline Animator

| Author | Recent Posts |
| --- | --- |



### Rayhanania

Managing Writer at The Arab
Daily News

RAY HANANIA — Columnist

Ray Hanania is an award winning political
and humor columnist who analyzes
American and Middle East politics, and life
in general. He is an author of several
books.

Hanania covered Chicago Politics and
Chicago City Hall from 1976 through 1992.
He began writing in 1975 publishing The
Middle Eastern Voice newspaper in
Chicago (1975-1977). He later published
"The National Arab American Times"
newspaper (2004-2007).

Hanania writes weekly columns on Middle
East and American Arab issues as Special
US Correspondent for the Arab News
ArabNews.com, at TheArabDailyNews.com,
and at SuburbanChicagoland.com. He has
published weekly columns in the
Jerusalem Post newspaper,
YNetNews.com, Newsday, the Orlando
Sentinel, Houston Chronical, and Arlington
Heights Daily Herald.

Hanania is the recipient of four (4) Chicago
Headline Club "Peter Lisagor Awards" for
Column writing. In November 2006, he was
named "Best Ethnic American Columnist"
by the New American Media. In 2009,
Hanania received the prestigious Sigma
Delta Chi Award for Writing from the
Society of Professional Journalists. He is
the recipient of the MT Mehdi Courage in

## Humanity
"

June 4 @ 6:00
pm - 11:00 pm

View All Events

## Writers
## Promote
▶

Arafat's legacy an
inspiration to
everyone seeking
freedom, justice


Arafat's
legacy an
inspirati
on to
everyo...

Journalism Award. He was honored for his
writing skills with two (2) Chicago Stick-o-
Type awards from the Chicago Newspaper
Guild. In 1990, Hanania was nominated by
the Chicago Sun-Times editors for a
Pulitzer Prize for his four-part series on the
Palestinian Intifada.

His writings have also been honored by
two national Awards from ADC for his
writing, and from the National Arab
American Journalists Association.

**Click here to send Ray Hanania email.**

Share 0          Like 0          Tweet

## SHARE …

Share 0          Like 0

**0**
Shares

May 16, 2019          rayhanania

American Arabs, Christian &
Muslim, Israel, mainstream, Middle
East, News, Palestine & Jordan, racism,
US Arab Politics          criticism of Israel ,
Depaul University , equal rights ,
extremist comments , Israeli Apartheid
, Israeli racism , Jason Hill. Palestine ,
racist comments , Students for Justice
in Palestine

← Response to Mitch McConnell and
Kevin McCarthy's Idiot Wind
Trumping Ambassador Friedman on
Israel's 'Secret' Weapon Courtesy of a
White House Call →

# Leave a reply

Default Comments (0)

Facebook Comments

Disqus Comments

You must be logged in to post a comment.

Copyright (C) 2015-2020 The Arab Daily News, All Rights Reserved

Permission Granted to republish with attribution to author & The Arab Daily News

Sign up to receive weekly top stories and breaking news in your inbox.    Your email address



(https://depauliaonline.com/feed/rss/) (https://vimeo.com/user73684497) (https://www.youtube.com/channel/UCkwMCXf107uXjczUe6MEDOg?
view_as=subscriber) (https://soundcloud.com/page29) (https://www.instagram.com/thedepaulia/) (https://twitter.com/TheDePaulia?lang=en)
(https://www.facebook.com/TheDePaulia/)



Monday, March 21, 2022

Search 🔍

# The DePaulia

(https://depauliaonline.com)



8



News    La DePaulia    Nation & World (https://depauliaonline.com/category/nation/)

Opinions (https://depauliaonline.com/category/opinions/)    Arts & Life    Sports    Special Issues    More

(https://www.t
u=https%3A%
8-weeks-
later-how-
the-
student-
coalition-
to-censurehill-
won%2F)

Opinions (https://depauliaonline.com/category/opinions/)

# OPINION: 8 weeks later: how the student coalition to #CensureHill won



(https://twitter
text=OPINIOI
8 weeks
later: how
the student
coalition to
#CensureHill
won&url=http



(//depauliaon
8-weeks-
later-how-
the-
student-
coalition-
to-
censurehill-
won/?
print=true)

Rifqa Falaneh (https://depauliaonline.com/staff_name/rifqa-falaneh/), Contributing
Writer | June 3, 2019





Courtesy of Rifqa Falaneh (https://depauliaonline.com/staff_name/courtesy-of-rifqa-falaneh)

Rifqa Falaneh (second from the left) speaks with other student coalition organizers against Professor Jason Hill on her Radio DePaul show "Fresh Eyes."

This quarter at DePaul has been an absolute mess, to say the least. At the same time, however, it has also been one of immense growth and community.

Earlier this quarter, a coalition of student organizations released a statement condemning Professor Jason D. Hill for his pattern of racist, anti-Palestinian, xenophobic, sexist and Islamophobic statements.

Hill has called Middle Eastern and Muslim people "uncivilized," "barbaric" and "primitive" in his tweets. He has also attacked the Black Lives Matter movement, and in an article for The Federalist, openly called for the ethnic cleansing of Palestinians. So, as you can see, he's an overall problematic dude caught while holding a position of power. Don't believe me? Just scroll through his Twitter to see for yourself.

From the start, this campaign has caught widespread attention not only from DePaul's campus, but also from local, national and international media as well. Moreover, it has garnered support through a petition of more than 3,400 signatures and the coalition hosted a rally of over 200 students, faculty and others to pressure DePaul's administration to censure Hill and have him commit to racial sensitivity training.

Many have tried to misconstrue this message under the guise of academic freedom and the whole free speech debate, and it's simply ridiculous. The overall message from students is simple: Condemn hate speech and create a safe environment on campus. As a DePaul student myself, I am constantly reminded of the Vincentian mission, but with this situation, DePaul was hesitant in upholding their Vincentian values.  As students maintained the pressure and continued to mobilize and organize for their demands, the administration had no choice but to confront this issue.

This resulted in a meeting between


(https://depauliaonline.com/wp-content/uploads/2019/06/image2.jpg)

Signs hanging on the stairwell of Arts and Letters Hall during an April 23 "Dump Hill" protest.    Courtesy of Rifqa Falaneh

LAS Dean Guillermo Vasquez de Velasco and leaders of the coalition. The meeting was productive overall and two days following it, Ghanem released a statement condemning Hill. This was a big win for students and, to celebrate, the coalition, with the co-sponsorship from multiple departments, held a celebratory


8

dinner/iftar in the SAC Pit.

Although Hill was censured, this is just the first step. The coalition is continuing strong and will not stop until their long-term demands are met. This is to ensure that another "Milo incident" doesn't happen and that DePaul addresses racism and other issues appropriately.

(https://www.f
u=https%3A%
8-weeks-
later-how-
student-
coalition-
to-
censurehill-
won%2F)

Hate speech today is very different than hate speech historically and should be treated as a serious offense. In the age of social media, words travel and negatively impact the lives of many. Hate speech is an alarm we cannot afford to snooze or ignore. We must wake up and actively work against it.

(https://twitter
t=
8 weeks
later: how
the student
coalition to
#CensureHill
won&url=http

**Rifqa Falaneh is a junior majoring in international studies. As a Students for Justice in Palestine board member, she is one of the leading organizers for the student coalition for #CensureHill.**

DePaul free speech (https://depauliaonline.com/tag/depaul-free-speech/)

Jason Hill (https://depauliaonline.com/tag/jason-hill/)

(//depauliaon
8-weeks-
later-how-
the-
student-
coalition-
to-
censurehill-
won/?
print=true)

View Comments (8)

Opinions (https://depauliaonline.com/category/opinions/)






Sign up to receive weekly top stories and breaking news in your inbox. Your email address Sub ▲


with-floridas-15-week-abortion-ban/)

**Opinion: Roe v. Wade's future is grim with Florida's 15-week abortion ban (https://depauliaonline.com/57304/opinions/opinion-roe-v-wades-future-is-grim-with-floridas-15-week-abortion-ban/)**

that-weird/)

**Column: I haven't gotten Covid yet… is that weird? (https://depauliaonline.com/57373/opinions/column-i-havent-gotten-covid-yet-is-that-weird/)**

perfect-solution-but-its-a-step-in-the-right-direction/)

**Drug decriminalization: It isn't a perfect solution, but it's a step in the right direction (https://depauliaonline.com/57370/opinions/drug-decriminalization-it-isnt-a-perfect-solution-but-its-a-step-in-the-right-direction/)**

**Opinion: DePaul's University Counseling Services failed me (https://depauliaonline.com/57344/opinions/opinions-ucs/)**




(https://depauliaonline.com/57226/opinions/opinion-are-libraries-radical/)



**Opinion: Are libraries radical? (https://depauliaonline.com/57226/opinion-are-libraries-radical/)**

(https://www.t u=https%3A% 8-weeks-later-how-the-student-coalition-to-censurehill-won%2F)

# The DePaulia (https://depauliaonline.com)

(https://depauliaonline.com/feed/rss/) (https://vimeo.com/user73684497) (https://www.youtube.com/channel/UCkwMCXf107uXjczUe6MEDOg?view_as=subscriber) (https://soundcloud.com/page29) (https://www.instagram.com/thedepaulia/) (https://twitter.com/TheDePaulia?lang=en) (https://www.facebook.com/TheDePaulia/)



*The Student News Site of DePaul University*



 

(https://twitter v=SPINIOI 8 weeks later: how the student coalition to #CensureHill q_url=http



Search





About (https://depauliaonline.com/about/)

Contact (https://depauliaonline.com/contact/)

Staff (https://depauliaonline.com/staff/)

Advertise (https://depauliaonline.com/advertise/)

Contribute 2019-2020 (https://depauliaonline.com/get-involved/)

(//depauliaon 8-weeks-later-how-the-student-coalition-to-censurehill-won/? print=true)

© 2022 • FLEX WordPress Theme (https://snosites.com/why-sno/) by SNO (http://snosites.com) • Log in (https://depauliaonline.com/wp-login.php)

EXHIBITS 18-29
(Under Seal)