**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JASON HILL,

               Plaintiff,

               v.

DEPAUL UNIVERSITY,

               Defendant.

No. 22-cv-06990

Judge John F. Kness

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jason Hill, a professor at DePaul University, brought suit against Defendant DePaul University concerning events that occurred following the publication of Plaintiff's article, *The Moral Case for Israel Annexing the West Bank— and Beyond.* Plaintiff alleges that Defendant's reactions to the article created a hostile work environment, amounted to race-based retaliation, and constituted religious, sex, and race-based discrimination. Now before the Court is Defendant's motion for summary judgment (the Court previously dismissed two counts on Defendant's motion to dismiss). For the reasons that follow, Defendant's motion for summary judgment is granted.

## I.    BACKGROUND

The remaining claims are as follows: Count I alleges race discrimination and a hostile work environment under 42 U.S.C. § 1981; Count II alleges retaliation and a

hostile work environment under Section 1981; and Count IV alleges retaliation under Title VII, 42 U.S.C. § 2000e-3(a), following the dismissal of other Title VII theories.[1]

The material facts bearing on these claims are effectively undisputed. Plaintiff is a tenured philosophy professor at DePaul. (Dkt. 113 ¶ 5.) In April 2019, Plaintiff published an article titled *The Moral Case for Israel Annexing the West Bank—and Beyond. (Id. ¶ 14) ( "the Article"). Several excerpts from the Article follow:

> *Not all cultures are indeed equal. Some are abysmally inferior and regressive based on their comprehensive philosophy and fundamental principles—or lack thereof—that guide or fail to protect the inalienable rights of their citizens.*

(*Id.* ¶ 15.)

> *The Israeli left should abandon its agonistic handwringing over so-called Palestinian occupation and realize that applying Israeli law in Judea and Samaria, meaning the wholesale destruction of Hamas in Gaza— Hamas being a terrorist organization that can claim no rights as a group and no right to any square inch of land in the region—is an application of democratic law protecting the rights of the individuals who rightfully belong there.*

(*Id.* ¶ 16.)

> *The decline of the Palestinian people is narrated by their willful ideological malfeasance. They have never come into their own as a people largely because they have never explicitly held a philosophy that can support freedom, the basic liberal principles of individual rights, and a free market economy.*

(*Id.* ¶ 17.)

Plaintiff himself acknowledged the Article was "radical," was not surprised by backlash, asked if "folks" were speechless, and asserted that the publisher was

---

[1] Plaintiff's Title VII claims as to race, sexual orientation, and religious discrimination (Count III) and Plaintiff's Illinois negligence claim (Count V) were dismissed. (Dkt. 32.)

courageous for posting the Article. (Dkt. 113 ¶ 18.) After the Article was published, students protested on campus, distributed leaflets, and demanded Plaintiff's removal from his teaching positions. (*Id.* ¶ 20.)[2] In response, the Faculty Council passed a resolution condemning his speech as an "abuse of his academic freedom" because it "failed to exercise adequate concern for accuracy, restraint, or respect for the opinions of others." (*Id.* ¶¶ 29–30.) It cautioned Plaintiff "to refrain from abusing his freedom as a scholar in writing on controversial issues in the future." (*Id.*) But the resolution also reaffirmed Plaintiff's right to publish consistent with school policies. (*Id.*)

On May 15, 2019, shortly after the Faculty Council Resolution, Acting Provost Ghanem sent an email to the DePaul community "on free speech and Vincentian Values," expressing sadness "that Dr. Hill used his right to academic freedom to disparage one group over another," but "applaud[ing] the students[] and faculty [who] engag[ed] in intellectual dialogue in response." (Dkt. 113 ¶ 52.)

One month later, in June 2019, a colleague responded to an email chain about a separate article Plaintiff wrote about Mexico; the colleague stated the article was "[m]orally despicable and academically unsound. It sounds a lot like Trump's ranting about 'sh\*\*-hole countries'—ironically, as Trump would say, Hill himself originates from such a country." (Dkt. 113 ¶ 37–38.) But that colleague was neither part of the DePaul administration (she was a coworker) nor had she ever met Plaintiff. (*Id.* ¶ 41.) Plaintiff does not recall how he found out about his colleague's email. (*Id.* ¶ 39.)

---

[2] Plaintiff admits there have been no student protests or leaflets related to him since May 2019. (Dkt. 113 ¶ 66.)

Over two years later, in November 2021, Plaintiff received a performance evaluation that was "below expectations," drawing largely on numeric student ratings and comments that, for example, asserted that Plaintiff was "rude," "disrespectful," and made "transphobic comments." (Dkt. 113 ¶¶ 42–45.) That performance evaluation, however, had not been disseminated to any prospective employers and had not been either published internally or externally. (*Id.* ¶¶ 46–47.) After the performance evaluation, Plaintiff received permission to teach a course, but the class was cancelled because very few students enrolled. (*Id.* ¶ 51.) All of Plaintiff's requests to teach courses had otherwise been granted. (*Id.* ¶ 69.)

Plaintiff remained a tenured full professor at all relevant times, with no reduction in rank, pay, or benefits. (*Id.* ¶ 65.) In fact, Plaintiff consistently received salary increases since 2019 (except between 2020 and 2022 when there was a University-wide salary freeze). (*Id.* ¶ 50.) Plaintiff also received both a sabbatical and a remote work accommodation. (*Id.* ¶¶ 62, 70.)

## II. STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery

4

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III. DISCUSSION

### A. Section 1981 Race Discrimination (Counts I & II)

To defeat summary judgment on a Section 1981 disparate treatment claim, Plaintiff must produce evidence that he suffered an adverse employment action, and that his race was the but-for cause of that action. *Comcast Corp. v. Nat'l Ass'n of African Am. Owned Media*, 140 S. Ct. 1009, 1014–15, 1019 (2020); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[3] Courts must evaluate the record as a whole and ask whether a reasonable jury could find that race caused the challenged decision. *Ortiz*, 834 F.3d at 765. A plaintiff may also proceed under the *McDonnell Douglas* framework, but the plaintiff still "bears the burden of showing that race was a but-for cause of [plaintiff's] injury" and that he suffered an adverse employment action. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).

---

[3] This analysis proceeds under the unified legal framework for discrimination claims in Section 1981 and Title VII suits. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) ("The legal analysis for discrimination claims under Title VII and Section 1981 is largely identical.").

An adverse employment action in this context requires a plaintiff to show he suffered some injury concerning a change in his employment terms or conditions, such as termination, demotion, a decrease in wage or salary, a material loss of benefits, or a reduction in responsibilities. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016); *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024) (a change to a term or condition of employment can include the "what, where, and when" of the employee's work). Criticism, ostracism, or reputational harm, without a concrete change in the terms and conditions of employment, is not enough. *See Galvan v. State,* 117 F.4th 935, 946–47 (7th Cir. 2024) (reprimand had no adverse impact on employment).

### 1.    Plaintiff Can Identify No Adverse Actions

Plaintiff identifies five incidents as adverse actions. The first is the May 2019 Faculty Council resolution. But the record contains no evidence that University officials with authority over compensation, rank, benefits, or duties adopted, directed, or implemented the resolution in a way that altered Plaintiff's employment. *Brewer v. Bd. of Trs.*, 479 F.3d 908, 917–19 (7th Cir. 2007) (adverse employment action must be taken by a decisionmaker who has the authority to alter the terms and conditions of employment or someone who has the ability to influence the decisionmaker). Plaintiff remained a tenured full professor. (Dkt 113. ¶ 65.) Plaintiff was not disciplined (aside from the symbolic Faculty Council Resolution "censure" that merely urged compliance with University policies). *Galvan,* 117 F.4th at 946–47. Plaintiff's pay and benefits were unchanged, and he received continual raises after the May

2019 incident (except for COVID years because there was a University-wide salary freeze). (*Id.* ¶ 50.)

Moreover, the resolution did not affect the "what, where, and when" of employment: Defendant granted all of Plaintiff's requests to teach courses (although one class was cancelled because of low enrollment), granted Plaintiff a sabbatical, and granted Plaintiff remote work accommodations. (*Id.* ¶¶ 51, 62, 69, 70.)

Based on the undisputed evidence, Defendant's mere expression of disagreement with an employee's public statements, without any effect on the terms and conditions of employment, was, as a matter of law, not an adverse employment action. *Galvan,* 117 F.4th at 946–47 (mere reprimand insufficient to constitute adverse employment action); *Powell v. Fujimoto*, 119 F. App'x 803, 807 (7th Cir. 2004) ("where a censured employee retains his job and does not suffer any loss of pay or rank, any alleged harm to his stature or earnings prospects is purely speculative.").

Plaintiff's second cited incident stems from an email Acting Provost Ghanem sent to the DePaul community on May 15, 2019, one month after the Article was published. (Dkt. 80 ¶ 52.) Ghanem's email discussed free speech and Vincentian values, expressed Ghanem's sadness that Plaintiff used his academic platform to disparage one group over another, and celebrated the students and faculty who engaged in responsible intellectual dialogue and discourse. (Dkt. 80-3 at 159–60.) Plaintiff asserts that this email was an adverse action because it "encouraged students and faculty to continue their riotous ways" and "ingratiate[d] antisemitism

7

thereby endangering the lives of Jewish people and their supporters, one of whom was Dr. Jason Hill." (Dkt. 119 at 3.)

But Plaintiff has failed to identify how the email affected any objective conditions of employment. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 636 (7th Cir. 2006) (identifying a change in the terms and conditions of employment is an "objective exercise," and "[t]hat a given employee perceives a burden is not enough."). To the extent Plaintiff premises his adverse action argument on safety and access to campus, Plaintiff admitted that in response to his safety concerns "campus security escorted him to class and relocated some of his classes" and that "he was satisfied with th[is] response." (Dkt. 113 ¶ 59.) Plaintiff made no complaints to Defendant about his personal safety after the protests. (*Id.* ¶ 60.) There being no changes to the terms or conditions of Plaintiff's employment arising from Acting Provost Ghanem's email, it cannot constitute an adverse employment action.

Plaintiff's third cited incident is a colleague's 2019 email that referenced "sh\*\*-hole countries." (Dkt. 119 at 4–5.) Although the email may have been coarse, it was written by a coworker, not a decisionmaker, and did not change Plaintiff's rank, salary, benefits, or responsibilities. (Dkt. 113 ¶ 37–38, 41.) Stray or offensive remarks by coworkers, without an accompanying employer decision that alters the terms of employment, do not constitute an adverse employment action for a disparate treatment claim. *Boss*, 816 F.3d at 917; *Brewer*, 479 F.3d at 917–19. Plaintiff recognizes as such, admitting that the email "on its own may not make for an adverse employment action." (Dkt. 112 at 4–5.)

8

Plaintiff's fourth cited incident arises from what Plaintiff argues is Defendant's failure to investigate his complaint of harassment or discrimination on April 26, 2019, just weeks after Plaintiff published the Article. (Dkt. 119 at 5–6.) But mere failure to investigate does not rise to the level of an adverse employment action. *See, e.g.*, *Lopez v. Vill. Disc. Outlet Inc.*, No. 23 C 16201, 2024 WL 3688709, at *4 n.5 (N.D. Ill. Aug. 6, 2024); *Rosa v. Bd. of Trs.*, No. 18-CV-8477, 2020 WL 7319574, at *11 (N.D. Ill. Dec. 11, 2020) (failure to take remedial measures or perform adequate investigation did not amount to adverse action for retaliation claim). Instead, Plaintiff must show that the failure to investigate affected the terms or conditions of employment and made him "worse off." *Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024). Plaintiff makes no such showing. Instead, the undisputed evidence shows Plaintiff's safety concerns were adequately addressed: students who made uncouth comments were removed; Plaintiff's requests for remote work were granted; Plaintiff was given a sabbatical; and his pay was increased. (Dkt. 113 ¶¶ 13, 63, 50, 59–60, 62, 70.) Plaintiff therefore fails to establish that Defendant's purported lack of investigation constitutes an adverse employment action.

Plaintiff's fifth cited incident is Plaintiff's November 2021 performance evaluation. A negative or mixed performance review, without a tangible job consequence, does not qualify as an adverse employment action. *Grube v. Lau Indus.*, 257 F.3d 723, 729 (7th Cir. 2001). The undisputed record shows that the evaluation did not change Plaintiff's title, compensation, or classes he could teach. (Dkt 113. ¶ 69.) Plaintiff received the same percentage salary increase as other faculty for the

relevant cycle, and he continued to receive subsequent increases. (*Id.* ¶ 50.) As the Seventh Circuit has explained, even evaluations that may influence promotion rankings do not rise to the level of an adverse action where there is no concrete diminution in pay, rank, or responsibilities. *Reives v. Ill. State Police*, 29 F.4th 887, 894–95 (7th Cir. 2022).[4]

In sum, based on the foregoing undisputed facts, Plaintiff can identify no adverse action that affected the terms or conditions of his employment.

### 2. Plaintiff Cannot Establish That Race Was the Cause of Any Adverse Employment Action

Because none of the identified events qualifies as an adverse employment action, the Section 1981 disparate treatment claim fails at the first element. Summary judgment is warranted on that basis alone. *Boss*, 816 F.3d at 917. Even if the record could support a finding that any one of the incidents was adverse, however, Plaintiff has not produced evidence from which a reasonable jury could find but-for racial causation.

Section 1981 requires proof that race was the determinative cause of an adverse action. *Comcast*, 140 S. Ct. at 1014–15. Plaintiff cannot cite any evidence to make this showing: the record instead ties each incident to the content and fallout of Plaintiff's April 2019 Article: the Faculty Council resolution addressed his speech and reaffirmed academic freedom; Ghanem's email confronted the substance of the Article

---

[4] Plaintiff has also waived reliance on this performance evaluation as an adverse action because Plaintiff failed to respond to Defendant's arguments on this issue. (Dkt. 79 at 5–7); *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in response to the moving party's motion for summary judgment.").

and emphasized constructive dialogue; and student protests were driven in opposition to the ideas expressed in the Article. (Dkt. 113 ¶¶ 20, 29–30, 52.) Plaintiff himself admitted that such institutional reactions were an expected outcome of his Article. (*Id.* ¶ 18.) On these facts, the evidence does not permit a reasonable inference that race, rather than the controversy surrounding the Article, was the but-for cause of any challenged act. *Ortiz*, 834 F.3d at 765.

Comparator evidence is also absent. To raise an inference of discriminatory intent under *McDonnell Douglas*, Plaintiff must identify similarly situated employees outside the protected class who were treated more favorably. *Lewis*, 36 F.4th at 759. The undisputed record discloses no colleague with the same supervisor, subject to the same standards, who engaged in materially similar conduct but received more favorable treatment. (Dkt. 119 at 7 n.3) (Plaintiff admitting that "[h]is discrimination claim may fail because he has not been able to identify a comparator."). The lack of any suitable comparator further undermines an inference of discriminatory animus. *Lewis*, 36 F.4th at 759.

Viewing the record as a whole, no reasonable jury could conclude that Plaintiff suffered an adverse employment action because of his race. On the contrary, the evidence points to institutional and colleague reactions to a public controversy rather than to racial animus. The absence of a concrete change in the terms and conditions of employment is dispositive; the absence of comparator evidence independently defeats the claim. Summary judgment is therefore granted for Defendant on the Section 1981 racial discrimination claims in Counts I and II.

11

### B. Plaintiff's Hostile Work Environment Claims Under Section 1981 (Counts I & II) Fail Because Defendant's Conduct Was Neither Severe Nor Pervasive

A racially hostile work environment claim under Section 1981 requires evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, that the hostility occurred because of race, and that there is a basis for employer liability. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993); *Vance v. Ball State Univ.*, 646 F.3d 461, 469–73 (7th Cir. 2011).

Section 1981 reaches racial discrimination in the making and enforcement of contracts, including the employment relationship, and the standards generally mirror those applied under Title VII. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Section 1981 protects against discrimination based on race and on ancestry or ethnic characteristics, not on political viewpoint or the content of speech. *St. Francis Coll. v. Al Khazraji*, 481 U.S. 604, 613 (1987).

A court faces with a motion for summary judgment in this context must assess the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Harris*, 510 U.S. at 21–23. The environment must be both subjectively offensive to the plaintiff and objectively offensive to a reasonable person. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). Sporadic slurs or isolated comments, unless extremely serious, do not meet the severe or pervasive threshold. *Smith v. Ill.*

12

*Dep't of Transp.*, 936 F.3d 554, 560–61 (7th Cir. 2019); *see also Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477–78 (7th Cir. 2004).

When the alleged harassers are coworkers rather than supervisors, employer liability attaches only if the employer was negligent in discovering or remedying the harassment. *Vance v. Ball State Univ.*, 570 U.S. 421, 427–31 (2013). A plaintiff must show that the employer knew or should have known of the harassment and failed to take reasonable corrective measures. *Id.* at 429–31. If the employer takes prompt and appropriate remedial action reasonably likely to prevent recurrence, liability does not attach. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).

Applying these standards, no reasonable jury could find that Plaintiff experienced a racially hostile work environment. As an initial matter, the vast majority of the incidents Plaintiff cites concern criticism of, and protest against, the content of his April 2019 Article—an article Plaintiff expected backlash on because it was "radical." (Dkt. 113 ¶ 18.) Plaintiff's cited incidents include, for example, the Faculty Council resolution, the Ghanem email, campus protests, improper student conduct, and his colleague's email. (Dkt. 119 at 11–14.) But disagreement with ideas, even harsh disagreement, is not harassment because of race within the meaning of Section 1981. *St. Francis Coll.*, 481 U.S. at 613. Plaintiff identifies no racial content in the resolution, which condemned his views while affirming academic freedom, and he offers no evidence that the protests, flyers, or Ghanem's email invoked racial

13

epithets or racially charged themes;[5] these incidents cannot support a hostile environment claim. *See Smith*, 936 F.3d at 561.

Only one of Plaintiff's cited incidents[6] identifies an employee of Defendant who made comments with arguable racial or national origin content. (Dkt. 113 ¶ 63.)[7] That incident is a single 2019 email by a coworker that stated Plaintiff came from a "sh\*\*-hole" country. (Dkt. 113 ¶¶ 37–38, 63.) But the record shows that the message was not sent to Plaintiff, he learned of it secondhand, and it was not repeated. (*Id.* ¶¶ 39, 41.) One secondhand remark of this type, without more, is neither severe nor pervasive. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271–72 (7th Cir. 2004) (courts should consider "whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them second-hand"); *see also Hrobowski*, 358 F.3d at 477–

---

[5] Plaintiff states that one student used a derogatory remark toward him during a protest, but Plaintiff had neither seen the student previously nor reported the incident to the University. (Dkt. 113 ¶ 58.)

[6] There was a second incident in 2015 during Plaintiff's battle for tenure, where a another colleague allegedly told Plaintiff that "the reason a lot of people in this department don't like you is that they perceive you as being an uppity black man." (Dkt. 80-5 at 35.) Plaintiff does not rely on this incident in opposing summary judgment. Even if he did, however, Plaintiff cannot show that this comment was so severe or pervasive such that it altered the terms or conditions of Plaintiff's employment. *Smith*, 936 F. 3d at 560–61. Indeed, Plaintiff became tenured soon after this remark. (Dkt. 80-5 at 35.) But because Plaintiff did not cite this incident, any such argument is waived. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) (undeveloped arguments are waived).

[7] Plaintiff cites one other incident, involving a purported employee of Defendant who allegedly used a racial epithet in class, but Plaintiff's assertions regarding race are directly contradicted by objective video evidence, and Plaintiff's emails reveal this person was actually a student. (Dkt. 129-1 ¶¶ 6–12); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (courts "should not adopt" a plaintiff's version of a story when it is "blatantly contradicted by the record."). But even if this student was an employee, Plaintiff admits that Defendant promptly removed the individual after Plaintiff reported the incident and that Plaintiff has since endured no similar incidents. (Dkt. 128 ¶ 13; Dkt. 113 ¶ 63); *see Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004) (employer not liable when it takes prompt and appropriate remedial action).

14

78. As the Seventh Circuit has repeatedly held, isolated or episodic comments do not meet the severe or pervasive requirement absent a constellation of additional facts that magnify their impact. *Smith*, 936 F.3d at 560–61.

Nor is there a triable basis for employer liability on this record. The cited email was written by a coworker, not a supervisor, so Plaintiff must show that Defendant knew or should have known of the conduct and failed to take reasonable corrective action. (Dkt. 113 ¶ 37–38); *see Vance*, 570 U.S. at 429–31. Plaintiff offers no evidence that he reported this email to an administrator with authority to act, or that the Defendant otherwise had actual or constructive notice before litigation. (Dkt. 119 at 13–14, 13 n.5) (arguing instead that Defendant could be held liable for "not discovering . . . the harassment" but not citing any evidence that Defendant was on constructive or actual notice regarding the email). By contrast, when Plaintiff did flag *specific* incidents or concerns about racial harassment or safety, the undisputed evidence shows that Defendant responded to those concerns and took measures to address them; such action forecloses a finding of negligence. (Dkt. 128 ¶ 13; Dkt. 113 ¶¶ 59, 60, 63); *see Wyninger*, 361 F.3d at 978.

Ultimately, because the evidence, viewed in Plaintiff's favor, shows at most isolated, secondhand, and nonrecurrent remarks, coupled with nonracial disagreement about the content of his writings, and because there is no basis for imputing coworker conduct to the University, no reasonable jury could find race-based harassment that was severe or pervasive with employer liability under

15

Section 1981. Summary judgment is therefore granted for the Defendant on the hostile work environment theory in Counts I and II.

### C.   Retaliation (Title VII (Count IV) and Section 1981 (Count II))

Plaintiff also alleges retaliation under Title VII and Section 1981. (Dkt. 1 ¶¶ 52–57, 71–74.) Title VII makes it unlawful to retaliate against an employee because the employee has opposed discrimination or participated in a proceeding under the statute. 42 U.S.C. § 2000e-(3)a. Section 1981 likewise encompasses retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452–57 (2008). To avoid summary judgment, Plaintiff must present evidence that he engaged in protected activity, that he suffered a materially adverse action, and that the adverse action was caused by the protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352–62 (2013); *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). The materially adverse standard in retaliation is broader than the adverse employment action standard in discrimination and reaches actions that might dissuade a reasonable worker from making or supporting a charge. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Causation requires but-for proof. *Nassar*, 570 U.S. at 362.

Plaintiff argues he engaged in three protected activities: (1) "advocating for Jewish or black people"; (2) sending an email to Defendant on April 26, 2019 complaining of harassment and discrimination; and (3) filing an EEOC charge and state court lawsuit.[8] (Dkt. 119 at 14–15.) These actions (with the exception of

---

[8] Although Plaintiff raised the 2020 EEOC charge and state court lawsuit as protected activities in his complaint, Plaintiff failed to discuss either activity in his responsive briefing.

16

"advocating for Jewish or black people") constitute protected activity. *Compare Miller*, 20 F.4th at 1155, *with Franzone v. Bd. of Educ. Maercker Sch. Dist. No. 60*, No. 24 CV 6285, 2025 WL 446261, *6–7 (N.D. Ill. Feb. 10, 2025) (mere advocacy on behalf of a protected class is not a protected activity). The dispute therefore centers on whether Plaintiff suffered a materially adverse action and whether any such action was caused by the protected activity.

Plaintiff identifies the same "earlier . . . adverse employment action[s]" in support of his retaliation claims. (Dkt. 119 at 15.) But for the same reasons stated earlier in this Opinion, none of the cited incidents constitute adverse employment actions that changed the terms or conditions of employment. *See supra* Section III.A. Moreover, none of the purported adverse employment actions would dissuade a reasonable worker from engaging in any of the cited protected activities on this record. *See id.*; *Burlington Northern*, 548 U.S. at 68 (a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," that "it is important to separate significant from trivial harms," and "that the provision's standard for judging harm must be objective"); *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016).

---

*See generally* (Dkt. 119.) Plaintiff's arguments that either of those steps constitutes a protected activity are therefore waived. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). Even if not waived, the vast majority of the asserted "adverse employment action[s]" preceded the April 2020 protected activity and therefore cannot serve as retaliatory acts. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020). The remaining allegedly retaliatory acts fail for the same reasons as those relating to Plaintiff's April 26, 2019 email.

For starters, the negative performance review cannot constitute an adverse action, especially where, as here, the review occurred over two years after the protected activity and the Plaintiff continued to receive raises afterward. *See* (Dkt. 113 ¶¶ 42–45);[9] *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1109 (7th Cir. 2012) ("[I]t is not clear whether a negative performance review, standing alone, can ever constitute a materially adverse employment action in the retaliation context."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (to survive summary judgment on merely suspicious timing, there must be "no more than a few days . . . between the protected activity and the adverse action").

Moreover, the Ghanem email and the Faculty Council resolution did not result in any "significant harm" to Plaintiff that would dissuade a reasonable worker from reporting a charge of discrimination. *Ismail v. DeJoy*, No. 23 C 851, 2025 WL 371781, at *6 (N.D. Ill. Feb. 3, 2025) (quoting *Muldrow*, 601 U.S. at 357) ("A retaliation claim, unlike a discrimination claim under Title VII, requires showing that 'the retaliatory action is "materially adverse," meaning that it causes "significant" harm.'"). At worst, the Faculty Council resolution and the Ghanem email scolded Plaintiff for his Article, akin to a negative performance review, but with no actual consequences from any decisionmaker. *Cf. Brown*, 700 F.3d at 1109 (there is no adverse action, let alone a "materially" adverse action, when there are no actual consequences from negative comments).

---

[9] Defendant has proffered legitimate nonretaliatory reasons for the evaluation, including student complaints, and Plaintiff presents no evidence that these reasons are pretextual. *See* (Dkt. 113 ¶¶ 42–45); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224–25 (7th Cir. 2017).

Plaintiff also admits that the coworker email "on its own may not make for an adverse employment action." (Dkt. 112 at 4–5.) Nor could it, as Plaintiff has produced no evidence that the coworker was a person with decisionmaking authority or even knew about Plaintiff's protected activities. *See Brown,* 700 F.3d at 1108 (affirming dismissal of retaliation claims when plaintiff produced no evidence that a decision maker knew of the protected activities).

Plaintiff's failure-to-investigate argument also fails. Mere failure to investigate does not rise to the level of an adverse employment action, especially when the retaliation claim is premised on the employer's failure to investigate the same complaint alleged as the protected activity. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[I]n a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint.").[10] Even if Plaintiff was correct about the applicable law, the undisputed evidence reveals that Defendant provided Plaintiff campus security escorts for three weeks, Plaintiff was satisfied with the response from campus security, and Defendant granted Plaintiff's requests for class relocation and remote teaching. (Dkt. 128 ¶¶ 33–34; Dkt. 113 ¶¶ 57, 59–60.) These facts cannot be

---

[10] Although the Seventh Circuit has not ruled on this precise issue, district courts in this Circuit have held, as have other circuits, that retaliation claims for failure to investigate cannot be premised on the complaint that is alleged as the protected activity. *See, e.g., Lopez v. Vill. Disc. Outlet Inc.*, No. 23 C 16201, 2024 WL 3688709, at *4 n.5 (N.D. Ill. Aug. 6, 2024) (citing *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir. 2012); *Fincher*, 604 F.3d at 721); *Rosa v. Bd. of Trs.*, No. 18-CV-8477, 2020 WL 7319574, at *11 (N.D. Ill. Dec. 11, 2020) (failure to take remedial measures or perform adequate investigation did not amount to adverse action for retaliation claim).

squared with Plaintiff's conclusory arguments that Defendant caused Plaintiff significant harm by failing to investigate student protests. (Dkt. 119 at 5–6.)

Finally, even if any of the purported adverse actions would dissuade a reasonable worker, Plaintiff lacks any affirmative evidence of retaliatory motive. *See Brown,* 700 F.3d at 1108–09 (affirming summary judgment against retaliation claims when the plaintiffs failed to "produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have") (emphasis in original). Beyond pure speculation, Plaintiff relies on suspicious timing. (Dkt. 119 at 9–10.) At best, some of Plaintiff's purported adverse actions, such as the Faculty Council resolution, the coworker email, the Ghanem email, and the failure to investigate student protests, occurred temporally close to the April 26, 2019 complaint. (Dkt. 114 ¶¶ 18, 20, 29; Dkt. 119 at 14–15.) But suspicious timing will "rarely be sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer,* 679 F.3d 957, 966 (7th Cir. 2012) (quotations removed).

Plaintiff cites no evidence in the record that his colleague who sent the email about "sh\*\*-hole countries" or the individuals who proposed the Faculty Council resolution had knowledge of his April 26, 2019 harassment and discrimination complaint. *Cf. Brown,* 700 F.3d at 1108–09; *Kidwell*, 679 F.3d at 966 ("[P]laintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct."). Regarding the Ghanem email and failure to investigate, Plaintiff cannot show that either was motivated by his protected activity rather than by his "own aberrant actions or other intervening circumstances [that] led to the negative

20

responses that he incurred." *Kidwell*, 679 F.3d at 967. Indeed, the Ghanem email responded to the substance of Plaintiff's Article—expressing sadness "that Dr. Hill used his right to academic freedom to disparage one group over another"—that Plaintiff admitted was "radical" and that he was not surprised by backlash. (Dkt. 113 ¶¶ 18, 52.) And Plaintiff's argument that Defendant failed to properly investigate the student protests is undercut by Plaintiff's admissions that he failed to properly lodge a formal complaint (as required by University policies to trigger an investigation). (Dkt. 119 at 5–6; Dkt. 114 ¶¶ 4–8.)

Plaintiff has not identified a materially adverse action tied to his protected activity and has not produced evidence that would allow a reasonable jury to find a retaliatory motive. Accordingly, the retaliation claims under Title VII and Section 1981 fail as a matter of law. Summary judgment is therefore granted to Defendant on Count IV and on the retaliation component of Count II.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

SO ORDERED in No. 22-cv-06990.

Date: March 26, 2026

JOHN F. KNESS
United States District Judge

21